**UNITED STATES COURT OF APPEALS**

**FOR THE THIRD CIRCUIT**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Appellee in Consolidated Appeal | Docket No. 15-2811 |
| 15-2811, 15-2826, 15-2844 & 15- | |
| 2925 | |
| - vs - | |
| | |
| NICODEMO S. SCARFO, | **MOTION FOR LIMITED REMAND TO THE DISTRICT COURT TO CORRECT THE RECORD ON APPEAL, MOTION TO COMPEL PRODUCTION OF JUROR INFORMATION AND SEALED DOCUMENTS, AND MOTION TO STAY THE BRIEFING SCHEDULE** |
| Appellant in Consolidated | |
| Appeal | |

**TO: PATRICIA S. DODSZUWEIT, CLERK**     NORMAN J. GROSS, ESQ.
    United States Court of Appeals     United States Attorney's Office
    for the Third Circuit             Camden Federal Building &
    21400 U.S. Courthouse,             US Courthouse
    Independence Mall West             4th Floor
    601 Market Street, Room 21400     401 Market Street
    Philadelphia, PA 19106-1790       Camden, New Jersey 08101

**PLEASE TAKE NOTICE** that appellant Nicodemo Scarfo,

through his attorneys Michael E. Riley, Law Offices of

Riley and Riley, P.C., hereby moves, pursuant to Federal

Rule of Appellate Procedure 10(e), before the Honorable

Judges of the United States Court of Appeals for the Third

Circuit, for an Order permitting Appellant to stay the

current briefing schedule for and remand the matter to the District Court for the correction and reconstruction of the record, as well as an order compelling the production of sealed documents and assigned juror numbers.  In support of this motion, Appellant states as follows:

PRELIMINARY STATEMENT

Movant, Nicodemo S. Scarfo, seeks this Court of Appeal's intervention to remand for an evidentiary hearing to correct the District Court's material misstatements pursuant to Rule 10(e)(2)(C) and to compel production of juror information and sealed documents pursuant to Rule 10(e)(3), as a result of the District Court's abuse of discretion (1) when the District Court made unsolicited material misstatements in contradiction to counsels' recollection and the record, (2) by denying Appellant access to assigned juror number information, and (3) by denying access to sealed pretrial motions joined by Appellant, thereby precluding reference or use by Appellant in arguments before this Honorable Court.

Appellant seeks this Honorable Court's assistance in correcting the District Court's material misstatement, an order granting Appellant's motion seeking remand and reassignment, as well as an order granting Appellant's

motion to compel the District Court's production of assigned juror number information and access to sealed documents joined by Appellant prior to trial.

The District Court's misstatement amounted to an attempt to materially alter what occurred during the course of trial, was unsolicited, and qualified as an abuse of discretion. Likewise, denial of Appellant's request seeking access to assigned juror numbers and sealed documents, forecloses on Appellant's ability to present and support various arguments on appeal, in violation of the protections guaranteed under due process. The District Court abused its discretion by filing its wholesale denial of Appellant's requests.

Accordingly, this Honorable Court should grant Appellant's motions for correction of the District Court's material misstatements, limited remand pursuant to Federal Rule of Appellate Procedure 10(e), reassignment of the case to a conflict-free District judge due to the underlying matters set forth herein and compel production of assigned juror numbers and access to sealed filings joined to allow proper review by the Court on appeal.

FACTUAL AND PROCEDURAL HISTORY

On or about October 26, 2011, the Grand Jury, in and for the District of New Jersey, sitting in Camden, charged Appellant with the following offenses: RICO Conspiracy, 18 U.S.C. § 1962(d) (Count 1); Securities Fraud Conspiracy, 18 U.S.C. § 371 (Count 2); Wire Fraud Conspiracy, 18 U.S.C. § 1349 (Count 3); Wire Fraud, 18 U.S.C. § 1343 (Consulting and Legal Services Payments) (Counts 4 to 16); Wire Fraud - 18 U.S.C. § 1343 (Acquisition Payments) (Counts 17 to 19); Conspiracy to Commit Money Laundering, 18 U.S.C. § 1956(h) (Count 20); Conspiracy to Commit Bank Fraud, 18 U.S.C. § 1349 (Count 21); Conspiracy to Make False Statements in Connection with Loan Application, 18 U.S.C. § 371 (Count 22); Conspiracy to Obstruct Justice, 18 U.S.C. § 1512(k) (Count 23); Conspiracy to Sell or Transfer Firearm and Ammunition to a Prohibited Person, or Possess a Firearm by a Convicted Felon 18 U.S.C. § 371 (Count 24); Felon in Possession of a Firearm 18 U.S.C. § 922(g)(1) (Count 25). Juror selection and trial occurred over the course of seven (7) months.

The present matter has been complicated as a result of the complex allegations set forth within the Indictment, the sheer magnitude of the discovery, the multitude of filings by the parties, and a lengthy trial. The sheer

magnitude of discovery in *United States v. Scarfo, et al*. totaled an estimated 406.2 million pages, qualifying the present case as "the largest discovery, single quantity discovery of any case in the history of the State of New Jersey." Tr. 9/13/12, 42.[1]

Likewise, the trial proved equally as lengthy and complicated, beginning in early January of 2014 and concluding many months later in July of 2014.[2] At the conclusion of the trial 1,908 exhibits were submitted to the jury for consideration during deliberations. The jury deliberated for ten (10) days and returned a verdict on the 11th day, finding Appellants guilty of all counts on July 3, 2014.

Of the seven (7) defendants that decided to go to trial, the jury convicted Appellant Scarfo, Appellant Pelullo, Appellant William Maxwell and Appellant John Maxwell of on all charges, while the remaining three (3) Defendants: Donald Manno (Appellant's former attorney), Gary McCarthy, and David Adler were acquitted on all charges. On July 28, 2015, the Honorable Robert B. Kugler

---

[1] In accordance with the 600GB of data estimated by Mr. Cinquanto of Cornerstone Discovery (See ECF 801-1, 3), the estimate would be well over 400 million pages of produced Rule 16 documents. These figures are consistent with the production in the investigation of Enron in *United States v. Skilling. See Skilling,* 554 F.3d 529, 576 (5th Cir 2009).

[2] Jury selection occurred from October through November of 2013, and then the Court recessed proceedings until January of 2014.

sentenced Appellant to 30 years in prison. Appellant has filed a timely appeal, which is currently pending in this Court.

During the pendency of this appeal, Appellant has learned of a number of discrepancies within the record that must be corrected prior to submitting Appellant's brief in support of his appeal.

Once the District Court imposed its sentence with regard to Appellant, counsel vigorously pursued a complete transcript and other items of record. Appellant's counsel requested a complete transcript of all proceedings held before the District Court and pursued same with tenacity.

On or about July 29, 2015, Appellant timely filed his notice of appeal. On or about August 12, 2015, counsel submitted its initial "Transcript Purchase Order for the Third Circuit Court of Appeals" seeking "a transcript of the proceedings heard on the date listed below from November 1, 2011 to July 30, 2015." The District Court's transition from traditional CJA24 forms to transcript requests by way of the new eVoucher system complicated and delayed Appellant's counsel's request by many months. *See* Appellant's Motion for Leave Seeking Correction and Reconstruction of the Record Pursuant to Fed. R. App. P. 10, ECF 1545, 2/14/19.

Once properly submitted through the District Court's eVoucher system, the District Court asked Appellant to explain and clarify why the requested transcripts would be useful in his appeals prior to authorizing Appellant's request for transcripts. Appellant's counsel laid out the arguments that Appellant intended to pursue for each and every one of the requested transcripts, as basis for why each were necessary for the sake of appeal. Appellant's counsel provided these arguments to both the government and the District Court. The District Court approved this final request for transcripts on or about November 9, 2016. In February 2017, the last of the transcripts were finally transmitted to counsel.

After receipt of the final transcript, Appellant's counsel reviewed the record. As a result of that review, a number of errors and omissions were identified within the record. On or about May 2, 2017, Appellant filed a letter addressed to the Clerk of Courts seeking:

- The District Court's Trial Exhibit Log with Corresponding Admission Dates;
- "Juror Numbers," including each corresponding (a) six (6) digit jury pool number, (b) voir dire line-up number, as well as (c) corresponding final juror "seat" number;
- The Court's letter that accompanied the juror summons;
- A list of sealed filings, including but not limited to filed documents, exhibits, and transcripts;

- A complete docket with sealed filings;
- Any and all sealed filings related to filings involving "extortion;"
- Any and all sealed filings related to "anonymous jury" matters; and
- Any and all sealed filings related to Doc. 845 Motion to Compel as to David Adler (January 2014) and all associated filings.

Defense counsel's requests went by and far unfulfilled.[3] ECF 1399, 5/2/17. Appellant argued that the aforementioned information was necessary to determine the accuracy and adequacy of the record. In a phone call with the Clerk's office, counsel was advised that the juror information and the District Court's exhibit log had been destroyed. *See* ECF 1545, 2/14/19, 6.

Thereafter, Appellant sought the District Court's assistance to obtain and/or reconstruct the following items that remain at issue:

- The District Court's Exhibit Log
- Juror Information and Questionnaires
- All Sealed Filings Related to:
    - Extortion,
    - Anonymous Jury,
    - Title III,
    - ESI vs. Privilege,
    - Taint Team Issues, and
    - Any sealed filings pertaining to all defendants sentenced in this matter.
- Amendments and/or Omissions from the Record:
    - All defendants' and government's sentencing memoranda and associated filings

---

[3] Counsel was provided with a word document that constituted "The Court's letter that accompanied the juror summons."

o The index of files uploaded to Jurors' iPads.

On or about February 14, 2019, Appellant filed a motion seeking the assistance of the District Court, as well as, leave of the District Court's injunction[4] prohibiting the defendants from filing any and all future motions, so that Appellant may attempt to correct and amend the record pursuant to Fed. R. App. P. 10. *See* ECF 1545, 2/14/19.

In Appellant's motion, a number of discrepancies were identified. On or about April 23, 2019, the District Court held a status conference to hear the parties' basis for seeking correction and/or supplementation of the record. During the hearing, counsel on behalf of Appellant identified a number of documents, passages, and items missing that constitute the record.

Appellant specifically identified eight (8) critical audio exhibits that were played on the first day of testimony as a sample of exhibits that were never admitted into evidence by the government, yet were submitted to the jury during deliberations. During the hearing, the government conceded that it "neglected" to "formally move those exhibits into evidence." Tr. 4/23/19, 36-7. Despite this, the eight (8) audio exhibits were marked as admitted

---

[4] ECF 1274, 7/16/15.

on the government's exhibit list. *See* ECF 1545-6, 2/14/19, 20-21. The government's exhibit list was also submitted to the jury. *See* ECF 1545-6, 2/14/19.

During the hearing, the government scoffed "other than those eight exhibits, the defendants haven't pointed to anything else that any other exhibits offered by the government that weren't formally admitted into evidence," claiming that "if there are specific exhibits that they claim were improperly presented to the jury, they need to identify them with specificity, otherwise the procedures described under Federal Rule of Appellate Procedure 10 just can't take place." *See* Tr. 4/23/19, 36-37, attached hereto as Exhibit "A".

Appellant's counsel advised that there could be hundreds of "improperly presented" exhibits that were submitted to the jury, which served as the basis for seeking the District Court's exhibit log as well as a hearing to review the parties' notes and declarations as to the admission of exhibits during the course of trial. During the hearing, the District Court advised counsel on behalf of Appellant to account for the missing or erroneous parts of the record within one (1) week of the hearing for submission to the District Court. Tr. 4/23/19, 19.

The following day, on or about April 24, 2019, the District Court without notice, reversed its position and filed an order outright denying Appellant's motion(s). *See* ECF 1565, 4/24/19.  In the days following its order, the District Court filed a lengthy letter detailing a process that it claimed to have employed during the course of the trial with regard to the admission and eventual submission of exhibits to the jury. *See* ECF 1566, 4/29/19. The process detailed by the District Court is inconsistent with the recollection of the parties and the record.

At the following status hearing on or about May 13, 2019, given its prior order, the District Court did not address the previously raised concerns regarding various outstanding issues, namely the District Court's exhibit log, an accounting of "improperly presented" exhibits that had not been admitted into evidence yet submitted to the jury, sealed juror information, a sealed extortion motion filed by former counsel on behalf of Appellant missing from the docket, and the sentencing documents for the defendants, rather the District Court limited the hearing to the identification of the sealed filings on the docket.

At the May 13, 2019 hearing, the District Court promised to find and identify missing sealed ECF filings, and further promised that "if I find anything that might be

useful, I can release them.  I'll let you know what it is[,]" and instructed Appellant to "send a letter" specifying the sealed documents that were necessary for Appellant's appeal.  See Tr. 5/13/19, 3, 17, attached hereto as Exhibit "B."

Pursuant to the District Court's instruction, Appellant's counsel submitted a list of sealed documents that Appellant requires access to and are useful on appeal, by way of letter on or about November 5, 2019.  *See* ECF 1586, 11/5/19.

On or about November 20, 2019, the District Court conducted a hearing by way of phone.  During the District Court's short phone conference with counsel, the District Court criticized Appellant's delay in submitting its request and outright denied it in its entirety.

All of the aforementioned matters listed above all qualify as critical subject matter that Appellant intends to raise on appeal.  Accordingly, remand to resolve these issues remains the sole remedy to ensure meaningful review on appeal.

APPELLANT'S ENTITLEMENT TO RELIEF

I.   A LIMITED REMAND IS NECESSARY TO CORRECT THE RECORD PURSUANT TO FEDERAL RULE OF APPELLATE PROCEDURE 10(E)(2)(C) DUE TO THE DISTRICT COURT'S UNREASONABLE ABUSE OF DISCRETION BY MAKING UNSOLICITED MATERIAL MISSTATEMENTS CONCERNING THE PROCESS BY WHICH EXHIBITS WERE SUBMITTED TO THE JURY DURING DELIBERATION AND THAT THE DEFENSE COUNSEL INSPECTED AND "CONSENTED" TO ALL EXHIBITS THAT WENT TO THE JURY. THE DISTRICT COURT'S RECOLLECTION IS INCONSISTENT WITH THAT OF THE PARTIES AND THE RECORD.

At the outset, Appellant does not seek to expand the record by and through the Court's Inherent Equitable Authority. *See Lowry v. Barnhart*, 329 F3d 1019, 1024-25 (CA4 2002); *see also United States v Walker*, 2019 US App LEXIS 2194, *15-16 (CA10); *United States v. Barrow*, 118 F3d 482, 487-88 (CA6 1997). A limited remand is necessary in order to correct the District Court's unsolicited misstatement that expanded the record pursuant to Rule 10(e)(2)(C). Rule 10(e)(2)(C) states: "If anything material to either party is omitted or misstated in the record by error or accident, the omission or misstatement may be corrected and a supplemental record may be certified and forwarded... by the court of appeals". *Id.*

> As a threshold matter, the Court must reject Hatco's argument that Rule 10(e) is not applicable in the instant case. The district court may supplement the record on appeal in two instances under Rule 10(e): (1) 'any difference arises

as to whether the record truly
discloses what occurred in the district
court,' and (2) when 'anything material
to either party is omitted from the
record by error or accident <u>or is
misstated</u> therein.' Rule 10(e) provides
a mechanism for ensuring that the
record reflects <u>accurately</u> what
transpired in the district court. <u>it
does not authorize a district court 'to
add to the record on appeal matters
that did not occur there in the course
of proceedings</u>..." [emphasis added]
(quoting *Fassett v. Delta Kappa
Epsilon*, 807 F.2d 1150, 1165 (3d Cir.
1986); *see also United States v.
Elizalde-Adame*, 262 F3d 637, 640-41 (7th
Cir. 2001) "The purpose of Rule 10(e)
is to ensure that the record on appeal
<u>accurately</u> reflects the proceedings in
the trial." [emphasis added]; *See also
United States v. Franklin*, 250 F3d 653,
663 (8th Cir. 2001).

*Hatco Corp. v W.R. Grace & Co.*, 859 F. Supp 769, 772
(DNJ 1994)

"When a dispute concerning whether the record truly
discloses what occurred in the district court has been
submitted to the district court, the court's determination
is conclusive absent a showing of intentional falsification
or plain unreasonableness." *United States v. Serrano*, 870
F.2d 1, 12 (1st Cir. 1989) (internal citations and
quotation marks omitted); *see also Brika*, 416 F.3d at 529."
*United States v. Pagán-Ferrer*, 736 F.3d 573, 582 (1st Cir.
2013).

The District Court's letter dated April 29, 2019, (1)
contained misstatements, (2) those statements are material

and in contradiction to what actually occurred during the course of trial, and (3) the aforementioned misstatements within the District Court's letter were unreasonable and an abuse of discretion. Appellant therefore submits this motion seeking limited remand to review and correct the record pursuant to Rule 10(e)(2)(C), prior to Appellant submitting his brief in support of appeal to ensure a fair, accurate, and complete record for the sake of the Appellate Court's review of facts at issue.

The present motion hinges on the District Court's statements at a hearing on April 23, 2019 and within a letter filed in response to the aforementioned hearing by the District Court on or about April 29, 2019, that set forth a statement of events that the District Court claimed had occurred during trial. Specifically the District Court's letter claimed that the defense consented to the submission of all exhibits submitted to the jury for deliberations. The District Court's letter was filed after a hearing held on April 23, 2019, which addressed Appellant's motion seeking leave to file a motion pursuant to Rule 10 that sought reconstruction of material destroyed

by the District Court and to correct certain errors.[5]  At no
time did Appellant's motion address discrepancies
concerning the methodology or process in which exhibits
were submitted to the jury or whose duty it was to verify
exhibits prior to submission to the jury.  The District
Court's letter amounted to a sua sponte recitation of
events that proved inconsistent with the trial record.  The
District Court's letter stated that the defense reviewed
the exhibits on four (4) separate occasions: (1) during the
government's proffer of each exhibit; (2) Almost daily
meetings with all parties, including the defense's court
appointed technology expert, Cornerstone Discovery, to
verify what was admitted by comparing notes; (3) weekly
meetings with defense counsel and the government, to ensure
that only admitted exhibits were uploaded; and (4) at the
conclusion of the trial, the Court required all counsel to
review all exhibits that were uploaded by the District
Court and agreed upon what the jury would receive during
deliberations.  The District Court further stated that the
defense consented to all exhibits to that were submitted to
the jury for deliberations.  The aforementioned statements
were not requested to be addressed, resolved, or prompted

---

[5] *See* ECF 1275, 7/17/15. ("IT IS HEREBY FURTHER ORDERED that
no further motions shall be filed in this case, and any
such motions filed will be disregarded by the Court.)

by Appellant's motion, yet the District Court, on its own accord, addressed these matters within its letter.

Further, these misstatements were not cited or supported by any reference within the record. *See* Tr. 4/23/19, 3 and 25-31; ECF 1566, 4/29/19. The two (2) primary misstatements that Appellant intends to correct are (1) that counsel was responsible for every other party's exhibits, including the government, and (2) the fact that at the close of the case that defense, by way of its representative, Mark Catanzaro, inspected and "consented" to all of the exhibits that went to the jury for deliberations. Within the District Court's letter on April 29, 2019 and at the hearing on April 23, 2019, the District Court made a number of conclusions of law by commenting on the jury's use of extraneous information, which is prohibited under Rule 10(e). *See* ECF 1566, 4/29/19; *see also United States v. Guibilo*, 2009 US Dist LEXIS 37666, *7 (DNJ)) "[T]his Court is not empowered under Rule 10(e) to make legal conclusions of perjury or evidentiary violations." The defense never sought expansion or recreation of the record with regard to whether or how extraneous information reached the jury room nor which exhibits were or were not properly admitted into evidence. Rather, Appellant only asked for the court to reconstruct

its official exhibit list.

During the hearing on April 23, 2019, Appellant's counsel was surprised that the District Court sought to define the duties of the parties to review and confirm the admission of over 1,900 exhibits submitted to the jury for deliberations. Appellant's counsel attempted to rebut the District Court's misstatements of fact, by citing to the record occasions when the District Court instructed the parties to review and account for each parties' <u>own</u> exhibits. [emphasis added]. Tr. 4/23/19, 29.

Counsel remains firm with regard to its position that the defense never consented to submission of any exhibits that were not admitted into evidence to the jury for consideration during deliberations. During the course of trial, the District Court indicated that it was incumbent upon each party to ensure that their own properly admitted exhibits were submitted to the jury, meaning that the defense was only responsible for ensuring the accuracy and submission of their own exhibits and that in turn, the government was responsible for managing its own exhibits and ensuring that only properly admitted exhibits were submitted to the jury. *See* Tr. 2/19/14, 159-61, Tr. 4/16/14, 180-81.

Despite this disagreement with the procedure

concerning exhibit submission to the jury, what remains odd is that the District Court stated on the record that the defense consented to the submission of the government's exhibits to the jury, yet does not make this assertion within the letter filed on April 29, 2019, and there is no citation or reference to the record supporting the District Court's statement regarding the defense's consent. Tr. 4/23/19, 3.

Appellant filed its motion for leave seeking correction and reconstruction of the record pursuant to Rule 10, and specifically sought to recreate the District Court's official exhibit list. This request required a showing of "colorable need." Although a "record of sufficient completeness" is assumed guaranteed to indigent, the courts recognize an incarcerated defendant's burden of showing his colorable need for a complete record for the sake of meaningful review on appeal. *Mayer v. Chicago*, 404 U.S. 189, 194 (1971). In *Mayer*, the Supreme Court "identified two factors that are relevant to the determination of [colorable] need" (1) the value of the transcript to the defendant in connection with the appeal or trial from which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript." *Britt v. North Carolina*, 404

U.S. 226, 227 (1971). The colorable need standard does not require the defendant to demonstrate a showing of need with any "particularity," rather the defendant need only show that a sufficiently complete record is necessary for review of the issues intended to be raised on appeal. Rule 10 "is typically invoked for creating a record for meaningful review on appeal." *Roberts v. Ferman*, 826 F.3d 117, 123 (3d Cir. 2016).

Within his motion, Appellant argued that defense can demonstrate its colorable need for a "record of sufficient completeness" for the sake of meaningful review by the Appellate Court, by identifying a sample of approximately eight (8) audio recordings that were played to the jury during the government's first witness's testimony, an agent of the Bureau of Prisons ("BOP"). Those eight (8) audio recordings subsequently went back with the jury during deliberations. However, review of the record revealed that those eight (8) recordings were never entered into evidence during trial. Appellant sought the District Court's exhibit list to identify and confirm the admission of the other exhibits, nearly two thousand (2,000) of them during the course of the lengthy trial.

At the subsequent hearing on April 23, 2019, the government conceded that the sample of eight (8) BOP audio

recordings provided within Appellant's brief were never admitted into evidence. Tr. 4/23/19, 36-7. This was the only reference or example Appellant provided with regard to the admission of exhibits, and the need to recreate and/or correct the record given inconsistencies. Appellant's request did not seeking the District Court's intervention or commentary regarding the admission or in this case, the government's failure to properly admit exhibits, it was simply to verify the dates of admission by and through the District Court's exhibit list. The Appellant's motion was certainly not an invitation or a request to the District Court to make impermissible conclusions of law. *See United States v. Guibilo*, No., 2009 U.S. Dist. LEXIS 37666, at *7 (D.N.J. Apr. 21, 2009) ("[T]his Court is not empowered under Rule 10(e) to make legal conclusions of perjury or evidentiary violations.").

Appellant further advised the District Court that the need to recreate the exhibit list was not only limited to the sample of eight (8) BOP audio exhibits, but that the defense had identified hundreds of unadmitted exhibits that may pose as problematic for review on appeal. Appellant's counsel offered to provide the District Court with a full list of the exhibits not admitted into evidence. The District Court accepted and ordered counsel to compile and

provide the list of missing exhibits within one (1) week of the hearing. However, in an abrupt turnabout, the District Court foreclosed on its prior order, and filed an order twenty-four (24) hours later outright denying Appellant's motion.[6] The District Court ruled that the parties should rely on the transcripts to show whether and where exhibits were admitted. Tr. 4/23/19, 3, 26; *see also* ECF 1566, 4/29/19, 2.

Appellant seeks a limited remand to conduct an evidentiary hearing so that the factual inconsistencies can be properly rebutted and developed given the aforementioned

---

[6] See list Appellant compiled in accordance with the District Court's initial order on April 23, 2019, consisting of the 286 exhibits that served as an extraneous influence on the jury during deliberations attached hereto as **Exhibit "C"**. Approximately 26% of the 1,138 exhibits that the government submitted to the jury should not have been considered during deliberations. Of these 286 exhibits, 277 were related to Title III or BOP recordings, 140 were audio sessions and 137 associated transcripts that were not properly admitted into evidence. See list of the 140 audio exhibits not admitted into evidence that were provided by the government to the jury for deliberations, attached hereto as **Exhibit "D."** The remaining 9 exhibits were other types of evidence that were also not properly admitted into evidence. Of the 1,138 government exhibits submitted to the jury, 850 were properly admitted, submitted to the jury, and listed appropriate admission dates. The remaining 286 exhibits mentioned above were listed on the Government Admitted Exhibit List with dates of admission that are inconsistent with the record, since they were never admitted into evidence. This Government Admitted Exhibit List was provided to the jury, and listed the 286 exhibits with inaccurate dates of admission. *See* ECF 1545-6, 2/14/19.

factual and legal misstatements within the record. *United States v. Brown*, 441 F3d 1330, 1373-74 (11th Cir. 2006). The District Court's material misstatements will have a direct impact on the issues Appellant intends to raise on appeal, namely jury coercion. The list compiled by Appellant, but never considered by the District Court consists of 286 government exhibits that were never properly admitted into evidence at the time of trial. These 286 exhibits that were never admitted into evidence, were submitted to the jury and therefore served as extraneous information improperly considered by the jury during deliberations.[7]

Furthermore, the government committed misconduct when after inadvertently failing to admit these exhibits, they still knowingly submitted them to the jury for review during deliberations. This is evidenced in their "Government's Admitted Exhibit" list, which was also submitted to the jury. This document titled "Government's Admitted Exhibits" list includes the dates of admission for over 1,100 exhibits. *See* ECF 1545-6, 2/14/19. By adding dates of admission to exhibits that were never admitted, the government perpetrated a falsehood on the District Court, the defense, and the jury.

---

[7] *See supra* fn.6.

Accordingly, a limited remand to conduct an evidentiary hearing to correct and amend the record is the sole remedy to ensure an accurate and thorough review of the record by the Appellate Court.

II. A LIMITED REMAND TO CONDUCT AN EVIDENTIARY HEARING REQUIRES "LIMITED" REASSIGNMENT, AS IT IS THE ONLY WAY THAT THE AFOREMENTIONED MATTERS CAN BE FAIRLY ADDRESSED AND DISCREPANCIES SETTLED BETWEEN APPELLANTS AND THE DISTRICT COURT.

The only way to accomplish a fruitful and fair review of the aforementioned inconsistencies in the record requires reassignment of the District Court judge to conduct an evidentiary hearing on remand. The basis for such a request is due to the subject matter set forth herein, namely the review of the District Court and its staff's conduct during the course of trial. Reassignment of the District Court judge for the purpose of conducting an evidentiary hearing is necessary in order to avoid an obvious conflict. The District Court's material misstatements of the facts that occurred at trial requires a fair and objective judge, particularly given the sensitive nature of the issues surrounding the obligations of the District Court and its staff to preserve, account, and review the exhibits prior to submitting them to the jury for consideration during deliberations. *See United*

*States v. Lentz*, 383 F3d 191, 221 (4th Cir. 2004).

Similar to the matters at hand in the present case, the *Lentz* court determined that reassignment in the appearance of fairness outweighed "any waste of duplication." *United States v. Lentz*, 383 F3d 191, 222 (4th Cir. 2004). The *Lentz* court specifically considered three factors when determining reassignment on remand:

> "(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness."

*Lentz*, 383 F3d at 222.

The *Lentz* court reassigned the case on remand after the District Court "extensively criticized" the government after it moved for recusal "from holding the hearing into how extraneous evidence found its way into the jury room because it would necessarily require the judge to weigh the credibility of the [parties] against his long-time court personnel." *Id.* The *Lentz* court indicated that although it did not "imply personal criticism" of the District Court, that there was "concern[]" and ruled that "although the

25

district judge is very familiar with the case and has already ruled upon various issues, the grant of a new trial wipes the slate clean. We do not believe that any waste or duplication would be out of proportion to the appearance of fairness a reassignment will preserve." *Id.*

In accordance with *Lentz,* the present case should be reassigned given that the District Court (1) would reasonably be expected upon remand to have substantial difficulty in putting out of its mind previously expressed views or findings determined to be erroneous, (2) reassignment is advisable to preserve the appearance of justice, and (3) reassignment with regard to this matter would not entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

Reassignment is also appropriate in circumstances where the parties are in disagreement of what actually transpired during the course of trial. In *Bergerco USA,* the court reversed due to a lack of record on appeal, and warned of blindly adopting the District Court's "version" of what occurred during the course of trial, due to the District Court's natural tendency to adopt and ratify its previous rulings. The *Bergerco* court noted that the District Court's recollection is not always "more reliable" than that of Appellant's. *Bergerco USA v. Shipping Corp. of*

*India Ltd., 896 F2d 1210, 1214-15 (9th Cir. 1989). Bergerco* also considered the "long period of time [that] has passed between the trial and the Rule 10(c) proceeding." *Bergerco USA,* 896 F.2d at 1214-15.

> " If an appellant is to be barred from challenging a statement of the evidence approved through a Rule 10(c) proceeding, the district court's version of the evidence at trial will always prevail. However, the judge's recollection of what transpired is not necessarily more reliable than that of the parties, especially if a long period of time has passed between the trial and the Rule 10(c) proceeding. Moreover, one the court has entered judgment, it may become subject to the very natural weight of its conviction, tending to focus on that which supports its holding. To prohibit all challenges to a Rule 10(c) settlement of the evidence would effectively insulate the court's factual findings, to the exclusion of other recollections, from review whenever a transcript is lost or inadvertently destroyed. Rule 10(c) was intended to produce objective reconstruction. That desirable result is not comfortably furthered by insulating the court's personal recollections from challenge on appeal." *See also United States v. Caramadre*, 807 F3d 359, 376 (1st Cir. 2015) ("The core propose of Rule 10(c) would be frustrated if a district court's version of events was inoculated against judicial review."). *Id.*

We now find ourselves in a circumstance that the *Bergerco* court warned of: the "insulation [of] the court's

personal recollections from challenge on appeal" by blindly adopting the District Court's version of events, a version that is unsupported by the record, and is in contradiction to the recollections of the parties. The District Court's misstatements at the hearing held on April 23, 2019, and within its letter filed on April 29, 2019, set forth processes and procedures that are inconsistent with what actually occurred over the course of many months of trial - six (6) years ago. *See* Tr. 4/23/19, 3, 25-31; *see also* ECF 1566, 4/29/19. The District Court's unsolicited post-trial version of events seems to fit in to the court's natural inclination "to focus on that which supports its [prior] holding[s]." *Lentz*, 383 F3d at 222. Particularly given that the District Court, "would necessarily require the judge to weigh the credibility of the [parties] against his long-time court personnel," since "Ms. Arthur, the courtroom deputy [] controlled the uploading" of the exhibits to the jurors' iPads. ECF 1566, 4/29/19, 2.[8] The

---

[8] The term "uploading" is the digital equivalent of the clerk's accounting and submission of physical exhibits to the jury for deliberations. The term can be likened to the process in which the clerk physically collects and accounts for the trial exhibits, places them onto a cart, which is wheeled to the jury room for consideration during deliberations. *See* Tr. 5/28/14, 166; Tr. 6/3/14, 69-70. The exhibits were provided to the deputy court clerk digitally by the parties, the deputy court clerk would then upload the exhibits to the District Court's server, and

District Court provided a number of excuses on behalf of its deputy court clerk, citing that she wasn't always present in the courtroom when exhibits were entered into evidence and "she might only learn of exhibits when she returned to the courtroom." *See* ECF 1566, 4/29/19, 2.  The aforementioned facts suggest a deep seeded conflict of interest between the parties and the District Court. Reassignment is necessitated on the need to comply with "the appearance of fairness a reassignment will preserve," and doing so would not lead to "any waste or duplication." *Lentz*, 383 F3d at 222.

Given the parties' inconsistent recollection of the events of trial, the "long period of time [that] has passed between the trial and the Rule 10[] proceeding[,]" and the need for fair and accurate "judicial review" on appeal of the District Court's rulings during the course of trial, requires reassignment to ensure fair and conflict-free consideration of the facts at issue.

III. IN ACCORDANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 10(E)(3), THE HONORABLE COURT SHOULD GRANT APPELLANT'S MOTION TO COMPEL THE DISTRICT COURT TO PRODUCE THE ASSIGNED JURY NUMBERS AS DESCRIBED BY THE DISTRICT COURT ON 11/6/13, 203-204 IN ORDER TO ALLOW APPELLANT TO ASSOCIATE THOSE SITTING ON THE

---

then the exhibits were loaded onto iPads that were provided to the jurors.  The iPads were then used by the jurors to view and consider the exhibits during deliberations.

PETITE JURY WITH THEIR RESPECTIVE VOIR DIRE DURING THE JURY SELECTION PROCESS.

Appellant seeks this Honorable Court's assistance to gain access to assigned juror numbers to allow Appellant to reference and identify each anonymous juror within the record during the jury selection process.  The District Court's denial of Appellant's motion seeking production of assigned juror numbers pursuant to Federal Rule of Appellate Procedure 10(e) was an abuse of discretion. See United States v. Pagan-Ferrer, 736 F.3d 573, 582 (1st Cir. 2013) ("We review the district court's denial of a Rule 10(e) motion for abuse of discretion... When a dispute concerning whether the record truly discloses what occurred in the district court has been submitted to the district court, the court's determination is conclusive absent a showing of intentional falsification or plain unreasonableness."); see also United States v. Caramadre, 807 F.3d 359, 376 (1st Cir. 2015); United States v. Franklin, 250 F.3d 653, 663 (8th Cir. 2001).  It was unreasonable for the District Court to deny Appellant the Assigned Jury Numbers that will allow Appellant to connect the sitting juror to their respective voir dire.

The District Court unreasonably denied Appellant its list of assigned juror numbers, despite the District

Court's finding that Appellant demonstrated colorable need for the jury selection record. Appellant sought the jury selection transcripts post-trial for the sake of arguments that Appellant intended to raise on appeal. The District Court required Appellant to provide a basis detailing his need for all notes of testimony from the voir dire proceedings. Appellant complied. Satisfied, the District Court provided the aforementioned transcripts but did not provide the associated list of assigned juror numbers, which is the only way to identify the testimony of each prospective juror that was ultimately selected to sit on the jury.

To be clear, Appellant is not seeking the personal information or any information whatsoever that would reveal the identity of the jurors. Appellant is simply asking the District Court to provide the underlying juror selection numbers for each seated juror so that Appellant can match voir dire questions and answers to each seated juror. Without this information, it will be impossible for Appellant to determine which juror answered particular questions over the course of a lengthy, albeit complicated juror selection process that occurred over many days of testimony.

Prior to trial, the District Court granted the

government's motion to empanel an anonymous jury on or about August 2, 2013. ECF 587, 8/3/13. The jury selection process occurred over the course of seventeen (17) days. The District Court sent out 1,500 jury notices and approximately 500 jurors were brought in for selection. See Tr. 10/30/13, 243. The defense made nine (9) formal requests to excuse jurors for cause out of approximately sixty (60) jurors, the District Court denied all nine (9) defense requests. The voir dire of these sixty (60) jurors accounted for 10 days of transcripts. The District Court designed a selection process that assigned several different identification numbers for each juror: first, each juror was assigned a "jury pool number;" should the juror move onto the next phase, the juror is then assigned a second number designated as a "voir dire phase lineup number;" should the juror proceed to the next phase of jury selection, they would then be assigned a third number known as a "preemptory challenge phase lineup number;" and should the juror proceed to the final phase, the juror would be assigned a "juror seat number." Tr. 11/6/13, 203-04.

The District Court employed a complicated process to ensure juror anonymity, as laid out by the District Court and the deputy court clerk:

THE COURT: All right. Now, you know

your list, your master list that we
have that we're working off of, that
has all the jurors' numbers on them.
Once we get all the qualified jurors
and we bring them back next week for
the preemptory challenges, this gets
reshuffled to new numbers. The question
is how are we going to be able to
easily keep track of number 67 or
number 92, because they're going to be
assigned new numbers.

THE DEPUTY COURT CLERK: Right. The list
that they have is going to be just like
the Judge's list in any jury process.
The number will be their actual juror
number.

THE COURT: So they're going to have to
take the juror number off this list to
match it up with our juror numbers that
we're using now. All right, see the 03
-- look at the first one, number two,
030087. Concentrate on that, that's the
number, that's the actual juror number.
The ones in the left column are just
for the purpose of the selection
process, they're going to change. All
right. So the person who is now number
two, the first person we see, will not
be the first person on the reshuffled
list. All right? Everybody understand
that? Are we ready? All right, let's
go. This will be 122.
Tr. 11/6/13, 203-04[9]

After the jury selection was complete, the District

Court asked all parties to destroy all of the jury

information, assuring the parties that the District Court

---

[9] The District Court later denied that multiple juror
identification numbers were utilized in the selection
process, further complicating the record and juror
selection process employed by the District Court. *See* Tr.
4/23/19, 39:21-41:17. *See also* ECF 1545, 18-19.

would keep copies of the juror information in the event of an appeal, as expressed by the District Court: "I think we certainly need to protect the anonymity of the jurors by destroying everything, except the originals which we keep locked in the clerks' safe pending any appeals in the case." Tr. 11/12/13, 33.

Subsequently, there were several separate jury matters that involved roughly half the sitting jury, including coercion, fear, misconduct and inappropriate deliberating. After the conclusion of the trial, the defense and the government submitted a joint transcript request seeking the notes of testimony for the jury selection dates. *See* ECF 1369, 7/26/16 "Final Joint Transcript Request." The District Court approved the request on November 9, 2016. The transcripts were completed and transmitted in February 2017, over two and a half years after Appellants' were sentenced. Once the parties received the transcripts, counsel realized that it was impossible to trace and connect the sitting jurors to the several obscure numbers assigned to each juror during the various phases of jury selection.

Consequently, Appellant alerted the District Court in its formal letter requesting production of the assigned juror numbers to identify each juror's testimony during the

selection process.  *See* ECF 1399, 5/2/17.  Upon receipt of the letter, the District Court's deputy clerk informed counsel that the jury information had been destroyed.  See ECF 1545, 2/14/19, 6.  This confused counsel, given the District Court's prior order requiring the parties to destroy juror information with the assurance that all juror information would be preserved by the District Court for the sake of appeals:  "I think we certainly need to protect the anonymity of the jurors by destroying everything, except the originals we keep locked in the Clerk's safe pending any appeals in the case."  Tr. 11/12/13, 33. Appellant relied on the District Court's promise to keep originals of all juror documents in the event of an appeal.

Appellant responded by filing its motion pursuant to Rule 10 seeking leave to reconstruct the record.  Within Appellant's motion the complex process employed by the District Court and its promises made were laid out.[10]  On or about April 23, 2019, the District Court indicated that the

---

[10]  The preservation of juror information, including "all records and paper compiled and maintained by the [] clerk…shall be preserved in the custody of the clerk for four years or such longer period as may be ordered by a court[.]" 28 U.S.C. § 1868.  Appellant submitted his request for juror information prior to expiration of the four (4) year period, despite the Court's indication that the materials would be preserved as part of the record for appeal.

deputy court clerk "got some bad information[]" regarding the destruction of the juror information and that the District Court personally "checked this morning. We have the originals." Tr. 4/23/19, 10-11. The District Court went on to say that there were no additional numbers assigned to the jurors outside of the "jury pool number." Tr. 4/23/19, 39, 41. However, the record reveals that a number of different juror identification numbers were utilized to ensure juror anonymity. *See* Tr. 11/6/13, 203-04.

When Appellant asked for access to these juror numbers, the District Court indicated that although the Clerk had located the juror information, that the District Court would <u>not</u> be providing them to Appellant to preserve the anonymity of the jurors' identities. Tr. 4/23/19, 39-41. The District Court thereafter filed an order denying Appellant's motion seeking access to the assigned juror numbers and juror questionnaires.

Appellant requires this information, particularly given the fact that a number of issues involving the jury, including misconduct and coercion will be raised on appeal by Appellants. For instance, the District Court made promises to the prospective jurors that the trial would conclude by April 2014 or before, a promise based upon the government's assertion that the trial would conclude after

a mere three (3) months.  See Tr. 10/10/13, 13, 14, 17, 22.
The District Court assured eight (8) groups of prospective
jurors, each group consisting of approximately sixty (60)
individuals, that the trial would be completed by April
2014, if not sooner.  See Tr. 10/28/13, 4, 24; Tr.
10/29/13, 5, 90; Tr. 10/30/13, 4-5, 9; Tr. 10/31/13, 5, 10.
A number of jurors expressed concern over "the length of
time" of the trial. *See* Tr. 11/4/13, 71-80.  During voir
dire, one particular juror expressed concern that their
vacation plans over Easter week (4/20/2014) would become a
conflict.  See Tr. 11/4/13, 75-76.  The District Court
assured the juror "as I told the jurors last week, it's
going to be we think four months, it could be less…I don't
think that would be a problem."  See Tr. 11/4/13, 75-76.
Appellant's counsel voiced concern with regard to the "the
prepaid vacation situation," citing it as the basis for
Appellant's application to disqualify the prospective
juror.  Tr. 11/4/13, 80.  The District Court assured
counsel "I don't think that's going to be a problem."  Tr.
11/4/13, 80.

Due to the District Court's use of various
identification numbers in the juror selection process,
Appellant remains unsure if the aforementioned juror, who
had a previously scheduled prepaid vacation, was seated on

the jury.   As April approached, it became clear that the government was not close to concluding their case in chief. Frustration amongst the jurors began to become evident as the trial stretched much longer than promised.   See Tr. 4/10/14, 201.

The government concluded its case in chief on or about April 22, 2014.   Everyday thereafter the defense presented its case, weeks past the District Court's promised end date.   Thereafter, the District Court pressured the defense, even admonishing Appellant Pelullo's counsel for taking too long in front of the jury. *See* Tr. 3/20/14, 121-22.[11]

As deliberations began infighting, frustration and defiance permeated the jury.   *See* Juror No. 7 Conversation with District Court, Tr. 6/30/14, 18-19, attached hereto as Exhibit "E."   The deliberations became extremely hostile, one juror telling a substitute alternate juror "welcome to hell." *See* Tr. 6/30/14, 4.

This frustration and hostility spilled over into the U.S. Marshal van responsible for transporting jurors to and

---

[11]   Defendant Manno objected to the District Court's admonishment of the defense in front of the jury.   See Tr. 3/20/14, 121-22.   Appellant joined all trial objections. See Tr. June 10, 2014, 102 (the Court affirmed "that objections of one attorney are the objections of all the attorneys.").

38

from the courthouse. On or about July 1, 2014, after concluding deliberations for the day, a number of jurors impermissibly continued deliberations outside of the jury room, in front of alternate jurors who were not a part of the deliberations. *See* Tr. 7/2/14, 4, attached hereto as Exhibit "F." The following day, the alternate reported the misconduct to the District Court. The District Court alerted the parties that the alternate juror confronted three of the deliberating jurors, and expressed that their conversation was "inappropriate." Tr. 7/2/14, 5. The District Court also spoke with the U.S. Marshal that was driving the van, and she confirmed that she had witnessed conversation between the alternate jurors and the three deliberating jurors. Tr. 7/2/14, 5. The aforementioned circumstances alarmed the government, citing that "[t]he potential problem here is that some of the jurors may be talking about the case outside of the jury room which they've repeatedly been instructed not to do." Tr. 7/2/14, 11.

The above referenced juror matters serve as examples of the many issues that Appellant seeks to raise on appeal. It is critical for Appellant to be able to point and cite to each jurors' answers during their respective voir dire given the many instances of juror coercion, perceived

intimidation, and misconduct, to name a few. Appellant now seeks an order compelling the District Court to produce the associated assigned juror numbers so that Appellant can develop and point to arguments related to an array of juror issues on appeal. The only way for Appellant to properly argue and provide adequate basis for various arguments that he intends to raise, is to compel the District Court to produce the assigned juror identification numbers. The District Court's denial of Appellants' access to the aforementioned information is unreasonable and amounts to an abuse of discretion, and granting Appellant's motion to compel production of this useful information is the only reasonable remedy.

IV.   PURSUANT TO FEDERAL RULE OF APPELLATE PROCEDURE 10(E)(3), THIS HONORABLE COURT SHOULD GRANT APPELLANTS MOTION TO COMPEL DISTRICT COURT TO PRODUCE SEALED DOCUMENTS FILED BY CO-DEFENDANTS AND JOINED BY APPELLANT THAT APPELLANT PREVIOUSLY REQUESTED ACCESS TO, FOR THE SAKE OF ARGUMENTS APPELLANT INTENDS TO REFERENCE OR RAISE WITHIN HIS BRIEF

The recurring theme of unreasonableness is further supported by the District Court's foreclosure of access to various sealed documents that Appellant joined and are useful to Appellant on appeal. *See* ECF 352, 11/16/12; ECF 418, 2/6/13. Despite joining co-defendants' arguments prior to and during trial, Appellant's inability to adequately

articulate or point to arguments previously raised and joined by Appellant is due entirely to the District Court's denial of access to documents that are under seal and inaccessible to Appellant. Since there is no way for Appellant or Appellant's counsel to view these sealed documents, Appellant has been barred from citing to them within his appeal.

The District Court's denial of Appellant's motion seeking production of sealed filings that Appellant was a party to, pursuant to Federal Rule of Appellate Procedure 10(e), was an abuse of discretion. *See United States v. Pagan-Ferrer*, 736 F.3d 573, 582 (1st Cir. 2013) ("We review the district court's denial of a Rule 10(e) motion for abuse of discretion... When a dispute concerning whether the record truly discloses what occurred in the district court has been submitted to the district court, the court's determination is conclusive absent a showing of intentional falsification or plain unreasonableness."); *see also United States v. Caramadre*, 807 F.3d 359, 376 (1st Cir. 2015); *United States v. Franklin*, 250 F.3d 653, 663 (8th Cir. 2001). It was unreasonable for the District Court to deny Appellant access to sealed filings that Appellant joined and therefore was a party to, effectively foreclosing on Appellant's use and reference to these filings in his

direct appeal.

The vast majority of cases related to gaining access to sealed docket entries involve the media. The media often petitions the court to unseal documents pursuant to the First Amendment, citing the public's presumption of access to such documents and filings. The presumption of access to these types of judicial documents is a "common law right" that is "firmly rooted in our nation's history." *Lugosch v. Pyramid Co.*, 435 F.3d 110, 119 (2d Cir. 2006). Gaining access to these types of sealed "judicial documents" by those who are not a party to the litigation are common. However, counsel has yet to identify a single case involving a criminal defendant who is denied access to the filings they were a party to, on their own docket.

The only case that counsel has been able to identify that is remotely similar to the present circumstance is *United States v. Vinas*, which involved a criminal defendant who "submitted a letter to the court to 'frame the issues at hand'" with regard to a status conference. *United States v. Vinas*, 2017 U.S. Dist. LEXIS 86724, at *2 (E.D.N.Y. June 6, 2017). The *Vinas* letter contained information that was classified and was consequently filed under seal. The *Vinas* court deemed the letter "presumptively classified" and sealed the letter pursuant to "Section 3 of

the Classified Information Procedures Act ('CIPA')." *Id.* Thereafter, the defendant sought to <u>unseal</u> the letter.  The *Vinas* court unsealed all unclassified passages, but denied the disclosure of all classified passages citing that "the government's interest in protecting national security" overcomes the public's presumption of access. *Vinas*, 2017 U.S. Dist. LEXIS 86724, at *5 (E.D.N.Y. June 6, 2017). Explaining that the presumption of access, although "firmly rooted" in common law, can be overcome by a number of factors.  Namely, "Courts have listed a number of qualifying 'higher values' which may justify sealing, including the government's interest in protecting national security and related information." *Id. See United States v. Aref*, 533 F.3d 72, 82 (2d Cir. 2008) (redaction for "higher values" justified on a showing that information sought would "impair identified national interests"); *see also United States v. Moussaoui*, 65 F. App'x 881, 887 (4th Cir. 2003) (unpublished) ("At the outset, we note that there can be no doubt that the government's interest in protecting the security of classified information is a compelling one.").

    Unlike the many cases involving the media trying to obtain access to sealed documents or a case like *Vinas* involving denial of public access due to national security

concerns, Appellant is not seeking to unseal these documents. Appellant is simply seeking access to a number of sealed documents that he joined prior to trial, so that he may properly present arguments on appeal for judicial review by the Third Circuit Court of Appeals.[12]

The present matter is further distinguished when you consider who does have access to these sealed documents, namely the Appellee. The government has access to all of the motions filed by the defendants in this case. The Appellee has the luxury of citing to those motions, referencing them, and potentially using them in their own brief. In contrast, the Appellant has been handcuffed from utilizing or accessing this information in any way.

Appellant initially sought access to the sealed docket entries in the months following the completion of the trial transcripts. In May 2017, after reviewing the record and discovering discrepancies and potential issues on appeal, Appellant filed a letter with the District Court seeking access to the sealed documents both generally and specifically, citing a number of sealed documents Appellant joined. *See* ECF 1399, 5/2/17. Appellant's request was ignored.

On February 14, 2019, Appellant filed his Rule 10

---

[12] *See* ECF 352, 11/16/12; ECF 418, 2/6/13.

motion with the District Court seeking leave to correct and modify the record, and also sought access to sealed documents that he had joined. *See* ECF 1545, 2/14/19. On or about May 13, 2019, the District Court held a hearing to review and identify the sealed documents that Appellant required for the sake of appeal. The District Court promised that "if I find anything that might be useful, I can release them. I'll let you know what it is[,]" and instructed Appellant to "send a letter" specifying the sealed documents that were necessary for Appellant's appeal. Tr. 5/13/19, 3, 17. The District Court never followed up with the parties thereafter regarding the missing documents or any sealed documents that were deemed "useful."

Pursuant to the District Court's instruction, Appellant's counsel submitted a list of sealed documents that Appellant requires access to and are useful on appeal, by way of letter on or about November 5, 2019. *See* ECF 1586, 11/5/19. Within Appellant's letter, counsel sought identification of missing and unidentified filings, as well as specific filings related to a number of topics that Appellant intends to raise on appeal.

On or about November 20, 2019, the District Court conducted a hearing by way of phone. During the District

Court's phone conference with counsel, the District Court criticized Appellant's delay in submitting its request. Appellant explained that the process of researching and writing Appellant's brief clarified the sealed documents that were required for arguments Appellant intended to raise on appeal. The District Court denied Appellant's request in its entirety.

Notably, a number of the sealed documents that Appellant requested were deemed missing and unknown by the District Court during the May 13th hearing. The District Court had promised the parties that the District Court would "find" any missing docket entries and identify them for the parties. *See* Tr. 5/13/19 3, 17. To date, the following missing docket entries have not been identified or located: ECF 23, 304, 688, 773.

Appellants still require the following ECF docket entries prior to submitting their respective briefs: ECF 143 & 295 (taint team matters involving privilege); ECF 329 (Written documents related to Donald Manno, Appellant's former attorney, who represented himself, which created an actual conflict of interest); ECF 550, 551, 553, 554, 559

(filings related to anonymous jury issue); [13] ECF 712 (Government opposition to Appellant's Extortion Motion); [14] ECF 728 (Appellant's Opposition to ECF 712); ECF 845, 942 (Adler's 2nd & 3rd Brady Motions); [15] ECF 875 (Government Opposition to Pelullo's Motion to Dismiss for Misconduct Before the Grand Jury); [16] ECF 1157 (Government's motion regarding FBI Special Agent Pennock); ECF 1244 (Government Response to Pelullo's Motion to Compel Discovery Related to *Brady* violation).[17]

The District Court's failure to articulate a basis, either specifically or cumulatively, as to why Appellant cannot have access to certain sealed documents in its possession to allow Appellant to utilize them in his direct appeal before the Third Circuit Court of Appeals, does not

---

[13] Appellant's opposition remains missing from docket. Appellant is unsure if filing is among missing ECF entries that District Court must locate and identify.

[14] Appellant's extortion motion remains missing from the docket. Appellant is unsure if filing is among missing ECF entries that District must locate and identify.

[15] Appellant sought an extension to file his Rule 33(b)(1) motion for new trial pursuant to Rule 45(b)(1)(B) based upon a *Brady* claim learned post-trial. The District Court denied Appellant's request and barred all future motions. *See* ECF 1275, 7/17/15. *See also* Tr. 11/4/14, 82-83; Tr. 7/17/15, 22-25, 105; *See* Appellant Letter to Court, ECF 1280, 7/23/15; See Court Reply to Appellant's Letter, ECF 1281, 7/24/15. *See also* ECFs 1237, 1238, 1241, 1242, 1243, 1244 (sealed), 1252, 1260, 1263, 1264, 1269, 1270, 1272, 1275. *See also* ECF 1407, 1412, 1424, and Tr. 8/17/17.

[16] See *McKeever v. Barr*, 19-307, argued 9/5/19 before United States Supreme Court.

[17] See *supra* fn.15.

even begin to overcome the presumption under the common law that demands disclosure. Appellant cannot fathom one reason that the District Court would deny access of documents that were joined by a party to the case. Accordingly, Appellant now seeks assistance from the Honorable Court to grant his motion to compel the District Court grant access to sealed documents to which he was a party and order the District Court to locate, identify missing documents, and correct ECF.

## V.    MOTION FOR SUSPENSION OF BRIEFING SCHEDULE

Appellant is aware that the Standing Motions Panel may not grant this motion or may grant it only in part. To avoid the possibility of having to create a subsequent version of the brief, Appellant seeks a temporary suspension of the briefing schedule pending determination of this motion and evidentiary hearing.

WHEREFORE, Appellant requests (1) remand and reassignment to conduct an evidentiary hearing to correct the District Court's material misstatements pursuant to Rule 10(e)(2)(C), (2) this Honorable Court grants Appellant's motion to compel access to juror number information and sealed documents pursuant to Rule 10(e)(3), and (3) suspension of the briefing schedule pending

determination of Appellant's principal motion, completion of an evidentiary hearing, and granted access to the sealed filings and juror information set forth herein, with the opening brief and joint appendix to be made due after this Court's ruling.

Respectfully submitted,

**LAW OFFICES OF RILEY & RILEY**

Date:  February 5, 2020      /s/  *Michael E. Riley*
Michael E. Riley, Esquire
EXECUTIVE COURT
2 Eves Drive, Suite 109
Marlton, New Jersey 08053
Office:  609-914-0300
Email:RileyandRileyLaw@yahoo.com
*Attorney for Appellant*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing has been electronically filed this 5th day of February 2020 and is served electronically via the Court's Electronic Filing System ("ECF"), upon the following:

>           Mark E. Coyne, Esquire
>           Chief, Appeals Division
>           United States Attorney's Office
>           970 Broad Street, Suite 700
>           Newark, New Jersey 07102-2535
>           Email:  Mark.Coyne@usdoj.gov


>           All Appellants' Counsel via ECF


Date:  February 5, 2020        /s/  *Michael E. Riley*
                               Michael E. Riley, Esquire
                               EXECUTIVE COURT
                               2 Eves Drive, Suite 109
                               Marlton, New Jersey 08053
                               Office:  609-914-0300
                               Email:RileyandRileyLaw@yahoo.com
                               *Attorney for Appellant*

Exhibit "A"

<pre>
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEW JERSEY
 2

 3   _____

     UNITED STATES OF AMERICA
 4
                 -vs-                        CRIMINAL NUMBER:
 5                                              11-740
     NICODEMO SCARFO, ET AL,
 6                                          STATUS CONFERENCE
             Defendants.
 7

         Mitchell H. Cohen United States Courthouse
 8       One John F. Gerry Plaza
         Camden, New Jersey 08101
 9       April 23, 2019

10   B E F O R E:        HONORABLE ROBERT B. KUGLER
                         SENIOR UNITED STATES DISTRICT JUDGE
11

12       A P P E A R A N C E S:

13   OFFICE OF THE UNITED STATES ATTORNEY
     BY: NORMAN GROSS, ASSISTANT UNITED STATES ATTORNEY
14   FOURTH & MARKET STREETS
     CAMDEN, NEW JERSEY 08101
15

16   MICHAEL RILEY, ESQUIRE
     SARAH BREWER, ESQUIRE
17   THE WASHINGTON HOUSE
     100 HIGH STREET
18   MOUNT HOLLY, NEW JERSEY 08060
     ATTORNEYS FOR NICODEMO SCARFO

19   TROY A. ARCHIE, ESQUIRE
     21 ROUTE 130 SOUTH
20   CINNAMINSON, NEW JERSEY 08077
     ATTORNEY FOR SALVATORE PELULLO
21

22   MICHAEL HUFF, ESQUIRE
     1333 RACE STREET
23   PHILADELPHIA, PA 19107
     ATTORNEY FOR WILLIAM MAXWELL

24   MARK W. CATANZARO, ESQUIRE
     21 GRANT STREET
25   MOUNT HOLLY, NEW JERSEY 08060
     ATTORNEY FOR JOHN MAXWELL
</pre>

```
 1                    (Defendants not present)
 2           (The following took place in open court)
 3           THE DEPUTY COURT CLERK:  All rise.
 4           THE COURT:  How is everybody doing.  My God, just
 5   like the old days, right?
 6           All right.  Start with the appearances of counsel.  For
 7   the government, please.
 8           MR. GROSS:  Good afternoon, your Honor.  Assistant
 9   United States Attorney Norman Gross.  With me at counsel table
10   is Paralegal Specialist, Ann DeFay.
11           THE COURT:  Mr. Riley.
12           MR. RILEY:  Good afternoon, Judge.  Mike Riley on
13   behalf of Mr. Scarfo along with Sara Brewer.
14           THE COURT:  Mr. Archie.
15           MR. ARCHIE:  Good afternoon, your Honor.  Troy Archie
16   on behalf of Salvatore Pelullo.
17           THE COURT:  Mr. Huff.
18           MR. HUFF:  Good morning, your Honor, or excuse me.
19   Good afternoon.  Michael Huff on behalf of William Maxwell.
20           THE COURT:  Mr. Catanzaro.
21           MR. CATANZARO:  Good afternoon, your Honor.  Mark
22   Catanzaro appearing on behalf of John Maxwell.
23           THE COURT:  All right.  I have this letter of
24   April 19th from Mr. Gross.  Can we use this as our agenda?
25           MR. RILEY:  I think so, Judge.
```

01:00 (line 5)
01:01 (line 10)
01:01 (line 15)
01:01 (line 20)
01:01 (line 25)

|       |     |                                                                          |
|-------|-----|--------------------------------------------------------------------------|
|       | 1   | THE COURT:  Okay.  One, two and three have apparently                    |
|       | 2   | been resolved, but let me just say something about exhibits.             |
|       | 3   | The court doesn't, never has and probably never will keep an             |
|       | 4   | official exhibit list.  The official record of the exhibits is           |
| 01:01 | 5   | that which is found in the transcript.  Every transcript has             |
|       | 6   | an entry for every exhibit that's been introduced successfully           |
|       | 7   | in evidence and there's an index of them.  Having said that,             |
|       | 8   | in this case, the court also never retains exhibits.  In this            |
|       | 9   | case the way we handle the exhibits is was at the end of each            |
| 01:02 | 10  | week, and remember when we worked four days a week, I asked              |
|       | 11  | counsel and I appointed Mr. Catanzaro as the defense liaison             |
|       | 12  | counsel for exhibits to make sure that those exhibits that had           |
|       | 13  | been introduced were successfully uploaded into our system.             |
|       | 14  | And at the end of the trial I made sure all counsel were in              |
| 01:02 | 15  | accord as to what was uploaded and each and every one of you             |
|       | 16  | said that it had been examined and it was, you agreed that the           |
|       | 17  | exhibits that we had uploaded in our system were those                   |
|       | 18  | exhibits which had been successfully introduced in evidence             |
|       | 19  | and I got that from, agreement from everybody on the record              |
| 01:02 | 20  | before the juror sought any exhibit whatsoever.                          |
|       | 21  | All right, jury information questionnaires.  I don't                     |
|       | 22  | understand what this is all about.  What's going on here?                |
|       | 23  | What do we need this for?                                                |
|       | 24  | MR. RILEY:  Judge, if I may.  Many times it may be                       |
| 01:03 | 25  | helpful if, if Miss Brewer answers some of those questions               |

1    because obviously she did a --

2         THE COURT:  That's fine.

3         MR. RILEY:  -- a lot of work on this.  And I don't

4    want to rain on anybody's parade, but I don't know that the

01:03    5    first item is as secured as the court may think it is.  We

6    have issues that I think we need to air out for your guidance

7    because we still have to get, argue that motion and we made an

8    effort with the Government and the Government's been very

9    helpful and we've been trying to collect as much information

01:03    10   as we can both from our collective memories and also some of

11   the documents.  But we still have a ways to go before we get

12   to the point where I think unfortunately I think the court

13   thinks we are at this point.

14        So, with regard to the question you asked me with

01:03    15   regard to juror issues.  I think that Miss Brewer can address

16   those.  I think those were addressed when the transcript

17   request we presented to the court way back when to get those

18   voir dire questions and the information.  If you would, Sarah.

19        MS. BREWER:  Yes, your Honor.  When we put forth our

01:04    20   request for the transcripts that were outstanding and provided

21   the basis on appeal, we laid out a number of juror issues we

22   that we intended to raise on appeal including, an anonymous

23   jury and maybe some of the issues that took place during

24   deliberations.  And, so, those were the issues that we just

01:04    25   wanted to secure that juror information so that we look back

1    and --

2          THE COURT:  What is, what is in number four that you

3    need to know?

4          MS. BREWER:  It's, it's mostly regarding what, what

01:04    5    and exactly how each juror responded to the questionnaires.

6          THE COURT:  You were all here when the jurors

7    responded to questionnaires and Mr. Scarfo had two lawyers.  I

8    don't understand what was missed.

9          MS. BREWER:  We just want to be able to refer back to

01:04   10    those and as well as the voir dire.

11          THE COURT:  What is missing from the information that

12    you have in your possession?

13          MS. BREWER:  For instance, your Honor, it's

14    impossible for us to trace back each individual juror on their

01:05   15    voir dire because the number that they were assigned, we can't

16    trace back to the individual jurors, how they were seated, and

17    so there was no --

18          THE COURT:  No, they were not seated.  They were one

19    at a time.  They were.  Each juror was brought in to the

01:05   20    courtroom one at a time and sat in this witness chair for

21    purposes of individual voir dire.

22          MS. BREWER:  And they were given a specific number.

23          THE COURT:  Right, each had a number.  They were

24    identified only by their number.  So I don't understand what

01:05   25    the problem is.

01:05

01:06

01:06

01:06

01:06

1      MS. BREWER:  We can't seem to link up who number one

2  two, three, four, five was with -- where they were seated in

3  the juror box.  That's the issue.

4      THE COURT:  They weren't seated in the jury box.  The

5  only time they were seated in the juror box is after we had

6  done all the voir dire and all the questionnaires and I

7  brought all of the remaining jurors back in in order for you

8  to exercise your preemptory challenges.

9      MS. BREWER:  Right.

10      THE COURT:  The only time we had any jurors in the

11  jury box before we selected this jury.

12      MS. BREWER:  And we're finding it difficult to figure

13  out who said what in their voir dire because of --

14      THE COURT:  They only were done one at a time and

15  each identified by a number.  So if you have the transcript of

16  what they said, that's what they said.  That's all they ever

17  said.  In addition to the written questionnaire answers which

18  everybody had.

19      MS. BREWER:  Right.

20      THE COURT:  There was no questioning of twelve

21  jurors.

22      MS. BREWER:  If we are trying to isolate one

23  particular juror, the issue that we're asking is that we're

24  not quite sure which one is on the voir dire and where they

25  are because we're having difficulty identifying where, for

| | | |
|---|---|---|
| | 1 | instance, juror number seven was or juror number eight within |
| | 2 | the voir dire because there were a number above that |
| | 3 | testified.  And so we're trying to -- |
| | 4 | THE COURT:  All they testified, every one of them |
| 01:06 | 5 | testified. |
| | 6 | MS. BREWER:  Right.  And so when we're trying to |
| | 7 | figure out who belongs with what, we're having difficulty |
| | 8 | matching that up.  And that's, that's why we sought -- |
| | 9 | THE COURT:  I'm sorry, I just can't conceive of what |
| 01:07 | 10 | the problem is.  I just cannot understand what the problem |
| | 11 | was, having been through this process, and having all the |
| | 12 | lawyers go through this process five and a half years ago, and |
| | 13 | no one ever raising an issue about this for five and a half |
| | 14 | years either before, during or after trial.  I just can't |
| 01:07 | 15 | conceive of what the problem is. |
| | 16 | MS. BREWER:  And, Judge, we are under the impression |
| | 17 | that all of this is going to be kept for the sake of appeal. |
| | 18 | So we didn't bring it up until now until we were really |
| | 19 | working on -- |
| 01:07 | 20 | THE COURT:  What's the issue for appeal?  I don't |
| | 21 | understand.  You never, you never exercised all preemptory |
| | 22 | challenges.  Never.  And that's fatal to an appeal on the |
| | 23 | composition of the jury. |
| | 24 | MR. RILEY:  Judge -- |
| 01:07 | 25 | THE COURT:  Furthermore, before were sat the jurors, |

01:08

1  before we swore them in, when you indicated to me you were

2  done with your preemptory challenges, I asked each and every

3  attorney is the jury satisfactory.  Each and every attorney

4  said it was.  Then we seated the jury and we swore them in.  I

5  can't conceive of what the problem is now.

6         MR. RILEY:  Judge, I think in going back over this

7  again, we had issues with particular jurors.  Number eight,

8  for instance, we all recall her and in a situation where your

9  Honor discussed the items with her, then came out and

10  discussed with her a second time which was apparently

11  transcripts of, we had issues with jurors in the box talking

12  about the van ride back and forth about who was talking about

13  various aspects of the trial they shouldn't have been.  We had

14  another gentleman whose son didn't amount to much but his son

15  --

16         THE COURT:  This is jury selection you're talking

17  about during the trial, post-selection.

18         MR. RILEY:  Judge --

19         THE COURT:  Issues during the trial, jury misconduct.

20  Is that what you're saying?

21         MR. RILEY:  Those are issues and we're trying to --

22         THE COURT:  When was that brought to my attention?

23         MR. RILEY:  The jury misconduct?

24         THE COURT:  If there was any misconduct during the

25  course of trial, when was that brought to my attention.

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | MR. RILEY:  Well, I suspect it was brought to your           |
|        | 2  | attention fairly close in time to when it happened.          |
|        | 3  | THE COURT:  Did anyone ask the juror be excused and I        |
|        | 4  | turned it down?                                              |
| 01:09  | 5  | MR. RILEY:  No.  But I think Mr. Catanzaro asked that        |
|        | 6  | at one point some of the jurors be voir dired as to their    |
|        | 7  | conversations in the van.  That's my recollection.  I believe|
|        | 8  | that Mr. Catanzaro --                                        |
|        | 9  | THE COURT:  It has nothing to do then with the              |
| 01:09  | 10 | selection process.  That is what I'm hearing.  I'm trying to  |
|        | 11 | figure out what the issue is here.                           |
|        | 12 | MS. BREWER:  It's going back to seeing, Judge, what          |
|        | 13 | they said initially during the selection process.           |
|        | 14 | THE COURT:  No, that's not what Mr. Riley just said.         |
| 01:09  | 15 | Mr. Riley's talking about things that happened after the trial|
|        | 16 | started with various members of the jury panel for which there|
|        | 17 | would be a complete record in the transcript anyway.         |
|        | 18 | Well, is it the select process or is it post-selection       |
|        | 19 | process that the defendants are complaining about.           |
| 01:09  | 20 | MS. BREWER:  It's both, your Honor.                          |
|        | 21 | THE COURT:  It's both.  So, again, I don't know what         |
|        | 22 | could possibly be objected to during the selection process   |
|        | 23 | particularly since you never used all your preemptory         |
|        | 24 | challenges.  You had an opportunity to weed people out.  I was|
| 01:10  | 25 | extremely liberal in excusing jurors.  Extremely liberal in  |

| | |
|---|---|
| 1 | scrubbing that jury panel, which is probably why you didn't |
| 2 | need to use all your preemptory challenges at the time.  What |
| 3 | is it you want me to do now regarding this jury information? |
| 4 | MS. BREWER:  Judge, the cases indicated that we need |
| 01:10  5 | to bring this to the Court's attention prior to going up to |
| 6 | the Court of Appeals so that we don't sand bag the situation |
| 7 | and try to take advantage of there being some sort of error or |
| 8 | misstep that we have to bring it to your attention that we are |
| 9 | supposed to make diligent effort to try to recreate or |
| 01:10  10 | preserve or -- |
| 11 | THE COURT:  Well, what are you trying to create? |
| 12 | That's what I don't understand.  What needs to be recreated? |
| 13 | What doesn't exist that needs to be recreated?  You have the |
| 14 | transcript of all the proceedings regarding the jury.  What |
| 01:10  15 | needs to be recreated?  What is it that you need me to do? |
| 16 | MR. RILEY:  Judge, I think there's, there's a sense, |
| 17 | there's a sense what we're trying to do is trying to make sure |
| 18 | when we go up to the Third Circuit, we have a complete and |
| 19 | proper record.  We run into issues that we're attempting to |
| 01:11  20 | work out and maybe we're going to be successful.  Maybe we're |
| 21 | not and that's actually with some guidance from you would be |
| 22 | helpful.  But the bottom line is this.  We, we had the jury |
| 23 | questionnaires.  We were told once the jury is selected, |
| 24 | destroy them.  They were destroyed. |
| 01:11  25 | THE COURT:  Right. |

01:11

01:11

01:11

01:12

01:12

1  　　　　MR. RILEY:  Okay?  And apparently the court, your

2  Honor indicated to us, you guys can destroy these things.

3  That's okay because we're going to -- we'll be keeping a

4  record of them.  Well, apparently we don't have a record of

5  them.

6  　　　　THE COURT:  That's not true.

7  　　　　MR. RILEY:  Okay.  Then I've been misguided at some

8  point.  I was told that there was no record of --

9  　　　　THE COURT:  Well, Miss Arthur got some bad

10 information.  I checked this morning.  We have the originals.

11 　　　　MR. RILEY:  Okay.  That's --

12 　　　　THE COURT:  But you're never, trust me, you are never

13 going to find out the names of those jurors.

14 　　　　MR. RILEY:  Judge, I think we're trying to be as

15 complete as possible when we take this massive show on the

16 record to the Third Circuit.  You can imagine we're trying to

17 put together appendixes.  We're trying to get ourselves

18 organized in a way and we're running into problems.  We're

19 running into transcript problems which is we can discuss,

20 records of exhibits.  Problems that were gladly discussed.

21 We're trying to get this all incapsulated so we can move

22 forward.  And we've got clients which are no secret are

23 demanding people that have a lot of time on their hands, and

24 we're getting a lot of information.  Now we have an obligation

25 as much as may be distracting or maybe, your Honor may think

01:12

```
 1  that we're on a wild goose chase on something but we've got to
 2  have answers at some point.
 3       THE COURT:  Whether you're on a wild goose chase or
 4  the proverbial get out of jail free card, I don't know what it
 5  is you want me to do about this jury stuff.  What is it you're
 6  asking?
 7       MR. RILEY:  Judge, I think that that --
 8       THE COURT:  For me to do.
 9       MR. RILEY:  Judge, now that we're aware that we have
10  the original juror questionnaires, that may be, that may be
11  helpful to us as we move forward on some of these issues.
12  I've been discussing it with some of my colleagues because
13  everybody's got their own point of view on, on many of these
14  topics but I'm, I'm gratified to hear this that there is some
15  record which is maintained as to who these -- what was said in
16  those questionnaires because we're under the impression
17  clearly they were not available to us in any form.
18       THE COURT:  Well, I'm sure they're available to you,
19  but we have them.  And we have, we have the names, actual
20  names of the jurors.  Only one person who really knows where
21  that is.  I never have known the names of the jurors and no
22  one else ever did either.  But we have the originals of all
23  that information.  But apparently not asking for access to it,
24  but I can tell you if you're seeking access to it, you got a
25  long way to go to convince me that, that you need access to
```

1    it.

2        MR. RILEY:  Judge, I understand that.  I think our

3    concern was that they're an integral part of the record and we

4    were told they don't exist and that's troublesome.  You look

01:13    5    at the case law and you look at the situation we find

6    ourselves in, and when we're told they don't exist at all,

7    that means they're destroyed, that's a little distracting when

8    you're trying to make sure that when you put that appendix

9    together, which is monumental, you want to make sure you have

01:14    10    every explanation why you don't have something and our -- what

11    we've heard was they have all been destroyed.  Because I know

12    we've destroyed all of ours and your Honor indicated --

13        THE COURT:  You gave them back to me and I destroyed

14    them.

01:14    15        MR. RILEY:  I forget that's how we did it but we did

16    it.

17        THE COURT:  Well, I was told this morning that we

18    have the originals of all of them.  So, you know, I mean if

19    you have some application, I'll wait to hear what it is

01:14    20    because at this point I have not a clue.  Apparently the

21    government has given you the audio that they played during the

22    summation?  Don't we have that now?  Is that correct?  That's

23    number five.  Is that correct?

24        MR. RILEY:  Judge, I understand we have all that,

01:14    25    that's correct.

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | THE COURT:  All right.  Number six.  Something about          |
|       | 2  | 86 minutes of testimony.  I still don't know what that is but |
|       | 3  | apparently you have that resolved now?                        |
|       | 4  | MR. RILEY:  Judge, if you may recall, this was the            |
| 01:15 | 5  | testimony of Corey Leshner?                                   |
|       | 6  | THE COURT:  I don't recall.                                   |
|       | 7  | MR. RILEY:  Well, you remember --                             |
|       | 8  | THE COURT:  I remember him testifying but I couldn't          |
|       | 9  | tell you it was March 5th.                                    |
| 01:15 | 10 | MR. RILEY:  Exactly.  But you know how pivotal he             |
|       | 11 | was.  There are issues in terms of, we found a period where we |
|       | 12 | consider to be a gap or a misstatement of 86 minutes of time. |
|       | 13 | And we've gotten some recent information I'm told and maybe   |
|       | 14 | that can be resolved.  But we, for the longest time, were     |
| 01:15 | 15 | clearly under the impression that we don't have the audio.    |
|       | 16 | And what happened was that Leshner said some things and we    |
|       | 17 | looked at the transcript, it didn't match up with our        |
|       | 18 | recollections of what he said.  We're looking for the audio of |
|       | 19 | what his testimony which I understand the Reporters have and  |
| 01:15 | 20 | they work off of and we were told that the audio was not      |
|       | 21 | available.                                                    |
|       | 22 | THE COURT:  We'll get to that in just a minute.               |
|       | 23 | MR. RILEY:  We're looking you know if anybody wants           |
|       | 24 | to correct me on this, we're looking at trying to put together |
| 01:16 | 25 | those 86 minutes as to --                                     |

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | THE COURT:  But how -- where do you come with 86?            |
|        | 2  | What's the number from?                                      |
|        | 3  | MS. BREWER:  Judge, it's the timing that's next to           |
|        | 4  | the line numbers on the transcript.                          |
| 01:16  | 5  | THE COURT:  But I had the court reporters check that         |
|        | 6  | last week and they tell me it all adds up.  There is no 86   |
|        | 7  | minute gap.  They looked at the running numbers and they can't |
|        | 8  | find any 86 minute gap.                                      |
|        | 9  | MS. BREWER:  Yeah, if you look at it, like it's from         |
| 01:16  | 10 | one page to another.  I'll try to find it for your Honor.  I |
|        | 11 | thought I laid it out in the -- in our motion.  Like it's -- |
|        | 12 | there was a specific time of 86 minutes and I also believe, if |
|        | 13 | my recollection serves me, that it didn't add up.  There were |
|        | 14 | -- there was either direct or cross that were swapped out.   |
| 01:16  | 15 | So, it's definitely, I believe an issue and possibly a span of |
|        | 16 | time that was just missing.                                  |
|        | 17 | THE COURT:  All I can tell you is to ask the court          |
|        | 18 | reporters about that and they can't find it.  But maybe if you |
|        | 19 | sit down with them, they can find it.  I don't know what to  |
| 01:17  | 20 | tell you.  Mr. Gross.                                        |
|        | 21 | MR. GROSS:  Judge, Mr. Nami sent me a corrected copy         |
|        | 22 | of the March 5th transcript at least a month ago and he told |
|        | 23 | me that any errors that appear on the time stamps on those   |
|        | 24 | transcripts had been corrected in this most recent version of |
| 01:17  | 25 | the transcript.  I sent that to defense counsel.  It's been at |

01:17

01:18

01:18

01:19

01:19

```
 1  least a month, Judge.  My concern is the defendants now have

 2  due dates for their opening briefs in the Court of Appeals in

 3  I believe July.  We've got to get this case back on track and

 4  in front of the Court of Appeals, but I would ask that you

 5  direct defense counsel to take a look at this transcript that

 6  they've had now for quite some time and say with specificity

 7  what's wrong.  Initially I think the claim was that some large

 8  portion of Mr. Leshner's testimony was omitted from the

 9  transcript.  I think that's no longer the claim.  But I would

10  ask you to direct them within a week to identify with

11  specificity what's wrong with this transcript.

12       THE COURT:  Well, that's what I'm trying to find out

13  and I haven't gotten an answer yet as to what's wrong with the

14  transcript.  I mean what's most puzzling to me is they ordered

15  daily copy.  So, everybody got the transcript that night and

16  we had three day weekends every week for people to look at the

17  transcripts and nobody has ever complained until five years

18  later?  I don't get it.  At this point I can't conclude that

19  there's any problem with the March 5th transcript at all.  I

20  can't grant any relief because there's nothing missing as far

21  as I can tell.

22       Number seven, all official audio recordings.  Let me

23  correct counsel.  There is no such thing in this court as an

24  official audio recording.  We have court reporters.  We don't

25  have audio recordings in this courtroom.  I'm not sure what it
```

01:19

01:20

01:20

01:20

01:21

1   is you need audio recordings of.  Can you explain that to me,

2   please?

3         MS. BREWER:  Judge, it was an effort to -- there were

4   a number of small discrepancies that we had found in the

5   Leshner testimony.  We just wanted to go through it and make

6   sure that it was accurate.  And I would say that, Judge, on --

7   in Exhibit E there was an e-mail that with the court reporter

8   indicating some of our issues and it looks like that was March

9   5th.  I will confirm, but that, that e-mail was from 2015.  So

10   we did try four years ago to try to get this done.

11         THE COURT:  Well, what happened?  Did you give them

12   page and line numbers that you thought needed to be corrected?

13         MS. BREWER:  That's correct.

14         THE COURT:  What happened?

15         MS. BREWER:  We received the March 4th corrected, not

16   the March 5th until just now.  So we didn't receive anything

17   back except for, except for the March 4th that that was

18   corrected.

19         THE COURT:  Well, okay.  Well what was wrong with the

20   February 26th transcript?

21         MS. BREWER:  I believe that there was just some

22   discrepancies that we identified, some phrases that maybe we,

23   wanted to review and that was according to Mr. Scarfo and our

24   recollection is that there were some pieces or there were some

25   parts of the transcript that seemed to be inconsistent.

```
 1        THE COURT:  Inconsistent with what?

 2        MS. BREWER:  With his recollection and somewhat with

 3   our recollection.  There were traces or responses, at least

 4   one that I can think of that was not consistent with our

 5   recollection and I believe that it was something to do with

 6   respect to what he wouldn't say.  That at Mr. Scarfo's door

 7   step.  That was never reflected within the testimony.  We

 8   couldn't find that passage at all.

 9        So we wanted to just confirm because he was such a

10   critical witness that the transcript that we have accurately

11   depicts what was testified to and that's the reason.

12        THE COURT:  That's fine.  But the way to do that is

13   you ask the court reporter, whoever it was, to check his or

14   her notes which it's the transcript and the notes are the

15   official record that the notes have to be filed with the

16   court.  You asked the court reporter to check against his or

17   her notes the transcript, specifically give a specific lines,

18   page numbers and they will check that, and if you're still not

19   satisfied, you can ask the court reporter to listen to his or

20   her personal audio against the transcript.  But that's it.

21   You don't -- you never get the audio.  The audio is not the

22   official record and, in fact, I had that go to the Third

23   Circuit.  Choy versus ComCast case which is reported at 629

24   Federal Appendix, 362.  And the same thing in a civil trial

25   the plaintiff wanted the audio and I said you can't have the
```

01:21
01:21
01:21
01:22
01:22

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 01:23 | 5 |

1  audio and the Third Circuit affirmed.  They wrote the District

2  Court properly denied access to the audio recording, which was

3  merely the court reporter's personal backup to the

4  stenographic record.  So you're not going to get the audio,

5  but you can ask the court reporter to check his or her notes

6  and check his or her audio if you can find a specific part of

7  the transcript you think is not correct.

8       MS. BREWER:  We will do that, your Honor.  We'll go

9  through that.

10      THE COURT:  Well, you got to do it soon because you

11  got to get these briefs filed.  You got a week to get that

12  done.

13      Correction to mislabeled ECF documents 889 and 890.  I

14  checked them and you're correct.  They somehow got flipped,

15  and we will -- I will ask the Clerk to put the body of 890 or

16  889 is and vice versa.  Okay.  Make that correct.  I'm not

17  sure what difference that makes, but whatever.

18      Then the last one, number nine.  I'm completely

19  befuddled by that.  I have no idea what anybody is talking

20  about.  The full docket, including all sealed filings related

21  to extortion, anonymous jury, Title III.  ESA versus

22  Privilege, which I have no idea what you're talking about.

23  Taint Team issue and any sealed documents pertaining to all

24  defendants sentenced in this matter.  If it's sealed, it's by

25  definition been filed.  I'm not sure what it is you want.

01:24

01:24

01:24

01:25

01:25

1  What is it you want?  What is <u>ESA versus Privilege</u>?

2      MS. BREWER:  I believe it's -- that should be ESI,

3  the Electronic Sort Information.  That might be a typo.

4      MR. GROSS:  I think that's right, Judge.  That's,

5  that's my typo.

6      THE COURT:  Well, what's the privilege then.  What is

7  it you're looking for?  What's the extortion?  Sealed filings

8  related to extortion.  What sealed filings related to what

9  extortion?

10      MS. BREWER:  There was --

11      THE COURT:  Whose extortion?

12      MS. BREWER:  It's my understanding that there was an

13  -- and I acknowledge, that this is co-counsel, Mr. Gelb filed

14  it.  But on the docket it does not show that the extortion

15  motion that he argued before your Honor and might have been

16  before I came on to the case was filed.  It's not showing on

17  the docket and so --

18      THE COURT:  I'm sorry.  But what extortion motion are

19  you talking about?

20      MS. BREWER:  There was --

21      THE COURT:  Refresh my memory, please.

22      MS. BREWER:  There was a motion with regard to, I

23  believe it was the underlying basis for the extortion.

24      THE COURT:  Before or during or after trial.

25      MS. BREWER:  This was before the trial.  I think

01:25

01:26

01:26

01:26

01:27

1  significantly before the trial but I don't believe I was

2  involved in the case at that time.  But I can't see it on the

3  docket.  I asked Mr. Gelb for a copy.  He sent me the latest

4  copy that he had.  But it's not reflected on the docket.  And

5  this again is just in an effort to create this full record

6  that we can take onto the Appellate Court for review.  And,

7  so, what we're looking at is we can't, we can't see a lot of

8  the co-defendants' sealed filings.

9          THE COURT:  What for example?

10          MS. BREWER:  For instance, we, we had asked in our

11  letter Docket Number I think it's 1399 for a -- for the sealed

12  Adler motion.

13          THE COURT:  Oh, I looked at that, by the way because

14  you gave me a specific reference.  And that was the Drinker

15  firm filed a motion under seal.  I don't know why you have to

16  ask Barry Gross why he filed it under seal seeking an Order

17  from me directed to the U. S. Attorneys that they certify that

18  they've complied with their Brady obligations vis-a-vis Mr.

19  Adler and that was because there was a -- I want to be clear

20  on this, it wasn't so clear to me in reading through this.

21  There was some document that the government gave Mr. Gross and

22  during the course of trial, I think early on in the trial that

23  Mr. Gross, Mr. Adler's attorney could conceivably construe as

24  being exculpatory to Mr. Adler.  It certainly wasn't

25  exculpatory to anybody else.  I think that triggered Mr.

| | |
|---|---|
| | 1 |
| 01:27 | 5 |
| 01:27 | 10 |
| 01:27 | 15 |
| 01:27 | 20 |
| 01:28 | 25 |

1  Gross's motion to require the Government to certify that they

2  have given Mr. Gross all that Brady material they have.  It

3  may have been nothing.  In fact it was, it was inculpatory to

4  the other defendants, but maybe exculpatory to Mr. Adler

5  alone.

6          MR. RILEY:  I think that may be a problem then,

7  Judge, because some of these things pop up and --

8          THE COURT:  Well, if you tell me what it is, I can

9  look at it.

10          MR. RILEY:  I think that's what we're trying to do is

11  look --

12          THE COURT:  What numbers.  I can't go through two

13  thousand filings and pick out what --

14          MR. RILEY:  It's difficult, I know.

15          THE COURT:  I know.  But you know it better than I do

16  --

17          MR. RILEY:  Yeah.

18          THE COURT:  -- what you're looking for.

19          MR. RILEY:  Yeah.  Judge, I think we can give you

20  some specificity as to exactly what we're looking for.  We

21  can't -- if we don't know what it is, we can't say we need it,

22  and we need to know what it is.  We need to see the sealed

23  documents and see what the --

24          THE COURT:  Give me a number, the docket entry number

25  --

01:28

1        MR. RILEY:  Okay.

2        THE COURT:  -- and if it's sealed, I'll look at it.

3        MS. BREWER:  Yes.  We don't -- some of the sealed

4   documents at least what I'm looking at don't show it up on the

5   docket.

6        THE COURT:  What do you mean they don't show up.

7        MS. BREWER:  There will be a gap in the numbers.  It

8   will go from one to five and we can't see what two, three,

9   four are.

01:28

10       THE COURT:  Are there copies -- do your copies of the

11  docket sheet say sealed or they don't say sealed at all?

12       MS. BREWER:  I'll have to look.  I haven't seen a lot

13  of sealed documents on our docket.  There's just missing

14  entries.  So, I, I don't know, I don't know what I don't know

01:28

15  because I can't, I can't see it and that's why we're asking

16  for that so we can see the descriptions of the sealed

17  documents and then say, Judge, you know, we joined in this one

18  or we joined, we joined in all of them collectively.  But in

19  order to identify exactly what we're looking for and

01:28

20  unfortunately we don't know what we don't know because I can't

21  see it.

22       THE COURT:  But you found that one regarding Adler by

23  Barry Gross.

24       MS. BREWER:  And that one was listed.

01:29

25       THE COURT:  When I access the docket, what I see is a

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
|       | 1  | little different than published, when you looked up and you      |
|       | 2  | saw 1399, what did it say?                                        |
|       | 3  | MS. BREWER:  It, it will provide a, a description.               |
|       | 4  | You mean my letter?                                              |
| 01:29 | 5  | THE COURT:  No.  The one that says sealed.                       |
|       | 6  | MS. BREWER:  Oh, the one that says --                            |
|       | 7  | THE COURT:  How did you know that 1399 was sealed?              |
|       | 8  | MS. BREWER:  That particular one -- oh, 1399 isn't              |
|       | 9  | sealed.  That was my letter.  I'm sorry, Judge.                 |
| 01:29 | 10 | THE COURT:  Well, whatever the ones that I just                 |
|       | 11 | talked about with Barry Gross on behalf of David Adler that     |
|       | 12 | you flagged at, how did you know that that was sealed.          |
|       | 13 | MS. BREWER:  We could see that one.                             |
|       | 14 | THE COURT:  The docket it says sealed.                          |
| 01:29 | 15 | MS. BREWER:  Right.  Right.  But it's inconsistent,             |
|       | 16 | your Honor.  So, for instance, that's where our extortion       |
|       | 17 | motion isn't showing as sealed or anything on the docket.       |
|       | 18 | It's completely omitted on our end.  So --                      |
|       | 19 | THE COURT:  Well, so, you know, if you could find              |
| 01:30 | 20 | that for me and show it to me, maybe I can recollect it.  I     |
|       | 21 | can't tell you you filed -- and I'm not being critical.  You    |
|       | 22 | filed hundreds and hundreds of motions in this case and I       |
|       | 23 | can't possibly keep track of them all.                          |
|       | 24 | MS. BREWER:  I have a copy I can send to the court.            |
| 01:30 | 25 | THE COURT:  Would you?                                          |

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
|       | 1  | MS. BREWER:  If that would be helpful, yes.                      |
|       | 2  | THE COURT:  Yes, please.  Maybe it got mis-numbered             |
|       | 3  | or mis-docketed somewhere.  I don't know.  But you think it     |
|       | 4  | was before trial?                                                |
| 01:30 | 5  | MS. BREWER:  I'm, I'm certain of that, yes.                     |
|       | 6  | THE COURT:  Because there were plenty of them during           |
|       | 7  | the trial directed at the various counts of the indictments    |
|       | 8  | and after the trial.                                             |
|       | 9  | MS. BREWER:  I will locate it.                                   |
| 01:30 | 10 | THE COURT:  At your direction.  So you need to get to          |
|       | 11 | me the docket entries you want me to look at that have been     |
|       | 12 | sealed so I can take a look at it and see if it has any         |
|       | 13 | relevance whatsoever to any of the issues facing any of these  |
|       | 14 | four defendants.                                                 |
| 01:30 | 15 | MR. RILEY:  Judge, could we go back and talk about            |
|       | 16 | number one?                                                      |
|       | 17 | THE COURT:  Number one on the agenda.                           |
|       | 18 | MR. RILEY:  Yeah.  Yeah, that's been --                        |
|       | 19 | THE COURT:  The exhibit log.  Yes.                              |
| 01:31 | 20 | MR. RILEY:  Yeah.  Yeah.  The problem that, that we           |
|       | 21 | have as explained to me is that we don't have the official     |
|       | 22 | court's exhibit list.                                            |
|       | 23 | THE COURT:  There isn't any.  Never has been.                   |
|       | 24 | MR. RILEY:  Okay.  What we have is the Government's           |
| 01:31 | 25 | list, and correct me, Norm, if I'm wrong, the list that was    |

01:31

01:31

01:32

01:32

01:32

1  prepared and sent to the jury.

2       THE COURT:  You have the transcripts.  The

3  transcripts have all the admitted evidence.

4       MR. RILEY:  The problem is, Judge, I don't know that

5  that's the case, and I think the exhibit list shows things

6  being admitted on a certain time and the transcript does not

7  reflect the same thing.  There's, there's discrepancies at

8  least over a hundred that's been mentioned to me that are

9  discrepancies between the entry and the actual entry on the

10  exhibit list and the actual date.  Now, maybe it can be

11  explained with greater detail, but it's been a concern and

12  we've discussed it and in great detail with the government and

13  they've been very helpful and we've been trying to work with

14  each other to get to the bottom of it, but the problem is we

15  can't say with specificity and confidence that the list that

16  we have we're working off of is exactly correct.  And it's

17  given us a lot of headaches, a lot of problems.

18       THE COURT:  I thought your Cornerstone people gave

19  you the list.

20       MS. BREWER:  No, your Honor.  The list that

21  Cornerstone provided us was the list that went back, that was

22  uploaded to the Ipad for the jurors and then went back to the

23  jurors and that list is not consistent with the admission date

24  Because they did them in batches.  So if you look at the list

25  which is --

01:32

01:33

01:33

01:33

01:33

| | |
|---|---|
| 1 | THE COURT:  Stop there.  Who did what in batches? |
| 2 | MS. BREWER:  Cornerstone would take the exhibits in |
| 3 | batches and upload them. |
| 4 | THE COURT:  Right. |
| 5 | MS. BREWER:  So there would be dozens on one day and |
| 6 | maybe three within the trial and then a month later they would |
| 7 | do a batch of dozens or hundreds.  So we have dates but you |
| 8 | can see on those dates that they don't correspond with the |
| 9 | date of, of -- that they were introduced or admitted. |
| 10 | THE COURT:  How do you know what date they were |
| 11 | really introduced and admitted? |
| 12 | MS. BREWER:  That's, so that's the issue. |
| 13 | THE COURT:  Well, how do you know that they don't |
| 14 | correspond unless you know what the date was. |
| 15 | MS. BREWER:  Well, because we're looking in the |
| 16 | transcript and we, we compared them with on the front cover |
| 17 | where they list out the exhibits for that day and we've cross- |
| 18 | checked them and they haven't been reliable as far as that we, |
| 19 | -- as far as we can see.  I can get you a more detailed list |
| 20 | of that. |
| 21 | THE COURT:  Which isn't reliable, Cornerstone's or |
| 22 | the transcript? |
| 23 | MS. BREWER:  Both. |
| 24 | THE COURT:  How do you know that? |
| 25 | MS. BREWER:  We looked into the transcripts.  Mr. |

01:34   1   Scarfo looked into every single page and every single exhibit

2   that -- well, he's still working on it I believe, but looked

3   to correspond with when exhibits were admitted, introduced,

4   and it seems to be all over the place. And so we're just

5   trying to get --

6          THE COURT: That happened during the trial by the

7   way. People were forgetting to formally move something into

8   evidence and then do it at the end of the day, oh, by the way,

9   I forgot Exhibit 127. Can we move it now. Sure. Fine.

01:34   10         MS. BREWER: And we did find a lot of occasions when

11   that happened. They would be done in batches. You know, 6000

12   to 6010 we're going to put in today. I'm not -- I'm just

13   using that as an example, but we tried to find, there were

14   other occasions where we looked for that pattern that, you

01:34   15   know, batches were being submitted. We searched just by

16   searching 6-0 to capture 6-0-0-0 through, you know 6-9-9-9 and

17   we found that there were a number of exhibits that weren't

18   matching up with the transcript and that's why we were looking

19   for the Court's exhibit list to be able to compare the

01:34   20   transcript and match all of this up, and that's what we've

21   been struggling with.

22         THE COURT: Well --

23         MR. RILEY: Sometimes there were items that went to

24   the jury that don't appear to have been formally moved into

01:35   25   evidence and we're trying to track those down to present the

01:35

01:35

01:35

01:36

01:36

1    court with those, those items because, of course, if the jury

2    got items that they shouldn't have gotten, I don't know at

3    this point how we can assess that and show that.

4         THE COURT:  How do you explain that you were in

5    charge of that, and that things got to the jury that shouldn't

6    have gotten there?  How do you explain that?

7         MS. BREWER:  Judge, I will point out that at least at

8    the time that each of the parties was responsible for their

9    own materials.  That's, that's at least what was communicated

10   and what I had put in the motion that because of the volume

11   that we were supposed to look at our own materials submitted

12   to the court and then the court would upload it to the Ipad.

13   That's, that's at least what --

14        THE COURT:  And that's weekly you were supposed to

15   check what had been uploaded and then at the end of the trial

16   you were supposed to check and you assured me that you had

17   checked to make sure everything that was uploaded had been

18   admitted into evidence was to go to the jury.

19        MS. BREWER:  And, and we did for our exhibits

20   individually so we --

21        THE COURT:  All the defendants did and the government

22   did, too, I was told.  That's the only condition under which

23   the jury would get to see is if everybody assured me that they

24   had checked the adequacy of the uploads and everybody assured

25   me that they had and everything was fine.  So thus we gave the

1  jurors access.  So I wouldn't give them access to it

2  otherwise.

3       MS. BREWER:  And, Judge, this is -- when you go into

4  this homelessness analysis that the Appellate Court is going

01:36    5  to have to undertake, the purpose of this is to just to square

6  up and get an idea of where the evidence was admitted and if

7  there were exhibits that were not admitted that went back,

8  their -- they could look at this and say, it doesn't matter.

9  There was 2000 exhibits and five were improperly admitted or

01:37    10  given to the jury and it could be considered harmless.  But we

11  can't even get there because we don't know, we can't close the

12  universe as far as what was admitted and what wasn't admitted.

13  So we have to be able to identify dates that, that these

14  exhibits were admitted or not admitted in order to sort of

01:37    15  create a document that we can present to the Appellate Court

16  for the sake of review and that's all we're trying to do, is

17  to make sure that all of this is accurate, that we have a

18  record of when things were admitted, what went back to the

19  jury so that we can present it to the Appellate Court and have

01:37    20  them make a decision on it.

21       THE COURT:  Let's not also forget that before the

22  jurors viewed any piece of evidence in this case, it was all

23  digitized, it was all projected.  Defense counsel had an

24  opportunity to object to it first and then I would rule on

01:37    25  objections.  So either it was never objected to or I overruled

01:38
1   the objection to it.  And there were very few occasions where

2   I overruled any objections because there were few objections

3   as I recalled to the evidence that the jurors saw during the

4   course of the trial.  So you had -- I mean that's the first

5   step to protect the defendants.  The second step then came

6   with that weekly review.  The third step came with a review at

7   the end of the trial.  So I don't know what else we're

8   supposed to do to be honest with you.  But we don't keep, the

9   court doesn't keep the exhibits.  Never has.  The court

01:38
10  doesn't keep an official log.  There's no such thing.  The

11  official record is the transcript.  If you have problems with

12  exhibits that appear in the transcript, then I suggest you

13  talk to the court reporter who was there and have him or her

14  check their notes and then ask.  But if that still doesn't

01:38
15  resolve it, to check the audio to see what happened that day

16  at the time that that was introduced in evidence.  I don't

17  know what else to tell you, just anything else I can do.

18          MS. BREWER:  We can do that, your Honor.

19          MR. RILEY:  Can I have a moment, Judge?

01:38
20          THE COURT:  Yes.

21                  (Brief pause)

22          MR. RILEY:  Judge, maybe my terminology may not be

23  accurate, it wouldn't be the first time.  Number three talks

24  about the court's, the exhibit database uploaded to the jury's

01:40
25  Ipads.  Now I know we have a hard drive given to us by

 1  Cornerstone which shows the content, I believe the full

 2  content of the Ipad.

 3          THE COURT:  Whatever the jurors can see, yes.

 4          MR. RILEY:  Exactly.  The question I have, is there

 5  such an item called a court exhibit database that was uploaded

 6  to the Ipad?  Is that the same thing that we would have from

 7  the Cornerstone hard drive or is that a separate source of

 8  information?

 9          THE COURT:  I can't answer that question.  I don't

10  know where Cornerstone got it, the hard drive from where.

11          MR. RILEY:  Okay.  Does the court have an electronic

12  copy of all of the exhibits?

13          THE COURT:  Well --

14          MR. RILEY:  Separate and apart from the Cornerstone

15  hard drive.

16          THE COURT:  Okay, we have electronic copies of all

17  the exhibits that were provided.  Remember we asked you to

18  provide that to us before trial.

19          MR. RILEY:  Right.

20          THE COURT:  We have that, but that doesn't tell you

21  which ones went into evidence, that database because that was

22  before they were actually moved into evidence and I ruled on

23  any objections to moving something that was just a raw data

24  that both sides gave us that we kept segregated that we then

25  could, once it was admitted, you know, toggle it back into our

01:40
01:40
01:40
01:40
01:41

01:41

01:41

01:41

01:41

01:42

```
 1   server.
 2          MR. RILEY:  Did those -- do they have separate
 3   numbers, or was it given numbers after they were moved into
 4   evidence.
 5          THE COURT:  Well, you provided numbers, we didn't.
 6          MR. RILEY:  All right.  So from what I understand
 7   what you're saying, Judge, you have a copy of all the
 8   exhibits, except they don't necessarily bear the exhibit
 9   numbers that they bore when they were actually moved into
10   evidence.
11          THE COURT:  Well, I don't know.  I didn't say that.
12          MR. RILEY:  Okay.
13          THE COURT:  We have whatever each side gave us.
14          MR. RILEY:  Okay.
15          THE COURT:  And how ever you, how ever you titled
16   them is what we have.
17          MR. RILEY:  In our format, our title.
18          THE COURT:  Whatever you gave us, how ever you gave
19   it to us.
20          MR. RILEY:  Right.
21          THE COURT:  We have that.
22          MR. RILEY:  Okay.
23          THE COURT:  The raw, we have all the raw exhibits
24   that both sides gave us.
25          MR. RILEY:  Does the Court have a separate database
```

```
 1    of items that were given to the jurors, separate and apart

 2    from the Cornerstone hard drive?

 3              THE COURT:  I don't know.  I don't know.  I can find

 4    out.

 5              MR. RILEY:  Okay.

 6              THE COURT:  I don't know.

 7              MR. RILEY:  I think that would go a long way to

 8    helping us relieve some of this.

 9              THE COURT:  But if it's the same as Cornerstone, what

10    difference does it make.

11              MR. RILEY:  Well, I can't think it's a concern.  It

12    may not be and that --

13              THE COURT:  Well, when did Cornerstone get in?  It

14    didn't get it from us.

15              MR. RILEY:  I believe from what I understand, Mr.

16    Catanzaro can shed more light on this since he was head of

17    liaison with Cornerstone.  But my understanding is Cornerstone

18    went right to your IT people and took it off the server that

19    they were working off of.  That's my understanding.  Now I

20    don't, I don't --

21              THE COURT:  Well, that makes sense.

22              MR. RILEY:  Yeah, that would make sense.  I don't

23    know if that's how they did it or maybe they did it or maybe

24    they did it the wrong way.  I don't know.

25              THE COURT:  I don't know.  I can find out if anybody
```

|      |    |                                                                    |
|------|----|--------------------------------------------------------------------|
|      | 1  | remembers how, anybody here remembers how Cornerstone got          |
|      | 2  | their hard drive.  I don't know.  I'll ask if anybody can          |
|      | 3  | remember how they got that information.  I don't know.             |
|      | 4  | MR. RILEY:  Okay.  Thank you, Judge.                               |
| 01:43 | 5 | THE COURT:  All right.  I'm sure Mr. Catanzaro                     |
|      | 6  | doesn't remember.  Do you remember?                                |
|      | 7  | MR. CATANZARO:  (Counsel Shaking His Head)                         |
|      | 8  | THE COURT:  The answer is no.  He's shaking his head              |
|      | 9  | no.  He doesn't remember anything.                                 |
| 01:43 | 10 | MR. CATANZARO:  Oh, I'm sorry.  No.  I'm sorry.  No,             |
|      | 11 | sir.                                                               |
|      | 12 | MR. RILEY:  Judge, we'll, we'll respond to the                    |
|      | 13 | court's order with regard to the one week and we'll get back       |
|      | 14 | to the government on that and hopefully resolve those issues       |
| 01:43 | 15 | and then we'll have to talk to Cornerstone and ask them some      |
|      | 16 | specific questions how they did obtain the data, where did        |
|      | 17 | they get it from and if there's any other data that maybe we      |
|      | 18 | don't have for whatever reason and maybe in the court's           |
|      | 19 | possession in either of those two formats, either the disk or     |
| 01:43 | 20 | --                                                               |
|      | 21 | THE COURT:  Well, I'll ask if we have a copy of                   |
|      | 22 | exactly what was loaded, as opposed to all the raw stuff.         |
|      | 23 | MR. RILEY:  Okay.                                                  |
|      | 24 | THE COURT:  I don't know.  I'll ask if anybody                    |
| 01:44 | 25 | remembers how Cornerstone got the copy of what was loaded in    |

1    the server and available to the jurors.

2            MR. RILEY:  Thank you, Judge.

3            THE COURT:  All right.  And we'll go from there.

4        Mr. Gross, if you want to say something, you're

01:44    5    standing.

6            MR. GROSS:  Judge, I just to make sure that, I'd like

7    to summarize what happened today and make sure everybody

8    understands what we need to do going forward.

9            With respect to number one, we have provided the

01:44   10    defense with a copy of the Government's exhibit list which

11    identifies the exhibits by number.  It describes the exhibits,

12    it states the date that they were offered into evidence and

13    they were admitted into evidence.

14            Now, in Mr. Scarfo's motion, he identifies I think

01:44   15    eight exhibits.  Exhibits number 3000 through 3007.  Those

16    were a series of recorded conversations involving Nicodemo

17    Scarfo Senior who was incarcerated in Atlanta I believe, and

18    our review of the transcript show that the Government's

19    witness who was the custodian of records from the prison and

01:45   20    I'm not remembering at the moment, identified those, the, the

21    actual recordings and the transcripts were made of those

22    recordings.  And then when Agent Gilson testified, those

23    exhibits, those recordings were played to the jury.  There was

24    no objection on the ground that the Government hadn't formally

01:45   25    moved those exhibits into evidence, but it appears that we

01:46

1  neglected to do so.  Other than those eight exhibits, the

2  defendants haven't pointed to anything else that any other

3  exhibits offered by the Government that weren't formally

4  admitted into evidence.  And if there are specific exhibits

5  that they claim were improperly presented to the jury, they

6  need to identify them with specificity, otherwise the

7  procedures described under Federal Rule of Appellate Procedure

8  10 just can't take place.  It's simply insufficient to tell

9  the court, as we've heard today, that there were I think Mr.

01:46

10  Riley said hundreds?

11          MR. RILEY:  I think a hundred and forty, Judge.

12          MR. GROSS:  Okay.  Well, Judge, so where is the list

13  of a hundred 40?  I mean we're now --

14          MR. RILEY:  It's on its way.

01:46

15          MR. GROSS:  Okay.  So this motion was filed back in

16  February, evidence in this case closed sometime in June of

17  2014.  This just has to be brought to a close at some point.

18          With respect to number two, we have provided the

19  defendants I think two years ago with a draft joint appendix.

01:47

20  The Court of Appeals authorized us to submit a draft joint --

21  I'm sorry, a joint Appendix submitted by all the parties that

22  all the parties would use in writing their briefs.  It's going

23  to be thousands of pages and it's going to contain every

24  single exhibit, a copy of every single exhibit that went into

01:47

25  evidence at trial and it's going to contain all the

01:47

01:48

01:48

01:48

01:49

1   recordings.  It's going to take digital copies of the

2   recordings so the Court Appeals will actually be able to

3   listen to the intercepted conversations in this case and will

4   also contain all the transcripts.  They've had that for two

5   years, your Honor.  And we, and we asked them when we gave

6   them the draft, please let us know if there's additional

7   information that you need to be included here.  This is a

8   Joint Appendix and we've not heard back.

9        With respect to number three.  The exhibits database

10  loaded to the jury's Ipad.  I'm informed by Miss DeFay that

11  both the government and the defense have copies, digital

12  copies of that database, and when I -- you know, we've had

13  ongoing discussions since this motion was filed.  I've had

14  telephone conversations with defense counsel and Mr. Riley and

15  Miss Brewer during our last conversation confirmed that they

16  have from Cornerstone that digital file.  So, I -- if they're

17  disagreeing with that now, if they're saying that my

18  representation that we had that conversation is inaccurate in

19  any way, I'd like them to say so and tell me why it's wrong.

20  But unless they do, I think number three has been resolved

21  they have the database, they have the actual stuff that the

22  jurors saw on their Ipads.

23       Jury information and questionnaires.  The court has

24  addressed that.  The court has the questionnaires.  I just

25  want to ask, do we also, does the court have the juror list?

1    Because my understanding is, may not be accurate because I

2    didn't participate in the voir dire, but my understanding is

3    that the court assigned numbers to all of the people who were

4    summoned for voir dire in this case.  Probably several hundred

01:49    5    people, and they were all assigned a number.

6            THE COURT:  I don't know that some but certainly

7    everyone who came here.

8            MR. GROSS:  Right.

9            THE COURT:  And answered the questionnaire was told

01:49    10   to use the jury number and not their name on the

11   questionnaires.

12           MR. GROSS:  All right.  So --

13           THE COURT:  There was a number of people summoned

14   that never showed up.

01:49    15          MR. GROSS:  Okay.  So, so those juror numbers would

16   have been written on the questionnaires.

17           THE COURT:  Right.

18           MR. GROSS:  Okay.

19           THE COURT:  There were no names on the

01:50    20   questionnaires, just the juror numbers.

21           MR. GROSS:  Right.  And then there was some

22   subsequent list of numbers assigned to the jurors who were

23   brought into the courtroom for voir dire because I guess the

24   court winnowed down --

01:50    25          THE COURT:  No.  The process was we took it a day at

1    a time, and I forget how many, brought in 60 in the morning,

2    60 in the afternoon to fill out the questionnaires.  Then all

3    the attorneys would get a copy of the questionnaire at that

4    point.  And the next day while the second day of jurors were

01:50    5    here filling out questionnaires and then counsel, all the

6    attorneys would address the court as to those jurors from day

7    one who they agreed should be excused for cause.  So we just

8    threw them all out.  They never -- we never talked to them

9    again.  And then I would entertain, based on the questionnaire

01:51    10    only any other challenges for cause for each side.  All right?

11    And would grant some and deny some.  Then you'd be left with X

12    number of questionnaires of people who passed test number one.

13    We did that every day for a week, and at the end of that week

14    we have I think was a little over a hundred people left gotten

01:51    15    through the questionnaire process.  The second week then was

16    devoted to bringing in those people one at a time.  We'd bring

17    in I think 30 or 40.  I forgot the number, probably 30 for

18    each day.  And then I'd bring them out one at a time and put

19    them in the jury box -- in the witness stand and I'd go over

01:51    20    with them some of the questionable answers on the

21    questionnaire and then all the attorneys had the ability to

22    individually voir dire.  I'd have the attorneys introduce

23    themselves and then they each had the ability to voir dire

24    that juror on the basis of the questionnaire answers.  And

01:52    25    then when that juror would leave, I would entertain

01:52

01:52

01:52

01:53

01:53

1  applications for challenges for cause.  Well, sometimes we

2  didn't even get that far because it was clear from the first

3  few answers you got from the juror that they couldn't sit.  So

4  we did that for a week and we whittled it down to some number,

5  I don't know I needed a certain number of people left at that

6  point.  Then I brought them all in one day and we just started

7  randomly filling the jury box with numbers and then people

8  could exercise their preemptory challenges and then, you know,

9  juror in seat number two was challenged.  So we'd put somebody

10 else from the audience in two.  But there would be really no

11 more questions at that point.  That's how the process works.

12          MR. GROSS:  Right.  And then -- okay.

13          THE COURT:  But everybody remained identified by

14 number, juror number only.

15          MR. GROSS:  That was the number that was assigned to

16 them when the questionnaires were sent out.

17          THE COURT:  Yes.

18          MR. GROSS:  Okay.  Thank you.

19          THE COURT:  Now we did -- there is a list, one list

20 of the actual names of those people that we have.  But like I

21 said, I've never known the names.  None of my staff has ever

22 known the names.  Someone in the jury department knew the

23 names and we have that and then the actual names of these

24 people.  But, you know, there's been no suggestion of any

25 juror misconduct in five years.  So that's how that process

|       |    |                                                                     |
|-------|----|---------------------------------------------------------------------|
|       |  1 | works.                                                               |
|       |  2 | MR. GROSS:  Thank you, Judge.  All right.  Number                    |
|       |  3 | five.  We have supplied to all defense counsel some weeks ago        |
|       |  4 | the identity of all audio exhibits that were played or              |
| 01:53 |  5 | referenced during the initial and rebuttal summation.  And my       |
|       |  6 | understanding is that Mr. Riley is satisfied with that              |
|       |  7 | information.  And so, therefore, number, item number five has       |
|       |  8 | been resolved.                                                      |
|       |  9 | MR. RILEY:  Correct.                                                 |
| 01:53 | 10 | MR. GROSS:  Thank you.  Number six, is the March 5th               |
|       | 11 | transcript I have assigned that the defendants in the next          |
|       | 12 | week are going to review that particular transcript and tell        |
|       | 13 | us what complaints they have about it, if any.                      |
|       | 14 | THE COURT:  I don't think there's any evidence that                 |
| 01:54 | 15 | there's an 86 minute gap at this point.                             |
|       | 16 | MR. GROSS:  Number seven, your Honor.                               |
|       | 17 | THE COURT:  They're not getting the audio recordings.              |
|       | 18 | MR. GROSS:  Right.  You have directed the defendants               |
|       | 19 | in the next week to identify mistakes in any of the                 |
| 01:54 | 20 | transcripts, and they will address those purported errors to        |
|       | 21 | the court reporters who served on those days and ask for their      |
|       | 22 | transcript to be corrected.                                         |
|       | 23 | Number eight, it's been resolved.                                  |
|       | 24 | Number nine.  My understanding of the Court's Order is            |
| 01:54 | 25 | that they will identify in the next week any sealed documents        |

|  | 1 | that they believe are missing from the official docket and |
|---|---|---|
|  | 2 | then the court -- and I guess they will also inform the court |
|  | 3 | whether they want to review those documents or whether the |
|  | 4 | court should review those docket items in camera to see if |
| 01:55 | 5 | they should be turned to the defense. |

THE COURT:  If defense counsel wants to give me the numbers, the docket entry numbers, I'm happy to look at them.

MR. RILEY:  We'll do that, Judge.

THE COURT:  All right.  That's all I can do.

01:55  MR. GROSS:  All right, Judge.  Should we schedule another status conference in this matter or should we wait until defendants have responded to your Honor's Orders?  I'm just trying to keep this on track.

THE COURT:  You're just itching to write that brief,

01:55  aren't you.

MR. GROSS:  I'm going to have to write it sometime, Judge.  I'd like to write it before my brain closes down any more than it already has.

MR. RILEY:  We won't comment on that, Judge.

01:56  MR. GROSS:  Thank you.  I appreciate the courtesy.

MR. RILEY:  I can't speak for Mr. Huff.

MR. HUFF:  Off the record.

THE COURT:  Well, why don't we come back in this is the twenty-third.  We can come back in two weeks.

01:56  MR. GROSS:  Seventh of May?

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | THE COURT:  No.  Better do it on the 8th.  I got a                        |
|       | 2  | lot scheduled.  Wait a minute.  Wait a minute.  Wait a minute.            |
|       | 3  | The ninth, Thursday the ninth at 2:00 p.m.  How is that?                  |
|       | 4  | MR. GROSS:  That's fine for the government, Judge.                        |
| 01:57 | 5  | MS. BREWER:  Judge, do you want to us to identify if                      |
|       | 6  | there are inconsistencies with regard to the exhibits and by             |
|       | 7  | looking at the transcript or provide the list of the hundred             |
|       | 8  | and 40 or both?  We have a list that we used their list to               |
|       | 9  | double-check the transcripts and we found a hundred and 40               |
| 01:57 | 10 | that we believe were not admitted.  But then there's also the            |
|       | 11 | matter of what's listed on the first, the transcript that I              |
|       | 12 | don't think is accurate.  So I don't know which you would                |
|       | 13 | prefer.  If you refer to do both or --                                   |
|       | 14 | THE COURT:  When you say there's a hundred and 40                         |
| 01:57 | 15 | exhibits that were never formally moved in evidence.                      |
|       | 16 | MS. BREWER:  That's what Mr. Scarfo has identified.                       |
|       | 17 | I will get it as well, Judge, and if it appears to be correct.           |
|       | 18 | I will double check the number of them, and I've been able to            |
|       | 19 | search on my computer we think it will be quick.  But if you             |
| 01:58 | 20 | want me to look at the transcript, that's a different, that's            |
|       | 21 | a different process.  I can, I can also do that.  I just                  |
|       | 22 | wanted some clarity.                                                      |
|       | 23 | THE COURT:  No, I think you need to look at the                           |
|       | 24 | transcripts to see if there's an entry for that that they                |
| 01:58 | 25 | admitted into evidence.                                                   |

|      |    |                                                              |
|------|----|--------------------------------------------------------------|
|      | 1  | MS. BREWER:  Okay.                                            |
|      | 2  | THE COURT:  Do you have the dates that they were             |
|      | 3  | admitted?                                                     |
|      | 4  | MS. BREWER:  If, if we're referring to that second or        |
| 01:58 | 5  | third page on the transcript, if that's what you're referring |
|      | 6  | to, I can, I can look at those pretty quickly.               |
|      | 7  | THE COURT:  Well, there's an index on the back of            |
|      | 8  | each transcript I believe also.  You can also look it up that |
|      | 9  | way.                                                          |
| 01:58 | 10 | MS. BREWER:  I can do that as well.  I just might           |
|      | 11 | need a little bit longer than a week and a half because --   |
|      | 12 | THE COURT:  You've had five years to do this.  You've       |
|      | 13 | had plenty of time.                                          |
|      | 14 | MS. BREWER:  Okay, okay.  I can figure it out.             |
| 01:58 | 15 | THE COURT:  Mr. Huff, you have nothing to say today?        |
|      | 16 | MR. HUFF:  I, I join in the arguments of co-counsel.        |
|      | 17 | THE COURT:  All right.  Take a stand, Mr. Huff.  Take       |
|      | 18 | a stand.                                                      |
|      | 19 | MR. HUFF:  I do have the disk.  I found it, your           |
| 01:59 | 20 | Honor.                                                        |
|      | 21 | THE COURT:  What are you going to do with it?               |
|      | 22 | MR. HUFF:  I'm going to read over all of it, your          |
|      | 23 | Honor.                                                        |
|      | 24 | MR. RILEY:  It's going to be on the file, Judge.  He       |
| 01:59 | 25 | wants to be ready.                                            |

|  |  |
|---|---|
|  | 1 |

01:59 lines aligned:

```
                    THE COURT:  Mr. Archie, anything you want to say?

                    MR. ARCHIE:  Judge, I have a stupid question earlier

          when Mr. Gross was speaking.  The Ipad that the jury has, does

          the Third Circuit get that, or are we just relying on the

          appendix.

                    THE COURT:  You mean you get the Ipad?

                    MR. ARCHIE:  Yeah, the Ipad.

                    THE COURT:  There's nothing on the Ipad.  It's on the

          server.

                    MR. ARCHIE:  Okay, so it's on the server.  Okay.

                    THE COURT:  It's on the server.

                    MR. ARCHIE:  Okay.

                    THE COURT:  We wipe them clean after the trial.

                    MR. ARCHIE:  Okay.  All right.  If we looked at the

          Ipad versus what we had, it may solve the problem, but if it's

          on the server.

                    THE COURT:  No, we've used those Ipads many times

          since then.  They get wiped after every case.  I don't think

          you'll be able to find anything on the Ipad.

                    MR. ARCHIE:  Fine.

                    THE COURT:  Anything else, counsel?

                    MR. CATANZARO:  No, your Honor.

                    THE COURT:  All right.  Thank you, everybody.  We'll

          see you in a couple of weeks.

                    MR. ARCHIE:  Thank you, Judge.
```

1     THE COURT: Mr. Archie, anything you want to say?

2     MR. ARCHIE: Judge, I have a stupid question earlier

3 when Mr. Gross was speaking. The Ipad that the jury has, does

4 the Third Circuit get that, or are we just relying on the

01:59   5 appendix.

6     THE COURT: You mean you get the Ipad?

7     MR. ARCHIE: Yeah, the Ipad.

8     THE COURT: There's nothing on the Ipad. It's on the

9 server.

01:59   10     MR. ARCHIE: Okay, so it's on the server. Okay.

11     THE COURT: It's on the server.

12     MR. ARCHIE: Okay.

13     THE COURT: We wipe them clean after the trial.

14     MR. ARCHIE: Okay. All right. If we looked at the

01:59   15 Ipad versus what we had, it may solve the problem, but if it's

16 on the server.

17     THE COURT: No, we've used those Ipads many times

18 since then. They get wiped after every case. I don't think

19 you'll be able to find anything on the Ipad.

02:00   20     MR. ARCHIE: Fine.

21     THE COURT: Anything else, counsel?

22     MR. CATANZARO: No, your Honor.

23     THE COURT: All right. Thank you, everybody. We'll

24 see you in a couple of weeks.

02:00   25     MR. ARCHIE: Thank you, Judge.

1          (The matter was then concluded)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  I certify that the foregoing is a correct transcript from the

2  record of proceedings in the above-entitled matter.

3

4  /S/ Carl Nami, Official Court Reporter

5

6  Court Reporter/Transcriber

7  April 23, 2019

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT "B"

*1*

1      **UNITED STATES DISTRICT COURT**
2      **FOR THE DISTRICT OF NEW JERSEY**

3      _____

**UNITED STATES OF AMERICA**
4
             -vs-                    **CRIMINAL NUMBER:**
5
**NICODEMO SCARFO, ET AL,**            **11-740**
6                                    **STATUS CONFERENCE**
         **Defendants.**
7      _____

8      Mitchell H. Cohen United States Courthouse
       One John F. Gerry Plaza
       Camden, New Jersey 08101
9      May 13, 2019

10     **B E F O R E:**         HONORABLE ROBERT B. KUGLER
                           SENIOR UNITED STATES DISTRICT JUDGE
11

       **A P P E A R A N C E S:**
12

13     OFFICE OF THE UNITED STATES ATTORNEY
       BY: NORMAN GROSS
       ASSISTANT UNITED STATES ATTORNEYS
14

15     MICHAEL E. RILEY, ESQUIRE
       THE WASHINGTON HOUSE
       100 HIGH STREET
16     MOUNTY HOLLY, NEW JERSEY 08060
       ATTORNEY FOR NICODEMO SCARFO
17

18     TROY A. ARCHIE, ESQUIRE
       21 ROUTE 130 SOUTH
       CINNAMINSON, NEW JERSEY 08077
19     ATTORNEY FOR SALVATORE PELULLO

20     MICHAEL N. HUFF, ESQUIRE
       1333 RACE STREET
21     PHILADELPHIA, PA 19107
       ATTORNEY FOR WILLIAM MAXWELL
22

       MARK W. CATANZARO, ESQUIRE
23     21 GRANT STREET
       MOUNT HOLLY, NEW JERSEY 08060
24     ATTORNEY FOR JOHN MAXWELL

25

| | | |
|--|--|--|
| | 1 | (Defendants not present) |
| | 2 | (The following took place in open court) |
| | 3 | THE DEPUTY COURT CLERK:  All rise. |
| | 4 | THE COURT:  How is everybody? |
| 00:37 | 5 | MR. RILEY:  Good, Judge.  How are you? |
| | 6 | THE COURT:  Good.  Let's have the appearance of |
| | 7 | counsel.  We'll start with the government, please. |
| | 8 | MR. GROSS:  Good afternoon, your Honor.  Assistant |
| | 9 | United States Attorney Norman Gross, with Paralegal Specialist |
| 00:37 | 10 | Ann DeFay. |
| | 11 | MR. RILEY:  Good afternoon, Judge.  Mike Riley for |
| | 12 | Mr. Scarfo. |
| | 13 | MS. BREWER:  Good morning, your Honor -- or good |
| | 14 | afternoon, your Honor.  Sarah Brewer on behalf of Mr. Scarfo. |
| 00:37 | 15 | MR. ARCHIE:  Good afternoon, your Honor.  Troy Archie |
| | 16 | on behalf of Salvatore Pelullo. |
| | 17 | MR. HUFF:  Good afternoon, your Honor.  Michael Huff |
| | 18 | on behalf of William Maxwell. |
| | 19 | MR. CATANZARO:  Good afternoon, your Honor.  Mark |
| 00:37 | 20 | Catanzaro appearing on behalf of John Maxwell. |
| | 21 | THE COURT:  All right.  As far as I know, no one has |
| | 22 | asked any court reporter to correct any transcripts.  So I |
| | 23 | guess that's not an issue anymore.  And exhibits shouldn't be |
| | 24 | an issue anymore.  And I see that you listed all these docket |
| 00:38 | 25 | entries that are not viewable to the public.  Correct? |

00:38

         1          MR. RILEY:  Yes, sir.

         2          THE COURT:  All right.  I'll look at these.  And what

         3  is it you want me to look for?

         4          MR. RILEY:  Judge, you know, we, actually we don't

         5  know, we don't know what we don't know and --

         6          THE COURT:  What are you afraid of?

         7          MR. RILEY:  Well, Judge, I'm afraid of everything.

         8  At this stage in my life I have no --

         9          THE COURT:  Don't go there.  I'm almost where you

        10  are.

        11          MR. RILEY:  Yeah, I know.  You're catching up to me.

        12          THE COURT:  All right.

        13          MR. RILEY:  But, in any event, Judge, there's, I'm

        14  sure there are items in there that we have no interest in and

        15  also may not and may not be able to see them for a variety of

        16  other reasons.  But we do know or we think we feel we know

        17  there may be information within those sealed documents

        18  that might be helpful to us in the sense of prosecuting the

        19  appeal and dealing with the issues of Mr. Scarfo's issues and

        20  we don't know because we just simply don't know what they are.

        21          THE COURT:  Okay, I'll take a look at them.  If I

        22  find anything that might be useful, I can release them.  I'll

        23  let you know what it is.

        24          MR. RILEY:  Judge, really at this stage of the game

        25  that's really all we're asking because as I indicated, I think

1   there's approximately 50 or 60 of them, the count.

2          THE COURT:  You know, I have nothing else to do.  So

3   --

4          MR. RILEY:  Okay.  Keeps you busy.

00:39   5          THE COURT:  All right.  Are there any other issues

6   still out there that we need to resolve before we can get you

7   over to Philadelphia where you belong?

8          MR. RILEY:  Actually, Judge, I don't believe so.  My

9   colleagues might, but we don't.

00:39   10          MR. ARCHIE:  No, Judge.

11          THE COURT:  Okay.  You want to stick around for a

12   while?  I'll start looking at this stuff?

13          MR. RILEY:  Sure.

14          THE COURT:  I don't think -- are they accessible

00:39   15   here?  Do I have to go up to my office?  Are they accessible

16   here or do I have to go up to my office?

17          MR. GROSS:  Judge, you mind if I consult with Mr.

18   Riley?

19          THE COURT:  Off the record, Carl.

00:40   20          (Off the record discussion took place)

21          (Norman Gross and Michael Riley conferring off the

22   record)

23          (Back on the record in open court)

24          THE COURT:  Number two, is just the arrest warrant

00:43   25   issued to the defendants.  Five is the summons that was issued

|     |     |
| --- | --- |
|         | 1 | to Mrs. Scarfo.  Larry, where is 23? |
|         | 2 | (Brief pause) |
|         | 3 | THE COURT:  Forty-four is Leshner's CJA affidavit, |
|         | 4 | financial affidavit. |
| 00:44   | 5 | Fifty is Mr. Scarfo's financial affidavit. |
|         | 6 | Fifty-four is Mr. Parisi's affidavit. |
|         | 7 | Fifty-five is Mrs. Scarfo's affidavit.  This is all for |
|         | 8 | CJA appointments. |
|         | 9 | Seventy is William Maxwell's financial affidavit. |
| 00:45   | 10 | Seventy-five is Handley's financial affidavit. |
|         | 11 | Eighty-three is John Maxwell's financial affidavit. |
|         | 12 | Eighty-five is Pelullo's financial affidavit. |
|         | 13 | One forty-three is a transcript of something that |
|         | 14 | happened on March 9th.  Let me see what that is. |
| 00:46   | 15 | Larry, you have to enter your password again. |
|         | 16 | MR. GROSS:  Judge, is that March 9, 2012? |
|         | 17 | THE COURT:  Hang on.  We'll be right back. |
|         | 18 | (Brief pause) |
|         | 19 | THE COURT:  Okay.  March 9, 2012, yes.  This is part |
| 00:47   | 20 | of the Melissa Jampole, remember?  It was sealed because we |
|         | 21 | removed all the prosecutors? |
|         | 22 | MR. RILEY:  The Taint Team. |
|         | 23 | THE COURT:  The Taint Team.  The defendants were all |
|         | 24 | here.  Miss Jampole talking about setting up the Filter Team |
| 00:48   | 25 | who is handling it.  Miss Torg was involved in it regarding |

1    Mr. McCarthy's office.  Matt Smith was handling the search of

2    Manno's office.  She says that she had met with all of you.

3    I'm not sure why you wouldn't have this.  Going over all the

4    phone calls that were tape recorded that involved lawyers.

00:48    5    And she's giving us how long it's going to take for her to get

6    through all of this but defense counsel are here.  They're on

7    the record talking about some of these things.  I guess the

8    only reason we sealed was to prevent the Prosecution Team from

9    seeing it as to all the privileged conversations.  And it was,

00:49    10    it was only 13 pages.  Just essentially telling us what the

11    plan was and how long she thought it would take to get through

12    all this stuff.  Okay?  Larry, you got to do it again.

13                    (Brief pause)

14            THE COURT:  Why don't you just write it down.  I'll

00:50    15    do it.

16                    (Brief pause)

17            THE COURT:  Okay.  Thank you.  Okay.  One-ninety is

18    Mr. Pelullo through Mr. Archie's application to hire a Texas

19    based defense investigator.  I assume you remember what that

00:51    20    was.

21            MR. ARCHIE:  Yes.

22            THE COURT:  Okay.  One ninety-five is an order

23    extending the time for the Government to review the materials

24    seized as a result of the search of the law firm of Isien,

00:54    25    Fineberg and McCarthy, and that search warrant had been issued

1   out of E.D.P.A.

2        As of September 12, 2012 I granted an additional

3   120 days for the government to complete the review of the

4   documents seized from the firm of Isien, Fineberg and McCarthy

00:54   5   pursuant to the search warrant issued by the Honorable Timothy

6   R. Rice in the Eastern District of Pennsylvania.

7                    (Brief pause)

8        THE COURT:  I can't access 304 for reasons I don't

9   understand.  It's not linked to a document.  It's an unsealed

00:55   10   record from September 7th of 2012.  You'll have to hand find

11   that one.  It refers back to September 12th.  The only thing

12   that happened on September 12th had a hearing regarding Brady

13   ESI, attorney-client privilege matters.  Order to be entered

14   and they also entered an order that date regarding Mr.

00:56   15   Pelullo's relevant medical records.  I can't tell you what

16   that was about.  I don't remember.  304 we'll have to see if

17   we can hunt that down, whatever that is.  329 written

18   documents from Mr. Manno.  476 is the transcript from March 8,

19   2013.  477 is a transcript from December 12th, 2012.  Let me

00:57   20   look at them.

21        MR. GROSS:  Judge, you said December 12, 2012?

22        THE COURT:  Yeah.  On the 476, which is a transcript,

23   which is a transcript from March 8th of 2013.  I see that

24   notation that Pelullo and Scarfo were both here.  Talked about

00:58   25   the destruction of the NRESI.  Mr. Catanzaro reported on the

00:59

1  scanning.  How many boxes were left to be done.  I gave out

2  proposed jury questionnaires.  Told you I would give you a

3  copy of the script I was going to use to address the potential

4  jurors, and there's reference to a letter I had gotten even

5  from Miss Jampole about the privilege issues.  And she was

6  complaining in a letter to me that in her motions, people were

7  disclosing what was then some of the motions about some of the

8  privileged material.  And at that point, the prosecution team

9  left the courtroom and we talked about those privilege issues.

01:00

10 Then we talked about the problems at FDC Philadelphia with the

11 defendants getting access to the discovery and the kiosk.  You

12 remember the kiosk.

13         (Brief pause)

14         THE COURT:  All right.  Now the transcript and why it

01:01

15 was filed later from December 12th of 2012, talked about still

16 scanning the documents.  How much it's going to cost.  And

17 that's the meeting in which Mr. Catanzaro was appointed to be

18 the liaison for scanning and the discovery.  He was kind

19 enough to accept the appointment.  The last time he

01:02

20 volunteered to do anything.  Mr. Cinquanto was here.  He was

21 talking about the progress he is making and not making.  I

22 asked Mr. D'Aguanno if he wanted -- if he was going to make a

23 motion for an anonymous jury.  He said he needed more time.

24 Mr. Gross says he needed more time on the Title III motions.

01:03

25 I don't -- I can't imagine why he wouldn't have copies of

1    this.  Talking more about the discovery problems in

2    Philadelphia BOP and the laptops.

3         MR. GROSS:  Judge.

4         THE COURT:  Yes.

01:03    5         MR. GROSS:  Miss DeFay has pulled up a transcript on

6    her laptop.  She said portions of it starting on page 25 are

7    redacted.

8         THE COURT:  Okay.

9         MR. GROSS:  At least the version she has.

01:04    10         THE COURT:  Okay.  Miss Jampole was here again.

11    That's what happened.  So we threw the prosecutors out and she

12    reported on the status of the review and where she was with

13    that and the phone calls and she had never raised with defense

14    counsel about it and talked to them about it.  That's what

01:04    15    that's all about.  Most of the defense counsel actually spoke

16    during that, including Mr. Riley and Mr. Archie because Mr.

17    Scarfo and Mr. Pelullo were here, would hear, that was the

18    meeting in which we were trying to make some decisions about

19    the laptops and you needed time to talk to your clients about

01:05    20    that.  So that's what's there on that one.  I have no idea why

21    549 is unavailable.  It's a communication from the Third

22    Circuit assigning a case number as to some appeal Mr. Pelullo

23    had filed.

24         551 is the Government's motion for anonymous jury.

01:06    25         552 is Adler's opposition to the government's motion.

01:07

    1       553 is Lisa Scarfo's opposition motion to the

    2  government's motion.

    3       554 is Handley's opposition to the government's motion.

    4       555 is Manno's opposition to the government's motion.

    5      MR. GROSS:  Judge, did we skip 550?

    6      THE COURT:  I'm on that right now.  That's the Order

    7  from the court telling the Clerk to seal that motion by the

    8  Government.

    9      MR. GROSS:  Okay.

01:07   10      THE COURT:  Five-fifty-nine is Pelullo's opposition

  11  to the government's motion.

  12      635 is David Adler's second motion for severance.

  13      645 is the government's memo in support of their motion

  14  to disclose certain documents and files that were seized from

01:08   15  the Isien, Fineberg, McCarthy and offices.  That was filed by

  16  Miss Jampole.

  17      668 is William Maxwell's motion to issue subpoenas

  18  pursuant to Rule 17(c).

  19      669 is the U. S.'s opposition to Adler's motion for a

01:09   20  severance.

  21      686 was the Filter Team's response to Pelullo's motion

  22  to bar evidence from the wiretaps that had been reviewed by

  23  the Filter Team.

  24      668 is Gary McCarthy's response to Miss Jampole's

01:09   25  application regarding the Filter stuff.

1        698 is the Government's reply to Pelullo's opposition

2   to the government's motion to disclose the document seized

3   from Isien, Fineberg, and McCarthy.

4        7-0-2 is Pelullo's reply to the Taint Team's response

01:10    5   to Pelullo's motion to bar the government from using evidence,

6   work product and attorney/client and to dismiss the

7   indictment.

8        I'm going to jump out of turn here because the next one

9   that comes up is 721.  I'll get back to these others because

01:11   10   that's just the next one on the list.  That's the -- Pelullo's

11   response to the Taint Team's request to produce Pelullo's

12   Taint Team's request to submit to the trial prosecutors

13   certain evidence regarding Mr. Pelullo.

14        712 is the government's opposition to Scarfo's motion

01:11   15   to dismiss the extortion predicate in the indictment.

16        715 is again the Filter Team's memorandum in support to

17   disclose certain intercepted wire electronic communications as

18   to the defendants.

19        728 is Scarfo's reply to the Government's opposition to

01:12   20   the motion to dismiss the extortion predicate and to bar

21   references to the crime of extortion.

22        765 is Adler's third motion for a severance.

23        773, that's some kind of application by the Government.

24   It's not linked to -- we'll have to find that one.

01:13   25        777 seems to be, 773 is not available.  We'll have to

1    find that.

2        815 is the Order I entered requiring the Marshals to

3    transport the jurors and to provide security for the

4    transportation of the jurors.

01:14    5        820 amends that Order about security and transportation

6    for the jurors.

7        821 is it looks a motion by the Government to preclude

8    publication of exhibits by David Adler.

9        845 is the -- we talked about this before.  That's the

01:15    10   motion, Brady motion by Adler in which Barry Gross wanted me

11   to require the prosecutors to certify that they complied with

12   their Brady obligation.  And had to do with a document

13   regarding an interview with Handler which could have been

14   considered I guess Brady material as to Adler but not as to

01:15    15   anybody else.

16       875 is the Government's memorandum in opposition to

17   Pelullo's motion to dismiss the indictment for prosecutorial

18   misconduct before the Grand Jury or to require disclosure of

19   all Grand Jury transcripts.

01:16    20       883 is an application by John Maxwell for the issuance

21   of subpoenas.

22       937 is an Order as to Pelullo's application for

23   subpoenas.

24       938 is an Order as to John Maxwell's application for

01:17    25   subpoenas.

1      942 is another motion by David Adler regarding <u>Brady</u>

2  materials.  Again requesting the Court to require the

3  prosecutors to certify compliance with <u>Brady</u>.

4      1,001 is an Order granting an application by William

01:17    5  Maxwell.

6      1157 is a transcript from November 21, 2013.  I don't

7  have a link to it.  So I don't know what it is.  But there's

8  another transcript at 1158 also been sealed.  Again as to

9  November 21st, 2013.  I'm wondering if this is the Farrell

01:18   10  thing.  Mr. Gross will remember that.

11      MR. GROSS:  I do, your Honor.  And Miss DeFay has the

12  transcript from November 21, 2013 had to do with the

13  Government, with a government motion regarding Agent Pennock.

14      THE COURT:  Yeah, that's the one that I have but

01:19   15  there's another one of that date that I cannot access.  I'm

16  wondering if that's the other one because that's from about

17  the right time frame and Mr. Farrell had that problem in

18  Philadelphia, and we went back in the robbing room.  And that

19  was on the record.  But I'll check that.

01:19   20      MR. GROSS:  Okay.

21      THE COURT:  Twelve forty-four is the government's

22  response to Pelullo's motion to compel discovery.

23      1286 is simply the Court of Appeals assigning a case

24  number as to Mr. Scarfo's notice of appeal.

01:20   25      1296 is not sealed.  It's on your list.  That's a

1    letter from me to Mr. Riley and Mr. D'Aguanno regarding some

2    subpoena Mr. Riley wanted to issue.

3        1301 is the Court of Appeals assigning a case number

4    and a case manager to John Maxwell's appeal.

01:21    5        1309 is the same thing as to William Maxwell's appeal.

6        1327 is same thing again as to William Maxwell's

7    appeal.

8        1348 is a transcript of proceedings held on April 30,

9    2015.  Let's see what that is.  Oh, this is about a letter

01:22    10   that Mr. Pelullo sent me asking that Mr. Archie be replaced by

11   new counsel and wanting Mr. Farrell.  We know how that turned

12   out.  But that's what that's about, discussion about Mr.

13   Pelullo.  I had Mr. Pelullo with Mr. Archie and Mark

14   Ciddrone's name comes up and that's about that stuff that was

01:23    15   going on in Philadelphia where I think they're Russian guys.

16   But that's all there was.  I think I hit them all.

17            MR. GROSS:  Judge, I'm not sure you hit 745?

18            THE COURT:  Seven forty-five?

19            MR. GROSS:  Yes.

01:23    20            THE COURT:  Well go back and get it then.

21                    (Brief pause)

22            THE COURT:  We don't seem to have a 745.

23            MR. GROSS:  Just the other one.  We don't have

24   anything for I believe, number 23.

01:24    25            THE COURT:  Yeah, we don't have that.  We're going to

01:25

```
 1   have to run that down.

 2          MS. BREWER:  Judge, I may have missed one, 1327.

 3          THE COURT:  Oh, hang on a minute.  Still looking for

 4   745.  Sometimes these things show up much, much later.  We'll

 5   have to run that down.  I don't know where 745 got to.

 6          MS. BREWER:  Judge, a summary entry here is actually

 7   says a Clerk's note.  It says minute entry Document 745 was

 8   deleted for computer purposes.  Being re-docketed as

 9   Document 749.

10          THE COURT:  Seven forty-nine.  Thank you.  Seven

11   forty-nine is just a minute entry from the Clerk for the

12   proceedings for voir dire from November 4th, 2013.  A minute

13   entry, it's 749 right, Miss Brewer?

14          MS. BREWER:  That's right, Judge.

15          THE COURT:  Minute entry for proceedings held before

16   Judge Robert B. Kugler's, voir dire be done on 11/4/2013.

17   That's all it is.  You want me to look at 1327.

18          MR. GROSS:  Judge, I have --

19          THE COURT:  That's the case number and assignment of

20   a case manager by the Court of Appeals for William Maxwell's

21   appeal.  That's 1327.  Why the Third Circuit sealed it, I have

22   no idea, but it says right in there, docket restricted to

23   Court Staff.  I don't know why they do it.  So, 23 we can't

24   find and 745 we now find as 749.  But I can access 3-0-4 or

25   773 or 777 or 1157.  So we'll have to hand locate those.
```

1    Yeah, 773 is some government ex parte application submitted on

2    November 21st, 2013, but I can't -- there's no link on our

3    machine.  So --

4         MR. GROSS:  Judge, what date did you say when the

01:28    5    application was submitted?

6         THE COURT:  November 21, 2013, and then -- so that's

7    773.  And 777 is the Order I entered in response to that which

8    was November 25th of 2013.  I don't remember what it is.  But

9    the Government may have them.  I don't know.

01:29    10        MR. GROSS:, we'll see what we have, Judge.

11        THE COURT:  Okay.  I think that's it, though.  Yes on

12   the transcript.  The transcript, I think 1157 is the

13   transcript of what happened in the robing room regarding the

14   dispute and his problems with the Judges in the Common Pleas

01:30    15   Court in Philadelphia that had come to my attention.  I will

16   ask Mr. Nami to look back to November 21st, 2013 and if it

17   helps you, Mr. Nami, there's a note that says where you were

18   the court reporter maintained in a sealed vault and it says

19   modified on 9/23/2014.  I don't know what that means.  So

01:30    20   we'll see if we can find that .  But I'm pretty sure that's

21   what that is.

22        Anybody else have any questions about any of these

23   documents or these are docket entries, not documents.

24                    (No response)

01:31    25        MR. GROSS:  Nothing from the government, your Honor.

|       |    |                                                                 |
|-------|----|-----------------------------------------------------------------|
|       | 1  | THE COURT:  Is there anything else from anybody about           |
|       | 2  | any of these problems?  Are we done, except for these           |
|       | 3  | outstanding pieces?                                             |
|       | 4  | MR. RILEY:  I'm sorry, Judge.                                    |
| 01:31 | 5  | THE COURT:  Are we done?                                         |
|       | 6  | MR. RILEY:  I believe so.  I think what we'll do is             |
|       | 7  | review the list of what the entries are and possibly make a     |
|       | 8  | request to get some of them.                                    |
|       | 9  | THE COURT:  Send a letter.                                       |
| 01:31 | 10 | MR. RILEY:  We will.  Thank you for your time, Judge.           |
|       | 11 | THE COURT:  No problem.  So we're going to get this            |
|       | 12 | thing over to Philadelphia in the new century?                  |
|       | 13 | MR. GROSS:  My fondest hope, Judge, because in the             |
|       | 14 | next century I don't know what I will be able to do with this. |
| 01:32 | 15 | THE COURT:  Well, I will promise you I won't be here.         |
|       | 16 | As much as I miss all of you.  My thanks to everybody.          |
|       | 17 | MR. RILEY:  Thank you, Judge.                                    |
|       | 18 | MR. GROSS:  Thank you, your Honor.                               |
|       | 19 | MS. BREWER:  All right, thank you, Judge.                        |
| 01:32 | 20 | (The matter was then concluded)                                 |
|       | 21 |                                                                 |
|       | 22 |                                                                 |
|       | 23 |                                                                 |
|       | 24 |                                                                 |
|       | 25 |                                                                 |

1   I certify that the foregoing is a correct transcript from the

2   record of proceedings in the above-entitled matter.

3

4   */S/ Carl Nami, Official Court Reporter*

5

6

    *Court Reporter/Transcribers*

7

8   *May 21, 2019*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT "C"

UNITED STATES v. SCARFO, et. al.:

# GOVERNMENT EXHBITS NOT ADMITTED INTO EVIDENCE THAT SERVED AS EXTRANEOUS INFLUENCE ON THE JURY DURING DELIBERATIONS

| TOTAL | EXHIBIT No. | TYPE OF EXHIBIT |
|---|---|---|
| 1 | 200 | Title III Audio |
| 2 | 201 | Title III Audio |
| 3 | 1000 | Title III Audio |
| 4 | 1001 | Title III Audio |
| 5 | 1002 | Title III Audio |
| 6 | 1003 | Title III Audio |
| 7 | 1004 | Title III Audio |
| 8 | 1005 | Title III Audio |
| 9 | 1006 | Title III Audio |
| 10 | 2001 | Title III Audio |
| 11 | 2002 | Title III Audio |
| 12 | 2003 | Title III Audio |
| 13 | 2004 | Title III Audio |
| 14 | 2005 | Title III Audio |
| 15 | 3000 | Title III Audio |
| 16 | 3001 | Title III Audio |
| 17 | 3002 | Title III Audio |
| 18 | 3003 | Title III Audio |
| 19 | 3004 | Title III Audio |
| 20 | 3005 | Title III Audio |
| 21 | 3006 | Title III Audio |
| 22 | 3007 | Title III Audio |
| 23 | 3008 | Title III Audio |
| 24 | 3009 | Title III Audio |
| 25 | 3010 | Title III Audio |
| 26 | 3011 | Title III Audio |
| 27 | 3012 | Title III Audio |
| 28 | 3013 | Title III Audio |
| 29 | 3014 | Title III Audio |
| 30 | 3015 | Title III Audio |
| 31 | 3016 | Title III Audio |
| 32 | 3017 | Title III Audio |
| 33 | 3018 | Title III Audio |
| 34 | 3019 | Title III Audio |
| 35 | 3020 | Title III Audio |
| 36 | 3021 | Title III Audio |
| 37 | 3022 | Title III Audio |
| 38 | 3023 | Title III Audio |
| 39 | 3024 | Title III Audio |

**UNITED STATES v. SCARFO, et. al.:**

# GOVERNMENT EXHBITS NOT ADMITTED INTO EVIDENCE THAT SERVED AS EXTRANEOUS INFLUENCE ON THE JURY DURING DELIBERATIONS

| TOTAL | EXHIBIT No. | TYPE OF EXHIBIT |
|-------|-------------|-----------------|
| 40 | 3025 | Title III Audio |
| 41 | 3026 | Title III Audio |
| 42 | 3027 | Title III Audio |
| 43 | 3028 | Title III Audio |
| 44 | 3029 | Title III Audio |
| 45 | 3030 | Title III Audio |
| 46 | 3031 | Title III Audio |
| 47 | 3033 | Title III Audio |
| 48 | 3034 | Title III Audio |
| 49 | 3035 | Title III Audio |
| 50 | 3036 | Title III Audio |
| 51 | 3037 | Title III Audio |
| 52 | 3038 | Title III Audio |
| 53 | 3039 | Title III Audio |
| 54 | 3040 | Title III Audio |
| 55 | 3041 | Title III Audio |
| 56 | 3042 | Title III Audio |
| 57 | 3043 | Title III Audio |
| 58 | 3044 | Title III Audio |
| 59 | 3051 | Title III Audio |
| 60 | 3052 | Title III Audio |
| 61 | 3053 | Title III Audio |
| 62 | 3054 | Title III Audio |
| 63 | 3055 | Title III Audio |
| 64 | 3057 | Title III Audio |
| 65 | 3058 | Title III Audio |
| 66 | 3059 | Title III Audio |
| 67 | 3060 | Title III Audio |
| 68 | 3061 | Title III Audio |
| 69 | 3062 | Title III Audio |
| 70 | 3063 | Title III Audio |
| 71 | 3064 | Title III Audio |
| 72 | 3065 | Title III Audio |
| 73 | 3066 | Title III Audio |
| 74 | 3067 | Title III Audio |
| 75 | 3068 | Title III Audio |
| 76 | 3069 | Title III Audio |
| 77 | 3070 | Title III Audio |
| 78 | 3071 | Title III Audio |

UNITED STATES v. SCARFO, et. al.:

# GOVERNMENT EXHBITS NOT ADMITTED INTO EVIDENCE THAT SERVED AS EXTRANEOUS INFLUENCE ON THE JURY DURING DELIBERATIONS

| TOTAL | EXHIBIT No. | TYPE OF EXHIBIT |
|-------|-------------|-----------------|
| 79 | 3072 | Title III Audio |
| 80 | 4004 | Title III Audio |
| 81 | 4005 | Title III Audio |
| 82 | 4006 | Title III Audio |
| 83 | 5000 | Title III Audio |
| 84 | 6000 | Title III Audio |
| 85 | 6001 | Title III Audio |
| 86 | 6002 | Title III Audio |
| 87 | 6003 | Title III Audio |
| 88 | 6004 | Title III Audio |
| 89 | 6005 | Title III Audio |
| 90 | 6006 | Title III Audio |
| 91 | 6007 | Title III Audio |
| 92 | 6008 | Title III Audio |
| 93 | 6009 | Title III Audio |
| 94 | 6010 | Title III Audio |
| 95 | 6011 | Title III Audio |
| 96 | 6012 | Title III Audio |
| 97 | 6013 | Title III Audio |
| 98 | 6014 | Title III Audio |
| 99 | 8001 | Title III Audio |
| 100 | 8002 | Title III Audio |
| 101 | 8003 | Title III Audio |
| 102 | 8004 | Title III Audio |
| 103 | 8005 | Title III Audio |
| 104 | 8006 | Title III Audio |
| 105 | 8007 | Title III Audio |
| 106 | 8008 | Title III Audio |
| 107 | 8009 | Title III Audio |
| 108 | 8011 | Title III Audio |
| 109 | 8012 | Title III Audio |
| 110 | 8013 | Title III Audio |
| 111 | 8014 | Title III Audio |
| 112 | 8015 | Title III Audio |
| 113 | 8016 | Title III Audio |
| 114 | 8017 | Title III Audio |
| 115 | 8018 | Title III Audio |
| 116 | 8019 | Title III Audio |
| 117 | 8020 | Title III Audio |

**UNITED STATES v. SCARFO, et. al.:**

# GOVERNMENT EXHBITS NOT ADMITTED INTO EVIDENCE THAT SERVED AS EXTRANEOUS INFLUENCE ON THE JURY DURING DELIBERATIONS

| TOTAL | EXHIBIT No. | TYPE OF EXHIBIT |
|-------|-------------|-----------------|
| 118 | 8021 | Title III Audio |
| 119 | 8022 | Title III Audio |
| 120 | 8023 | Title III Audio |
| 121 | 8024 | Title III Audio |
| 122 | 8025 | Title III Audio |
| 123 | 8026 | Title III Audio |
| 124 | 8207 | Document |
| 125 | 8211 | Document |
| 126 | 9001 | Title III Audio |
| 127 | 9002 | Title III Audio |
| 128 | 9003 | Title III Audio |
| 129 | 9004 | Title III Audio |
| 130 | 9005 | Title III Audio |
| 131 | 9006 | Title III Audio |
| 132 | 9007 | Title III Audio |
| 133 | 9021 | Title III Audio |
| 134 | 9022 | Title III Audio |
| 135 | 9023 | Title III Audio |
| 136 | 9024 | Title III Audio |
| 137 | 9026 | Title III Audio |
| 138 | 9027 | Title III Audio |
| 139 | 9028 | Title III Audio |
| 140 | 9415 | Document |
| 141 | 9416 | Document |
| 142 | 9417 | Document |
| 143 | 1000A | Title III Audio Transcript |
| 144 | 1001A | Title III Audio Transcript |
| 145 | 1002A | Title III Audio Transcript |
| 146 | 1003A | Title III Audio Transcript |
| 147 | 1004A | Title III Audio Transcript |
| 148 | 1005A | Title III Audio Transcript |
| 149 | 1006A | Title III Audio Transcript |
| 150 | 135A | Document |
| 151 | 2001A | Title III Audio Transcript |
| 152 | 2002A | Title III Audio Transcript |
| 153 | 2003A | Title III Audio Transcript |
| 154 | 2004A | Title III Audio Transcript |
| 155 | 2005A | Title III Audio Transcript |
| 156 | 200A | Title III Audio Transcript |

UNITED STATES v. SCARFO, et. al.:
# GOVERNMENT EXHBITS NOT ADMITTED INTO EVIDENCE THAT SERVED AS EXTRANEOUS INFLUENCE ON THE JURY DURING DELIBERATIONS

| TOTAL | EXHIBIT No. | TYPE OF EXHIBIT |
|---|---|---|
| 157 | 201A | Title III Audio Transcript |
| 158 | 2303B-1 | Document |
| 159 | 3000A | Title III Audio Transcript |
| 160 | 3001A | Title III Audio Transcript |
| 161 | 3002A | Title III Audio Transcript |
| 162 | 3003A | Title III Audio Transcript |
| 163 | 3004A | Title III Audio Transcript |
| 164 | 3005A | Title III Audio Transcript |
| 165 | 3006A | Title III Audio Transcript |
| 166 | 3007A | Title III Audio Transcript |
| 167 | 3008A | Title III Audio Transcript |
| 168 | 3009A | Title III Audio Transcript |
| 169 | 3010A | Title III Audio Transcript |
| 170 | 3011A | Title III Audio Transcript |
| 171 | 3012A | Title III Audio Transcript |
| 172 | 3013A | Title III Audio Transcript |
| 173 | 3014A | Title III Audio Transcript |
| 174 | 3015A | Title III Audio Transcript |
| 175 | 3016A | Title III Audio Transcript |
| 176 | 3017A | Title III Audio Transcript |
| 177 | 3018A | Title III Audio Transcript |
| 178 | 3019A | Title III Audio Transcript |
| 179 | 3020A | Title III Audio Transcript |
| 180 | 3021A | Title III Audio Transcript |
| 181 | 3022A | Title III Audio Transcript |
| 182 | 3023A | Title III Audio Transcript |
| 183 | 3024A | Title III Audio Transcript |
| 184 | 3025A | Title III Audio Transcript |
| 185 | 3026A | Title III Audio Transcript |
| 186 | 3027A | Title III Audio Transcript |
| 187 | 3028A | Title III Audio Transcript |
| 188 | 3029A | Title III Audio Transcript |
| 189 | 3030A | Title III Audio Transcript |
| 190 | 3031A | Title III Audio Transcript |
| 191 | 3033A | Title III Audio Transcript |
| 192 | 3034A | Title III Audio Transcript |
| 193 | 3035A | Title III Audio Transcript |
| 194 | 3036A | Title III Audio Transcript |
| 195 | 3037A | Title III Audio Transcript |

**UNITED STATES v. SCARFO, et. al.:**

# GOVERNMENT EXHBITS NOT ADMITTED INTO EVIDENCE THAT SERVED AS EXTRANEOUS INFLUENCE ON THE JURY DURING DELIBERATIONS

| TOTAL | EXHIBIT No. | TYPE OF EXHIBIT |
|---|---|---|
| 196 | 3038A | Title III Audio Transcript |
| 197 | 3039A | Title III Audio Transcript |
| 198 | 3040A | Title III Audio Transcript |
| 199 | 3041A | Title III Audio Transcript |
| 200 | 3042A | Title III Audio Transcript |
| 201 | 3043A | Title III Audio Transcript |
| 202 | 3044A | Title III Audio Transcript |
| 203 | 3051A | Title III Audio Transcript |
| 204 | 3052A | Title III Audio Transcript |
| 205 | 3053A | Title III Audio Transcript |
| 206 | 3054A | Title III Audio Transcript |
| 207 | 3055A | Title III Audio Transcript |
| 208 | 3056A | Text Message |
| 209 | 3057A | Title III Audio Transcript |
| 210 | 3058A | Title III Audio Transcript |
| 211 | 3059A | Title III Audio Transcript |
| 212 | 3060A | Title III Audio Transcript |
| 213 | 3061A | Title III Audio Transcript |
| 214 | 3062A | Title III Audio Transcript |
| 215 | 3063A | Title III Audio Transcript |
| 216 | 3064A | Title III Audio Transcript |
| 217 | 3065A | Title III Audio Transcript |
| 218 | 3066A | Title III Audio Transcript |
| 219 | 3067A | Title III Audio Transcript |
| 220 | 3068A | Title III Audio Transcript |
| 221 | 3069A | Title III Audio Transcript |
| 222 | 3070A | Title III Audio Transcript |
| 223 | 3071A | Title III Audio Transcript |
| 224 | 3072A | Title III Audio Transcript |
| 225 | 3103A-9 | Document |
| 226 | 3402A | Document |
| 227 | 4004A | Title III Audio Transcript |
| 228 | 4005A | Title III Audio Transcript |
| 229 | 4006A | Title III Audio Transcript |
| 230 | 5000A | Title III Audio Transcript |
| 231 | 6000A | Title III Audio Transcript |
| 232 | 6001A | Title III Audio Transcript |
| 233 | 6002A | Title III Audio Transcript |
| 234 | 6003A | Title III Audio Transcript |

UNITED STATES v. SCARFO, et. al.:

# GOVERNMENT EXHBITS NOT ADMITTED INTO EVIDENCE THAT SERVED AS EXTRANEOUS INFLUENCE ON THE JURY DURING DELIBERATIONS

| TOTAL | EXHIBIT No. | TYPE OF EXHIBIT |
|---|---|---|
| 235 | 6004A | Title III Audio Transcript |
| 236 | 6005A | Title III Audio Transcript |
| 237 | 6006A | Title III Audio Transcript |
| 238 | 6007A | Title III Audio Transcript |
| 239 | 6008A | Title III Audio Transcript |
| 240 | 6009A | Title III Audio Transcript |
| 241 | 6010A | Title III Audio Transcript |
| 242 | 6011A | Title III Audio Transcript |
| 243 | 6012A | Title III Audio Transcript |
| 244 | 6013A | Title III Audio Transcript |
| 245 | 6014A | Title III Audio Transcript |
| 246 | 8001A | Title III Audio Transcript |
| 247 | 8002A | Title III Audio Transcript |
| 248 | 8003A | Title III Audio Transcript |
| 249 | 8004A | Title III Audio Transcript |
| 250 | 8005A | Title III Audio Transcript |
| 251 | 8006A | Title III Audio Transcript |
| 252 | 8007A | Title III Audio Transcript |
| 253 | 8008A | Title III Audio Transcript |
| 254 | 8009A | Title III Audio Transcript |
| 255 | 8010A | Text Message |
| 256 | 8011A | Title III Audio Transcript |
| 257 | 8012A | Title III Audio Transcript |
| 258 | 8013A | Title III Audio Transcript |
| 259 | 8014A | Title III Audio Transcript |
| 260 | 8015A | Title III Audio Transcript |
| 261 | 8016A | Title III Audio Transcript |
| 262 | 8017A | Title III Audio Transcript |
| 263 | 8018A | Title III Audio Transcript |
| 264 | 8019A | Title III Audio Transcript |
| 265 | 8020A | Title III Audio Transcript |
| 266 | 8021A | Title III Audio Transcript |
| 267 | 8022A | Title III Audio Transcript |
| 268 | 8023A | Title III Audio Transcript |
| 269 | 8024A | Title III Audio Transcript |
| 270 | 8025A | Title III Audio Transcript |
| 271 | 8026A | Title III Audio Transcript |
| 272 | 9001A | Title III Audio Transcript |
| 273 | 9002A | Title III Audio Transcript |

UNITED STATES v. SCARFO, et. al.:
# GOVERNMENT EXHBITS NOT ADMITTED INTO EVIDENCE THAT SERVED AS EXTRANEOUS INFLUENCE ON THE JURY DURING DELIBERATIONS

| TOTAL | EXHIBIT No. | TYPE OF EXHIBIT |
|-------|-------------|-----------------|
| 274 | 9003A | Title III Audio Transcript |
| 275 | 9004A | Title III Audio Transcript |
| 276 | 9005A | Title III Audio Transcript |
| 277 | 9006A | Title III Audio Transcript |
| 278 | 9007A | Title III Audio Transcript |
| 279 | 9021A | Title III Audio Transcript |
| 280 | 9022A | Title III Audio Transcript |
| 281 | 9023A | Title III Audio Transcript |
| 282 | 9024A | Title III Audio Transcript |
| 283 | 9025A | Text Message |
| 284 | 9026A | Title III Audio Transcript |
| 285 | 9027A | Title III Audio Transcript |
| 286 | 9028A | Title III Audio Transcript |

EXHIBIT "D"

# United States v. Scarfo:
# 170 TITLE III AND BOP AUDIO SESSIONS PRESENTED AT TRIAL

| Exhibit No. | Admitted (YES or NO) | Played / Referenced During Trial/ Testimony | Audio Played | Audio Referenced During Trial | Indictment Section | Government Admitted Exhibit List Date | Date Uploaded to Juror iPad | Session No. | Speakers | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 200 | NO | Cory Leshner | 3/5/14, 70 | | | 3/5/14 | 4/28/14 | SP2-21084 | Pelullo; Scarfo; Leshner | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 201 | NO | FBI S.A. Gilson; Misc. | 4/10/14, 24 | | 80(b) | 4/10/14 | 4/28/14 | SP1-1500 | Pelullo; Scarfo | "Iron Fist, Velvet Glove"; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 1000 | NO | FBI S.A. Gilson | 1/14/14 | | | 1/14/14 | 4/25/14 | SP-74 | Pelullo; Scarfo | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 1001 | NO | FBI S.A. Gilson | 1/14/14 | | | 1/14/14 | 4/25/14 | SP1-197 | Pelullo; Scarfo | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 1002 | NO | FBI S.A. Gilson; Cory Leshner | 1/14/14, 56; 2/27/14, 67 | 1/23/14, 79 | | 1/14/14 | 4/28/14 | SP1399 | Pelullo; Leshner | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 1003 | NO | FBI S.A. Gilson; Cory Leshner | 1/14/14, 57 | 1/13/14, 160; 2/27/14, 88 | | 1/14/14 | 3/25/14 | SP1-446 | Pelullo; Scarfo | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 1004 | NO | FBI S.A. Gilson; Cory Leshner | 1/15/14, 61; 2/27/14, 97 | | | 1/15/14 | 4/28/14 | SP1-1898 | Pelullo; Scarfo | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 1005 | NO | FBI S.A. Gilson; Cory Leshner; Gov Summation | 1/15/14, 62; 2/27/14, 97; 5/28/14, 206; 6/5/14, 17 | | | 1/15/14 | 4/28/14 | SP1-2112 | Pelullo; Wm. Maxwell | "The Other Guy"; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |

United States v. Scarfo:

# 170 TITLE III AND BOP AUDIO SESSIONS PRESENTED AT TRIAL

| Exhibit No. | Admitted (YES or NO) | Played / Referenced During Trial/ Testimony | Audio Played | Audio Referenced During Trial | Indictment Section | Government Admitted Exhibit List Date | Date Uploaded to Juror iPad | Session No. | Speakers | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 1006 | NO | Cory Leshner | 2/27/14, 70 | | | 2/27/14 | 4/28/14 | SP1-424 | Pelullo; Leshner | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 2000A | YES | FBI S.A. Gilson; Cory Leshner | 1/15/14 | | | 1/15/14 | | SP1-5885 | Pelullo; Leshner | Text Message; Admitted: 1/15/14, 64 - S.D'Aguanno |
| 2001 | NO | FBI S.A. Gilson; Cory Leshner | 1/15/14, 64; 2/27/14, 107 | 3/6/14, 60 | | 1/15/14 | 4/29/14 | SP1-5887 | Pelullo; Leshner | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 2002 | NO | FBI S.A. Gilson; Cory Leshner; Gov Summation | 1/15/14, 65; 2/27/14, 109 | 1/15/14, 80; 1/27/14, 221, 225; 6/5/14, 20 | | 1/15/14 | 4/29/14 | SP1-5889 | Pelullo; John Maxwell | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 2003 | NO | Cory Leshner | 2/27/14, 91 | | | 2/27/14 | 4/29/14 | SP1-475 | Pelullo; Leshner | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 2004 | NO | Cory Leshner | 2/27/14, 100 | | | 2/27/14 | 4/29/14 | SP1-3158 | Pelullo; Leshner | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 2005 | NO | Cory Leshner | 2/27/14, 103 | | | 2/27/14 | 4/29/14 | SP1-3858 | Pelullo; Leshner | $250K from Globalnet; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 3000 | NO | FBI S.A. Gilson; Gov Summation | 1/13/14, 163-64 | 6/4/14, 105 | | 1/13/14 | 4/29/14 | BOP-1749 | Pelullo; Scarfo Sr. | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |

# United States v. Scarfo:
# 170 TITLE III AND BOP AUDIO SESSIONS PRESENTED AT TRIAL

| Exhibit No. | Admitted (YES or NO) | Played / Referenced During Trial/ Testimony | Audio Played | Audio Referenced During Trial | Indictment Section | Government Admitted Exhibit List Date | Date Uploaded to Juror iPad | Session No. | Speakers | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 3001 | NO | FBI S.A. Gilson; Trial - Misc. | 1/13/14, 176 | | | 1/13/14 | 4/29/14 | BOP-1018 | Scarfo Sr.; Scarfo | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 3002 | NO | FBI S.A. Gilson; Trial - Misc. | 1/13/14, 178 | 1/27/14, 48 | | 1/13/14 | 4/29/14 | BOP-1209 | Scarfo Sr.; Scarfo | "All's good now"; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 3003 | NO | FBI S.A. Gilson; Gov Summation | 1/13/14, 181 | 6/4/14, 105 | | 1/13/14 | 4/29/14 | BOP-1742 | Pelullo; Scarfo Sr. | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 3004 | NO | FBI S.A. Gilson; Gov Opening Statement; Gov Summation | 1/13/14, 183-86; 1/27/14, 23 | 1/8/14, 47, 88; 1/13/14, 53, 89; 6/4/14, 78, 108; 6/11/14, 167-172 | 80(b) | 1/13/14 | 4/29/14 | BOP-1726 | Scarfo Sr.; Scarfo | "6 to 10 months" & "Uncle Vic"; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 3005 | NO | FBI S.A. Gilson; Gov Summation | 1/13/14, 187 | 1/27/14, 24; 6/4/14, 109-10 | | 1/13/14 | 4/29/14 | BOP-1136 | Scarfo Sr.; Scarfo | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 3006 | NO | FBI S.A. Gilson; Gov Summation | 1/13/14, 201-02 | 1/13/14, 191; 1/28/14, 4-5; 6/4/14, 111-14 | | 1/13/14 | 4/29/14 | BOP-1838 | Scarfo Sr.; Scarfo | "Body Guard"; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |

## United States v. Scarfo:
# 170 TITLE III AND BOP AUDIO SESSIONS PRESENTED AT TRIAL

| Exhibit No. | Admitted (YES or NO) | Played / Referenced During Trial/ Testimony | Audio Played | Audio Referenced During Trial | Indictment Section | Government Admitted Exhibit List Date | Date Uploaded to Juror iPad | Session No. | Speakers | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 3007 | NO | FBI S.A. Gilson; Gov Summation | 1/13/14, 204 | 1/13/14, 25, 161; 6/4/14, 71, 114-117, 125, 127; 6/5/14, 10, 20; 6/17/14, 87 | | 1/13/14 | 4/29/14 | BOP-1101 | Scarfo Sr.; Scarfo | "Probation monkey off my back"; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 3008 | NO | FBI S.A.Gilson ; Gov Summation | 1/15/14 | | | 1/13/14 | 4/29/14 | BOP-1726 | Scarfo Sr.; Scarfo | "6 to 10 months" & "Uncle Vic"; Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3009 | NO | FBI S.A. Gilson | 1/15/14 | | | 1/15/14 | 4/29/14 | SP1-4818 | Pelullo; Adler | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3010 | NO | FBI S.A. Gilson; Gov Opening Statement; Gov Summation | 1/15/14, 81; 4/21/14, 128 | 1/8/14, 14; 6/5/14, 33; 6/17/14, 151 | | 1/15/14 | 4/29/14 | SP-1587 | Pelullo; Scarfo | "Contributions not distributions"; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 3011 | NO | FBI S.A.Gilson ; Gov Summation | 1/15/14 | | | 1/15/14 | 4/29/14 | SP1-6714 | Pelullo; Adler; John Maxwell | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3012 | NO | FBI S.A. Gilson | 1/15/14 | | | 1/15/14 | 4/29/14 | SP1-7809 | Pelullo; Adler; Wm. Maxwell | Basic examination of record reveals that exhibit was not properly admitted into evidence |

# United States v. Scarfo:
# 170 TITLE III AND BOP AUDIO SESSIONS PRESENTED AT TRIAL

| Exhibit No. | Admitted (YES or NO) | Played / Referenced During Trial/ Testimony | Audio Played | Audio Referenced During Trial | Indictment Section | Government Admitted Exhibit List Date | Date Uploaded to Juror iPad | Session No. | Speakers | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 3013 | NO | FBI S.A. Gilson; Gov Opening Statement; Gov Summation | 1/15/14, 98; 3/18/14, 64; 5/29/14, 48-55; 6/5/14, 35 | 1/8/14, 63; 3/13/14, 103; 3/19/14, 109; 3/20/14, 128; 6/5/14, 40 | 52(b) | 1/15/14 | 4/29/14 | SP1-7819 | Pelullo; Adler; John Maxwell | "Friend back in Jersey"; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 3014 | NO | FBI S.A. Gilson; Misc. | 1/15/14, 99; 1/29/14, 123-25 | 6/5/14, 40 | | 1/15/14 | 4/29/14 | SP1-7820 | Pelullo; Wm. Maxwell | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 3015 | NO | FBI S.A. Gilson | 1/15/14 | | | 1/15/14 | 4/29/14 | SP1-7822 | Pelullo; Wm. Maxwell | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3016 | NO | FBI S.A. Gilson | 1/15/14 | | | 1/15/14 | 4/29/14 | SP1-7833 | Pelullo; Adler | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3017 | NO | FBI S.A. Gilson | 1/15/14 | | | 1/15/14 | 4/29/14 | SP1-7834 | Pelullo; John Maxwell | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3018 | NO | FBI S.A. Gilson | 1/15/14 | | | 1/15/14 | 4/29/14 | SP1-7929 | Pelullo; Adler | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3019 | NO | FBI S.A. Gilson | 1/16/14 | | | 1/16/14 | 4/29/14 | SP1-8005 | Pelullo; Lakin | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3020 | NO | FBI S.A.Gilson ; Gov Summation | 1/16/14, 11; 5/29/14, 59; 6/5/14, 37-39 | 1/27/14, 129 | 80(d) | 1/16/14 | 4/29/14 | SP1-8337 | Pelullo; Parisi; Scarfo | "We crushed them. Under your direction"; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |

# United States v. Scarfo:
# 170 TITLE III AND BOP AUDIO SESSIONS PRESENTED AT TRIAL

| Exhibit No. | Admitted (YES or NO) | Played / Referenced During Trial/ Testimony | Audio Played | Audio Referenced During Trial | Indictment Section | Government Admitted Exhibit List Date | Date Uploaded to Juror iPad | Session No. | Speakers | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 3021 | NO | FBI S.A.Gilson ; Gov Summation | 1/16/14 | | | 1/16/14 | 4/29/14 | SP1-9492 | Pelullo; McCarthy | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3022 | NO | FBI S.A.Gilson ; Gov Summation | 1/16/14 | | | 1/16/14 | 4/29/14 | SP1-9493 | Pelullo; Adler; Wm. Maxwell | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3023 | NO | FBI S.A. Gilson; Cory Leshner; Gov Summation | 1/16/14; 1/16/14, 18; 3/4/14, 24 | 1/27/14, 229-231; 6/5/14, 40 | | 1/16/14 | 4/29/14 | SP1-9496 | Pelullo; Scarfo | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 3024 | NO | FBI S.A.Gilson ; Gov Summation | 1/16/14 | | | 1/16/14 | 4/29/14 | SP1-9498 | Pelullo; McCarthy | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3025 | NO | FBI S.A.Gilson ; Gov Summation | 1/16/14 | | | 1/16/14 | 4/29/14 | SP1-9518 | Pelullo; Adler | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3026 | NO | FBI S.A. Gilson | 1/16/14 | | | 1/16/14 | 4/29/14 | SP1-9519 | Pelullo; McCarthy | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3027 | NO | FBI S.A. Gilson | 1/16/14 | | | 1/16/14 | 4/29/14 | SP1-10027 | Pelullo; McCarthy; Leshner | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3028 | NO | FBI S.A.Gilson ; Gov Summation | 1/16/14 | | | 1/16/14 | 4/29/14 | SP1-10029 | Pelullo; McCarthy | Basic examination of record reveals that exhibit was not properly admitted into evidence |

United States v. Scarfo:

# 170 TITLE III AND BOP AUDIO SESSIONS PRESENTED AT TRIAL

| Exhibit No. | Admitted (YES or NO) | Played / Referenced During Trial/ Testimony | Audio Played | Audio Referenced During Trial | Indictment Section | Government Admitted Exhibit List Date | Date Uploaded to Juror iPad | Session No. | Speakers | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 3029 | NO | FBI S.A. Gilson | 1/16/14 | | | 1/16/14 | 4/29/14 | SP1-10113 | Pelullo; Adler | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3030 | NO | FBI S.A.Gilson ; Gov Summation | 1/16/14 | | | 1/16/14 | 4/29/14 | SP1-10147 | Pelullo | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3031 | NO | FBI S.A. Gilson; Gov Opening Statement; Gov Summation | 1/16/14, 26; 6/4/14, 89-90 | 1/8/14, 36; 1/9/14, 86; 6/5/14, 3-6; 6/17/14, 152 | 59 | 1/16/14 | 4/29/14 | SP1-10195 | Pelullo; Scarfo | "Layers upon layers, like an onion" |
| 3032 | YES | FBI S.A. Gilson | 2/3/14 or 1/29/14 | | | 2/3/14 | 4/29/14 | SP1-8605 | Pelullo; David Roberts | Admitted: 1/29/14, 142 - D'Aguanno |
| 3033 | NO | Cory Leshner | 2/27/14, 121 | | | 2/27/14 | 4/29/14 | SP1-811 | Pelullo; Leshner | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 3034 | NO | Cory Leshner | 2/27/14, 126 | 2/27/14, 69 | | 2/27/14 | 4/29/14 | SP2-1023 | Pelullo; Wm. Handley | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 3035 | NO | Cory Leshner | 3/4/14, 56 | | | 3/4/14 | 4/29/14 | SP1-7481 | Pelullo; Wm. Maxwell | "Layers upon layers, like an onion"; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 3036 | NO | Cory Leshner | 3/4/14, 58; 5/29/14, 23 | 6/2/14, 85; 6/5/14, 17-19 | 51(a) | 3/4/14 | 4/29/14 | SP1-7483 | Pelullo; John Maxwell; Wm. Handley | "Stop using debit cards"; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |

# United States v. Scarfo:
# 170 TITLE III AND BOP AUDIO SESSIONS PRESENTED AT TRIAL

| Exhibit No. | Admitted (YES or NO) | Played / Referenced During Trial/ Testimony | Audio Played | Audio Referenced During Trial | Indictment Section | Government Admitted Exhibit List Date | Date Uploaded to Juror iPad | Session No. | Speakers | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 3037 | NO | Cory Leshner | 3/4/14, 66 | 3/6/14, 225; 3/10/14, 15 | | 3/4/14 | 4/29/14 | SP1-7545 | Pelullo; Leshner; Lana Pelullo | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 3038 | NO | Cory Leshner | 3/4/14, 74 | 3/10/14, 16 | | 3/4/14 | 4/29/14 | SP1-7562 | Pelullo; Scarfo; Leshner | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 3039 | NO | Cory Leshner | 3/4/14, 77 | | | 3/4/14 | 4/29/14 | SP1-7565 | Pelullo; Scarfo; Leshner | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 3040 | NO | Cory Leshner | 3/4/14, 79 | 3/6/14, 113; 3/10/14, 17; 3/11/14, 136 | 51(b) | 3/4/14 | 4/29/14 | SP1-7603 | Pelullo; Leshner | CL at WM Office; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 3041 | NO | Cory Leshner; Gov Summation | 3/4/14, 91 | 3/6/14, 114; 3/10/14, 18, 154; 6/17/14, 112 | 51(b) | 3/4/14 | 4/29/14 | SP1-7604 | Pelullo; Leshner; Wm. Maxwell; Todd Stark | CL at WM Office; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 3042 | NO | Cory Leshner | 3/4/14, 107 | | | 3/4/14 | 4/29/14 | SP1-7628 | Pelullo; Leshner | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |

United States v. Scarfo:

# 170 TITLE III AND BOP AUDIO SESSIONS PRESENTED AT TRIAL

| Exhibit No. | Admitted (YES or NO) | Played / Referenced During Trial/ Testimony | Audio Played | Audio Referenced During Trial | Indictment Section | Government Admitted Exhibit List Date | Date Uploaded to Juror iPad | Session No. | Speakers | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 3043 | NO | Cory Leshner; Gov Opening Statement; Gov Summation | 3/4/14, 109; 5/28/14, 183-196; 6/4/14, 63-67 | 1/8/14, 41; 3/6/14, 41; 3/13/14, 151-54; 3/13/14, 240-46; 4/2/14, 119-20; 4/22/14, 112-13; 6/2/14, 92-95; 6/4/14, 102; 6/5/14, 102-103; 6/17/14, 139 | 50 | 3/4/14 | 4/29/14 | SP1-16718 | Pelullo; Scarfo | "Rat is dead"; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 3044 | NO | Cory Leshner; Gov Summation | 3/4/14, 109 | 3/6/14, 41; 6/17/14, 140 | | 3/4/14 | 4/29/14 | SP1-16941 | Pelullo; John Maxwell | "He was the best rat we had"; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 3045 | YES | Trial - Misc. | 3/11/14 | | | 3/11/14 | 4/29/14 | SP1-15848 | Pelullo; Kenneth Stein | Admitted: 3/11/14, 136 - H.Wiener |
| 3046 | YES | Trial - Misc. | 3/11/14 | | | 3/11/14 | 4/29/14 | SP1-16335 | Pelullo; Kenneth Stein | Admitted: 3/11/14, 139 - H.Wiener |
| 3047 | YES | Trial - Misc. | 3/11/14 | | | 3/11/14 | 4/29/14 | SP1-9226 | Pelullo; Kenneth Stein | Admitted: 3/11/14, 159 - H.Wiener |
| 3048 | YES | Trial - Misc. | 3/12/14 | | | 3/12/14 | 4/29/14 | SP1-11562 | Pelullo; Kenneth Stein | Admitted: 3/12/14, 52 - H.Wiener |
| 3049 | YES | Trial - Misc. | 3/18/14 | | | 3/18/14 | 4/29/14 | SP1-11505 | Pelullo; Adler | Admitted: 3/18/14, 144 - H.Wiener |

# United States v. Scarfo:
# 170 TITLE III AND BOP AUDIO SESSIONS PRESENTED AT TRIAL

| Exhibit No. | Admitted (YES or NO) | Played / Referenced During Trial/ Testimony | Audio Played | Audio Referenced During Trial | Indictment Section | Government Admitted Exhibit List Date | Date Uploaded to Juror iPad | Session No. | Speakers | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 3050 | YES | Trial - Misc. | 3/19/14 | | | 3/19/14 | 4/29/14 | SP1-11010 | Pelullo; Adler; John Maxwell | Admitted: 3/19/14 |
| 3051 | NO | Gov Summation | 4/2/14 | | | 4/2/14 | 4/29/14 | SP1-12248 | Pelullo; Howard Drossner; Anthony Buczek | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3052 | NO | Gov Summation | 4/2/14 | | | 4/2/14 | 4/29/14 | SP2-11494 | Pelullo; Leshner; Anthony Buczek | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3053 | NO | FBI S.A.Gilson ; Gov Summation | 4/8/14, 157; 6/2/14, 98-99 | 6/17/14, 126 | | 4/8/14 | 4/29/14 | SP2-11289 | Pelullo; Scarfo | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 3054 | NO | FBI S.A. Gilson | 4/8/14 | | | 4/8/14 | 4/29/14 | SP2-12122 | Pelullo; John Maxwell | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3055 | NO | FBI S.A. Gilson | 4/8/14 | | | 4/8/14 | 4/29/14 | SP2-800 | Pelullo; Wm. Maxwell | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3056 | NO | FBI S.A. Gilson | 4/8/14 | | | 4/8/14 | 4/29/14 | SP2-840 | Pelullo; Wm. Maxwell | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3057 | NO | FBI S.A.Gilson ; Gov Summation | 4/8/14, 176 | 4/10/14, 194; 6/17/14, 113 | | 4/8/14 | 4/29/14 | SP2-1101 | Pelullo; Wm. Maxwell | "My uncle is going to kill me"; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 3058 | NO | FBI S.A. Gilson | 4/8/14 | | | 4/8/14 | 4/29/14 | SP2-1646 | Pelullo; Wm. Handley | Basic examination of record reveals that exhibit was not properly admitted into evidence |

**United States v. Scarfo:**
# 170 TITLE III AND BOP AUDIO SESSIONS PRESENTED AT TRIAL

| Exhibit No. | Admitted (YES or NO) | Played / Referenced During Trial/ Testimony | Audio Played | Audio Referenced During Trial | Indictment Section | Government Admitted Exhibit List Date | Date Uploaded to Juror iPad | Session No. | Speakers | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 3059 | NO | FBI S.A. Gilson | 4/8/14 | | | 4/8/14 | 4/29/14 | SP2-1971 | Pelullo; Kim Grasty | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3060 | NO | FBI S.A. Gilson | 4/8/14 | | | 4/8/14 | 4/29/14 | SP2-3759 | Pelullo; Wm. Maxwell; McCarthy | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3061 | NO | FBI S.A.Gilson ; Gov Summation | 4/9/14, 12-14 | 4/14/14, 58; 6/17/14, 140 | | 4/9/14 | 4/29/14 | SP2-6061 | Pelullo; Wm. Maxwell | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 3062 | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 4/29/14 | SP2-11042 | Pelullo; Lana Pelullo | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3063 | NO | FBI S.A.Gilson ; Gov Summation | 4/9/14 | | | 4/9/14 | 4/29/14 | SP2-11044 | Pelullo; Scarfo | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3064 | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 4/29/14 | SP2-11735 | Pelullo; McCarthy; John Maxwell | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3065 | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 4/29/14 | SP2-12000 | Pelullo; Scarfo | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3066 | NO | FBI S.A.Gilson ; Gov Summation | 4/9/14 | | | 4/9/14 | 4/29/14 | SP2-12768 | Pelullo; Wm. Maxwell | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3067 | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 4/29/14 | SP2-14600 | Pelullo; McCarthy | Basic examination of record reveals that exhibit was not properly admitted into evidence |

## United States v. Scarfo:
# 170 TITLE III AND BOP AUDIO SESSIONS PRESENTED AT TRIAL

| Exhibit No. | Admitted (YES or NO) | Played / Referenced During Trial/ Testimony | Audio Played | Audio Referenced During Trial | Indictment Section | Government Admitted Exhibit List Date | Date Uploaded to Juror iPad | Session No. | Speakers | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 3068 | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 4/29/14 | SP2-17136 | Pelullo; Wm. Maxwell | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3069 | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 4/29/14 | SP2-4841 | Pelullo; Wm. Maxwell | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3070 | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 4/29/14 | SP2-802 | Pelullo; Kim Grasty; Leslie Bedford | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3071 | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 4/29/14 | SP1-3375 | Pelullo; Howard Drossner | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 3072 | NO | Trial - Misc. | 4/28/14 | | | 4/28/14 | 5/7/14 | SP1-1994 | Pelullo; Leshner; Kenneth Stein | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 4000 | YES | FBI S.A. Gilson | 2/3/14 or 1/29/14 | | | 2/3/14 | 4/29/14 | SP1-3977 | Pelullo; David Roberts | Admitted: 1/29/14, 142 - D'Aguanno |
| 4001 | YES | FBI S.A. Gilson | 2/3/14 or 1/29/14 | | | 2/3/14 | 4/29/14 | SP1-4468 | Pelullo; Ponte | Admitted: 1/29/14, 142 - D'Aguanno |
| 4002 | YES | FBI S.A. Gilson | 2/3/14 or 1/29/14 | | | 2/3/14 | 4/29/14 | SP1-4475 | Pelullo; David Roberts | Admitted: 1/29/14, 142 - D'Aguanno |
| 4003 | YES | FBI S.A. Gilson | 2/3/14 or 1/29/14 | | | 2/3/14 | 4/29/14 | SP1-10595 | Pelullo; Leshner; David Roberts | Admitted: 1/29/14, 142 - D'Aguanno |

United States v. Scarfo:

# 170 TITLE III AND BOP AUDIO SESSIONS PRESENTED AT TRIAL

| Exhibit No. | Admitted (YES or NO) | Played / Referenced During Trial/ Testimony | Audio Played | Audio Referenced During Trial | Indictment Section | Government Admitted Exhibit List Date | Date Uploaded to Juror iPad | Session No. | Speakers | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 4004 | NO | Cory Leshner; Gov Summation | 2/27/14, 110; 5/29/14, 14 | 3/6/14, 57; 6/5/14, 19 | | 2/27/14 | 4/29/14 | SP1-2914 | Pelullo; John Maxwell; Ponte | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 4005 | NO | Cory Leshner | 2/27/14, 112 | | | 2/27/14 | 4/29/14 | SP1-2978 | Pelullo; Scarfo; Leshner | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 4006 | NO | Cory Leshner; Gov Opening Statement; Gov Summation | 2/27/14, 119; 5/28/14, 192-93 | 1/8/14, 42; 4/22/14, 112; 6/4/14, 66 | | 2/27/14 | 3/27/14 | SP1-3675 | Pelullo; John Maxwell | "Draper flipped one way for five cents"; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 5000 | NO | Trial - Misc. | 5/1/14 | | | 5/1/14 | 5/7/14 | SP2-11130 | Bianchi [voicemail] | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 6000 | NO | Trial - Misc. | 2/27/14 | | | 2/27/14 | 5/5/14 | SP1-6180 | Pelullo; Adler | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 6001 | NO | Cory Leshner | 2/27/14, 141 | | | 2/27/14 | 5/5/14 | SP1-6189 | Pelullo; Scarfo | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 6002 | NO | Cory Leshner | 2/27/14, 143 | | | 2/27/14 | 5/5/14 | SP1-6370 | Pelullo; Scarfo; Leshner | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 6003 | NO | Cory Leshner | 3/4/14, 9 | | | 3/4/14 | 5/5/14 | SP1-8051 | Pelullo; Leshner | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 6004 | NO | Cory Leshner | 3/4/14, 13 | | | 3/4/14 | 5/5/14 | SP1-8107 | Pelullo; Leshner | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |

# United States v. Scarfo:
# 170 TITLE III AND BOP AUDIO SESSIONS PRESENTED AT TRIAL

| Exhibit No. | Admitted (YES or NO) | Played / Referenced During Trial/ Testimony | Audio Played | Audio Referenced During Trial | Indictment Section | Government Admitted Exhibit List Date | Date Uploaded to Juror iPad | Session No. | Speakers | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 6005 | NO | Cory Leshner | 3/4/14, 16 | | | 3/4/14 | 5/5/14 | SP1-9310 | Pelullo; Scarfo; Leshner | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 6006 | NO | Cory Leshner | 3/4/14, 25 | | | 3/4/14 | 5/5/14 | SP1-11125 | Pelullo; Leshner | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 6007 | NO | Cory Leshner | 3/4/14, 35 | 6/17/14, 152 | | 3/4/14 | 5/5/14 | SP1-14396 | Pelullo; Scarfo | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 6008 | NO | Cory Leshner | 3/4/14, 40 | | | 3/4/14 | 5/5/14 | SP1-15122 | Pelullo; Scarfo; Leshner | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 6009 | NO | Cory Leshner | 3/4/14, 43 | | | 3/4/14 | 5/5/14 | SP1-11949 | Pelullo; Cole Maxwell | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 6010 | NO | Cory Leshner | 3/4/14, 47 | | | 3/4/14 | 5/5/14 | SP1-11952 | Pelullo; Leshner | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 6011 | NO | Cory Leshner | 3/4/14, 49 | | | 3/4/14 | 5/5/14 | SP1-17400 | Pelullo; Cole Maxwell | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 6012 | NO | Cory Leshner; Gov Summation | 3/4/14, 151-52 | 4/10/14, 104; 6/17/14, 123-24 | | 4/8/14 | 5/5/14 | SP2-10402 | Pelullo; Scarfo | "CIA wont be able to find us"; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 6013 | NO | FBI S.A. Gilson | 4/8/14 | | | 4/8/14 | 5/5/14 | SP2-10674 | Pelullo; Scarfo | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 6014 | NO | FBI S.A. Gilson | 4/8/14 | | | 4/8/14 | 5/5/14 | SP2-16114 | Pelullo | Basic examination of record reveals that exhibit was not properly admitted into evidence |

**United States v. Scarfo:**
# 170 TITLE III AND BOP AUDIO SESSIONS PRESENTED AT TRIAL

| Exhibit No. | Admitted (YES or NO) | Played / Referenced During Trial/ Testimony | Audio Played | Audio Referenced During Trial | Indictment Section | Government Admitted Exhibit List Date | Date Uploaded to Juror iPad | Session No. | Speakers | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 7000 | YES | Trial - Misc. | 3/11/14 | | | 3/11/14 | 4/28/14 | SP2-2363 | Pelullo; Kenneth Stein; Kim Grasty | Admitted: 3/11/14, 173 - H.Wiener |
| 7001 | YES | Gov Summation | 3/19/14 | | | 3/11/14 | 4/28/14 | SP2-1118 | Pelullo; Adler; Wm. Handley | Admitted: 3/19/14, 14 |
| 8000 | YES | Cory Leshner | 3/5/14 | | | 3/5/14 | 5/5/14 | SP1-10180 | Pelullo; Shea | Admitted: 3/5/14, 37 - S.D'Aguanno |
| 8001 | NO | Cory Leshner; Gov Summation | 3/5/14, 42; 4/9/14, 45-46 | 6/5/14, 83-86 | | 3/5/14 | 5/5/14 | SP2-752 | Pelullo; Howard Drossner | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 8002 | NO | Cory Leshner | 3/5/14, 44; 4/9/14, 49 | | | 3/5/14 | 5/5/14 | SP2-794 | Pelullo; Leshner; Kim Grasty | Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 8003 | NO | FBI S.A. Gilson | 4/9/14 | | | 3/5/14 | 5/5/14 | SP2-790 | Pelullo; Scarfo | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 8004 | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 5/5/14 | SP2-1222 | Pelullo; Howard Drossner | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 8005 | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 5/5/14 | SP2-1860 | Pelullo; Scarfo | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 8006 | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 5/5/14 | SP2-2910 | Pelullo; Jack Rubinek | Basic examination of record reveals that exhibit was not properly admitted into evidence |

# United States v. Scarfo:
# 170 TITLE III AND BOP AUDIO SESSIONS PRESENTED AT TRIAL

| Exhibit No. | Admitted (YES or NO) | Played / Referenced During Trial/ Testimony | Audio Played | Audio Referenced During Trial | Indictment Section | Government Admitted Exhibit List Date | Date Uploaded to Juror iPad | Session No. | Speakers | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 8007 | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 5/5/14 | SP2-3034 | Pelullo; Scarfo | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 8008 | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 5/5/14 | SP2-3148 | Pelullo; Scarfo | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 8009 | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 5/5/14 | SP2-3149 | Pelullo; Manno | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 8010A | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 5/5/14 | SP2-456,457 | Pelullo; Scarfo | Text Message; Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 8011 | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 5/5/14 | SP2-5821 | Pelullo; Leshner | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 8012 | NO | FBI S.A.Gilson ; Gov Summation | 4/9/14 | | | 4/9/14 | 5/5/14 | NS1-922 | Manno; Scarfo | Typo: reads "SP2-922"; Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 8013 | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 5/5/14 | NS1-1051 | Manno; Scarfo | Typo: reads "SP2-1051"; Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 8014 | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 5/5/14 | NS1-1119 | Parisi; Scarfo | Typo: reads "SP2-1119"; Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 8015 | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 5/5/14 | SP2-6948 | Pelullo; Scarfo | Basic examination of record reveals that exhibit was not properly admitted into evidence |

# United States v. Scarfo:
# 170 TITLE III AND BOP AUDIO SESSIONS PRESENTED AT TRIAL

| Exhibit No. | Admitted (YES or NO) | Played / Referenced During Trial/ Testimony | Audio Played | Audio Referenced During Trial | Indictment Section | Government Admitted Exhibit List Date | Date Uploaded to Juror iPad | Session No. | Speakers | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 8016 | NO | FBI S.A.Gilson ; Gov Summation | 4/9/14, 81-82; 6/5/14, 86, 103 | | | 4/9/14 | 5/5/14 | SP2-6964 | Pelullo; Manno | "FBI all over us"; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 8017 | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 5/5/14 | SP2-6984 | Pelullo; John Maxwell | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 8018 | NO | FBI S.A.Gilson ; Gov Summation | 4/9/14, 84; 6/5/14, 88-89 | 4/10/14, 37; 4/14/14, 67; 6/17/14, 152-53 | | 4/9/14 | 5/5/14 | SP2-7278 | Pelullo; Manno; Scarfo | "We don't have to hand over the trust"; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 8019 | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 5/5/14 | SP2-7606 | Pelullo; Lana Pelullo; Scarfo | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 8020 | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 5/5/14 | SP2-8125 | Peter Fox [voicemail] | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 8021 | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 5/5/14 | SP2-8412 | Pelullo; Peter Fox | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 8022 | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 5/5/14 | SP2-10003 | Pelullo; Peter Fox | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 8023 | NO | FBI S.A. Gilson | 4/9/14 | | | 4/9/14 | 5/5/14 | SP2-10264 | Pelullo; Scarfo | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 8024 | NO | FBI S.A.Gilson ; Gov Summation | 4/9/14 | | | 4/9/14 | 5/5/14 | SP2-11712 | Pelullo; Manno; Scarfo | Basic examination of record reveals that exhibit was not properly admitted into evidence |

United States v. Scarfo:

# 170 TITLE III AND BOP AUDIO SESSIONS PRESENTED AT TRIAL

| Exhibit No. | Admitted (YES or NO) | Played / Referenced During Trial/ Testimony | Audio Played | Audio Referenced During Trial | Indictment Section | Government Admitted Exhibit List Date | Date Uploaded to Juror iPad | Session No. | Speakers | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 8025 | NO | Trial - Misc. | 4/21/14 | | | 4/21/14 | 5/7/14 | SP2-1419 | Pelullo; Lisa Murray-Scarfo; Scarfo | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 8026 | NO | Trial - Misc. | 4/21/14 | | | 4/21/14 | 5/7/14 | SP2-1504 | Lisa Murray-Scarfo; Jocelyn Drabrek | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 8027 | YES | FBI S.A.Gilson ; Gov Summation | 4/22/14 | | | 4/21/14 | 5/7/14 | SP2-1872 | Pelullo; Wm. Maxwell | Admitted: 4/22/14, 60 - Questionable |
| 9000A | YES | FBI S.A.Gilson ; Gov Summation | 1/14/14 | | | 1/14/14 | 5/5/14 | SP1-1007 | Pelullo; Scarfo | Text Message; Admitted: 1/14/14, 94 - S.D'Aguanno |
| 9001 | NO | FBI S.A.Gilson ; Gov Summation | 1/14/14 | | | 1/14/14 | 5/5/14 | SP1-1010 | Pelullo; Scarfo | Basic examination of record reveals that exhibit was not properly admitted into evidence |

# United States v. Scarfo:
# 170 TITLE III AND BOP AUDIO SESSIONS PRESENTED AT TRIAL

| Exhibit No. | Admitted (YES or NO) | Played / Referenced During Trial/ Testimony | Audio Played | Audio Referenced During Trial | Indictment Section | Government Admitted Exhibit List Date | Date Uploaded to Juror iPad | Session No. | Speakers | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 9002 | NO | FBI S.A.Gilson ; Gov Summation | 1/14/14, 95-96 | 1/14/14, 12; 1/23/14, 110-12; 1/27/14, 93-94, 221-24; 1/28/14, 135-36; 1/30/14, 19-21; 6/4/14, 133-37; 6/17/14, 9, 160 | | 1/14/14 | 5/5/14 | SP1-1013 | Pelullo; Scarfo | "Sitting Duck"; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 9003 | NO | FBI S.A.Gilson ; Gov Summation | 1/14/14, 97-98; 1/29/14, 71 | 1/27/14, 221-25; 1/30/14, 97; 4/22/14, 115, 185; 5/14/14, 48-90; 6/4/14, 137 | | 1/14/14 | 5/5/14 | SP1-1095 | Pelullo; Manno; Scarfo | "Six months community service at Babe's"; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 9004 | NO | FBI S.A.Gilson ; Gov Summation | 1/14/14 | | | 1/14/14 | 5/5/14 | SP1-1096 | Pelullo; Scarfo | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 9005 | NO | FBI S.A.Gilson ; Gov Summation | 1/14/14, 102-03 | 6/17/14, 116-18, 167 | | 1/14/14 | 5/5/14 | SP1-1104 | Pelullo; Scarfo | [Johnny Checks] |
| 9006 | NO | FBI S.A.Gilson ; Gov Summation | 1/14/14 | | | 1/14/14 | 5/5/14 | SP1-3958 | Pelullo; Scarfo | Basic examination of record reveals that exhibit was not properly admitted into evidence |

**United States v. Scarfo:**

# 170 TITLE III AND BOP AUDIO SESSIONS PRESENTED AT TRIAL

| Exhibit No. | Admitted (YES or NO) | Played / Referenced During Trial/ Testimony | Audio Played | Audio Referenced During Trial | Indictment Section | Government Admitted Exhibit List Date | Date Uploaded to Juror iPad | Session No. | Speakers | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 9007 | NO | FBI S.A.Gilson ; Gov Summation | 1/14/14, 105-06 | 1/30/14, 35; 6/4/14, 141-42 | | 1/14/14 | 3/26/14 | SP1-3976 | Pelullo; Manno; Wm. Maxwell | DA:Shows NS & SP joined at the hip; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 9008A | YES | FBI S.A.Gilson ; Gov Summation | 1/29/14 | | | 1/26/14 | 3/26/14 | SP1-16289 | Pelullo; Wm. Maxwell | Text Message; Admitted: 1/29/14, 108 - S.D'Aguanno |
| 9009 | YES | FBI S.A. Gilson | 2/26/14 | | | 2/26/14 | 5/5/14 | SP1-18922 | Pelullo; Todd Stark | Admitted: 2/26/14, 84 - S.D'Aguanno |
| 9010 | YES | FBI S.A. Gilson | 2/26/14 | | | 2/26/14 | 5/5/14 | SP1-857 | Pelullo; Leshner | Admitted: 2/26/14, 84 - S.D'Aguanno |
| 9011 | YES | FBI S.A. Gilson | 2/26/14 | | | 2/26/14 | 5/5/14 | SP1-1187 | Pelullo; John Maxwell | Admitted: 2/26/14, 84 - S.D'Aguanno |
| 9012 | YES | FBI S.A. Gilson | 2/26/14 | | | 2/26/14 | 5/5/14 | SP1-1263 | Pelullo; John Maxwell | Admitted: 2/26/14, 84 - S.D'Aguanno |
| 9013 | YES | FBI S.A. Gilson | 2/26/14 | | | 2/26/14 | 5/5/14 | SP1-1293 | Pelullo; John Maxwell; Scarfo | Admitted: 2/26/14, 84 - S.D'Aguanno |
| 9014 | YES | FBI S.A. Gilson | 2/26/14 | | | 2/26/14 | 5/5/14 | SP1-1297 | Pelullo; John Maxwell | Admitted: 2/26/14, 84 - S.D'Aguanno |
| 9015 | YES | FBI S.A. Gilson | 2/26/14 | | | 2/26/14 | 5/5/14 | SP1-1301 | Pelullo; John Maxwell | Admitted: 2/26/14, 84 - S.D'Aguanno |
| 9016 | YES | FBI S.A. Gilson | 2/26/14 | | | 2/26/14 | 5/5/14 | SP1-1304 | Pelullo; John Maxwell | Admitted: 2/26/14, 84 - S.D'Aguanno |

United States v. Scarfo:

# 170 TITLE III AND BOP AUDIO SESSIONS PRESENTED AT TRIAL

| Exhibit No. | Admitted (YES or NO) | Played / Referenced During Trial/ Testimony | Audio Played | Audio Referenced During Trial | Indictment Section | Government Admitted Exhibit List Date | Date Uploaded to Juror iPad | Session No. | Speakers | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 9017 | YES | FBI S.A. Gilson | 2/26/14 | | | 2/26/14 | 5/5/14 | SP1-1337 | Pelullo; John Maxwell | Admitted: 2/26/14, 84 - S.D'Aguanno |
| 9018 | YES | FBI S.A. Gilson | 2/26/14 | | | 2/26/14 | 5/5/14 | SP1-1371 | Pelullo; John Maxwell | Admitted: 2/26/14, 84 - S.D'Aguanno |
| 9019 | YES | FBI S.A. Gilson | 2/26/14 | | | 2/26/14 | 5/5/14 | SP1-1378 | Pelullo; John Maxwell | Admitted: 2/26/14, 84 - S.D'Aguanno |
| 9020 | YES | Cory Leshner | 3/5/14 | | | 3/5/14 | 5/5/14 | SP1-8734 | Pelullo; Todd Stark; Scarfo | Admitted: 3/5/14, 32 - S.D'Aguanno |
| 9021 | NO | FBI S.A. Gilson | 4/8/14 | | | 4/8/14 | 5/5/14 | SP1-17530 | Pelullo; Wm. Maxwell | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 9022 | NO | FBI S.A. Gilson | 4/8/14 | | | 4/8/14 | 5/5/14 | SP1-17549 | Pelullo; Leshner | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 9023 | NO | FBI S.A.Gilson ; Gov Summation | 4/8/14 | | | 4/8/14 | 5/5/14 | SP1-18097 | Pelullo; Scarfo; Leshner | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 9024 | NO | FBI S.A. Gilson | 4/8/14 | | | 4/8/14 | 5/5/14 | SP1-18251 | Pelullo; Wm. Maxwell | Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 9025A | NO | FBI S.A. Gilson | 4/8/14 | | | 4/8/14 | 5/5/14 | SP1-18276 | Pelullo; Scarfo | Text Message; Basic examination of record reveals that exhibit was not properly admitted into evidence |
| 9026 | NO | FBI S.A. Gilson | 4/10/14, 25-36 | | | 4/10/14 | 5/5/14 | SP2-12906 | Pelullo; Scarfo | "Free at last"; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |

# United States v. Scarfo:
# 170 TITLE III AND BOP AUDIO SESSIONS PRESENTED AT TRIAL

| Exhibit No. | Admitted (YES or NO) | Played / Referenced During Trial/ Testimony | Audio Played | Audio Referenced During Trial | Indictment Section | Government Admitted Exhibit List Date | Date Uploaded to Juror iPad | Session No. | Speakers | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 9027 | NO | FBI S.A.Gilson ; Gov Summation | 4/10/14, 26 | 6/5/14, 10 | | 4/10/14 | 5/5/14 | SP2-13028 | Pelullo; Scarfo | "[I feel lighter"; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |
| 9028 | NO | FBI S.A. Gilson; Gov Opening Statement; Gov Summation | 4/10/14, 27 | 1/8/14, 71; 4/22/14, 101-02; 6/5/14, 13, 19-20, 38; 6/17/14, 123 | 80(h) | 4/10/14 | 5/5/14 | SP2-13127 | Pelullo; Scarfo | "I was just a conduit"; Extensive examination of the record revealed that this exhibit was not properly admitted into evidence. |

Exhibit "E"

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA

             -vs-                    CRIMINAL NUMBER:

NICODEMO SCARFO, ET AL,               11-740

             Defendants.

Mitchell H. Cohen United States Courthouse
One John F. Gerry Plaza
Camden, New Jersey 08101
June 30, 2014

**B E F O R E**:        HONORABLE ROBERT B. KUGLER
                        UNITED STATES DISTRICT JUDGE

         **A P P E A R A N C E S**:

PAUL J. FISHMAN, UNITED STATES ATTORNEY
BY: STEVEN J. D'AGUANNO
    HOWARD J. WIENER
    ADAM SMALL
ASSISTANT UNITED STATES ATTORNEYS

MICHAEL E. RILEY, ESQUIRE
JEREMY C. GELB, ESQUIRE
ATTORNEYS FOR NICODEMO SCARFO

TROY A. ARCHIE, ESQUIRE
MICHAEL FARRELL, ESQUIRE
ATTORNEYS FOR SALVATORE PELULLO

MICHAEL N. HUFF, ESQUIRE
ATTORNEY FOR WILLIAM MAXWELL

MARK W. CATANZARO, ESQUIRE
ATTORNEY FOR JOHN MAXWELL

Certified as true and correct as required by Title 28, U.S.C.,
Section 753
         /S/ Carl J. Nami

1    DRINKER BIDDLE & REATH LLP
     BY:  BARRY I. GROSS, ESQUIRE
2    ATTORNEYS FOR DAVID ADLER

3    HOWARD BRUCE KLEIN, ESQUIRE
     JOHN JOSEPH,  ESQUIRE
4    ATTORNEYS FOR GARY MCCARTHY

5

     DONALD FRANCIS MANNO, ESQUIRE
6    PRO SE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In the Robing Room)

2          THE COURT:  What is your seat number?

3          A JUROR:  Seven.

4          THE COURT:  All right.  You asked to see me this

00:06   5    morning?  You have some concerns about the way things are

6    going?  I've said to you, do not tell me or anyone else about

7    the deliberations.  Do not tell me the specific discussions

8    about the charges and the proofs and things like that.  But

9    you've had enough concern that you want to see me.  Would you

00:07  10    like to say something now knowing that I have to and will

11    share this with the lawyers in the case.  Go ahead.

12          A JUROR:  You've -- I'm experiencing frustration

13    because in a couple of instances I finding myself feeling one

14    way where everyone feels a different way in my attempt to ask

00:07  15    them to help to understand how they feel, totally shutting me

16    down.  Complaining about how much time we're taking.  Simply

17    stating that's the way I feel.  There's no discussion.

18    Stating that their minds are made up.  That it's not going to

19    change.  It's not helping me to understand how they're viewing

00:08  20    something.  I've -- I found I feel like, you know, I haven't

21    been -- it's not good behavior.  It's just not good behavior

22    and, hum, you know, I treat people with dignity and respect.

23    I feel like they're not being that way toward me.  And I don't

24    know why.  And the only thing I can think of is two clicks,

00:08  25    different vans.  We've been riding in two different vans so it

1  created clicks is what happened.  And anyway.  So I was very

2  frustrated on Thursday.  It was a number of things, including

3  when alternate number two is not going to be a sitting juror

4  or how ever you call that.

00:08    5         THE COURT:  Well, the gentlemen alternate.

6         A JUROR:  Yes.

7         THE COURT:  We call him alternate number one because

8  now number one is going to be --

9         A JUROR:  Anyway.

00:09   10         THE COURT:  Is going to be the first thing this

11  morning with the jurors.

12         A JUROR:  Well one of the people from the other van

13  said to him welcome to hell.  Excuse me.  You know that's --

14  which was just a dig.  And anyway.

00:09   15         THE COURT:  The key question that I have is whether

16  or not you're able to continue as a juror and to remain fair

17  and impartial in this case.

18         A JUROR:  I have the capacity to do that.  I have the

19  capacity to do that.  Of course, I care about what people

00:09   20  think of me.  However, it's pretty clear that I'm never going

21  to go camping with a lot of these people and I'm pretty

22  certain that I'm going to get over that.  And they probably

23  will too.  So, I wouldn't be surprised, however, if they tried

24  to vote me off the island, if you will.

00:09   25         THE COURT:  Well, you'll be hearing from us about

1  that, the disagreements that you're having have to do with the

2  potential verdicts in this case.  Correct?

3        A JUROR:  Hum, we haven't really had a lot of debate.

4  Just, you know, it's a whole -- they're going through the

00:10   5  instructions and understanding that da,da, da.  There have

6  been a couple of times when I felt one way and everybody else

7  felt the other.  We're at logger heads.  I want to understand

8  where you're coming from.  Maybe I too can see that.  And

9  they've been totally resistant to that.  And I just find that

00:10  10  offensive.

11        THE COURT:  Okay.

12        A JUROR:  And --

13        THE COURT:  Is there anything else you want to tell

14  me about your service as a juror going forward from today?

00:10  15        A JUROR:  No.  I mean.

16        THE COURT:  Okay.  Well, of course I'll inform

17  counsel of what's transpired and then we need, and it was our

18  plan since Thursday to address the suggestion with the

19  alternate juror.  So we'll ask you to go back in the

00:11  20  deliberation room and we'll probably be coming in to get all

21  the jurors to come out in the courtroom in a short while.

22  Okay?

23        A JUROR:  `Uh-huh.

24        THE COURT:  All right.  Thank you for bringing that

00:11  25  to our attention.  I appreciate it.

1    A JUROR:  Thank you, Your Honor.

2    THE COURT:  Thank you.

3    (The matter was then concluded in the robing room)

4    (open court)

00:14    5    THE DEPUTY COURT CLERK:  All rise.

6    THE COURT:  Have a seat, everybody.

7    (Brief pause)

8    THE COURT:  We'll wait for the defendants that need

9    to come up.  Things I need to tell you about this morning.

00:14    10    (Brief pause)

11    (Defendants present)

12    THE COURT:  All right.  Let's go on the record.  I

13    have two issues to bring to your attention.  One is easy.  One

14    is not so easy.  The easy issue is I got a note from juror

00:20    15    number three.  I have a doctor appointment tomorrow.  I have

16    cancelled the appointment three times due to jury duty.  I

17    really need to go to this appointment.  If I leave by 2:00

18    p.m. tomorrow, I will be good.  Also I have the confirmation

19    of the appointment on my cell phone if you need to confirm.

00:20    20    All right, I think we can let them go early tomorrow

21    for that.

22    Now here's the more difficult issue.  Juror number

23    seven asked to see me this morning privately.  I brought her

24    in the robing room.  I brought Carl in.  Barbara was there and

00:21    25    I told her not to discuss the deliberations specifically.  Not

1  to discuss with me the issues in the case.  She feels very

2  frustrated, and you can read it because Carl took it down.

3  But she says that the vans have developed clicks and she feels

4  enormous pressure from the others to decide things the way

00:21  5  they see it.  She doesn't, and she asks for explanations.  And

6  again you can read the details.  I didn't -- we didn't go on

7  very long.  And she doesn't get what she believed are

8  satisfactory explanations.  And that's my words, not hers.

9  But she's more detailed about it.  But anyway, my only

00:22  10  question to her, of course, can you continue and can you

11  continue to be fair and impartial.  And she said yes she

12  could.  And I told her thank you and asked her to return to

13  the jury deliberation room.  Told her we would be getting all

14  the jurors out shortly anyway.  She had mentioned something

00:22  15  about the alternate, and I said we'll be dealing with that in

16  a few minutes.  But that's essentially what she said.  Anybody

17  want to say anything about that?

18        MR. FARRELL:  Your Honor, just, if Your Honor please,

19  two things.  One, could we have a possible -- strike that.

00:23  20  Could we possibly take a quick look at that transcript if it's

21  short with Carl's assistance?

22        THE COURT:  Of course you're going to get the

23  transcript.

24        MR. FARRELL:  Before the jury comes out, Judge, just

00:23  25  in case we have anything that we might want to request.

```
 1          THE COURT:  Well, look -- well, okay.  Sure.
 2    Anything else?
 3          MR. FARRELL:  Judge, we may need -- I did see my
 4    client yesterday, but apparently something has come up.  Five
 5    minutes, Judge, before the jury comes out I just simply
 6    request.
 7          THE COURT:  You're going to get five minutes because
 8    Carl's going to need five minutes to put this together.
 9          MR. FARRELL:  Yes.
10          THE COURT:  Anything else from anybody?
11       All right, that's where we are at the moment.  We'll
12    stand adjourned until Carl can rough out a transcript for what
13    the juror said to me.  Okay.
14                    (Recess)
15                    (Open court)
16          THE DEPUTY COURT CLERK:  All rise.
17          THE COURT:  Let's get everybody together.  Have a
18    seat, please.
19                    (Brief pause)
20          THE COURT:  All right.  Anybody know where Mr. Gross
21    is?  Mr. Barry Gross?
22                    (Brief pause)
23          MR. BARRY GROSS:  Your Honor.  Sorry, Your Honor.  I
24    had a note book out there I can't find.
25          THE COURT:  Well, all right.  Has everybody had a
```

1   chance to read the transcript of my discussion with the juror?

2   Anybody have anything they want to say about this before we

3   get the jury out?

4           MR. MANNO:  I do, sir.

01:03   5           THE COURT:  Go ahead.

6           MR. MANNO:  First of all, Judge, it would seem to me

7   that the jury instruction that they've already received number

8   185 covers pretty much everything this juror expressed except

9   for two things.  One is her concern about the clicks in the

01:04   10  vans coming over here.  And I would simply ask that the court

11  instruct the jury that they are not to discuss the case unless

12  all 12 jurors are present.

13          THE COURT:  She didn't say they were discussing the

14  case in the van.  She just said that --

01:04   15          MR. MANNO:  Well, I understand that, but I'm saying

16  that it may be a good cautionary thing.  It's true they cannot

17  discuss it unless all 12 are present.  We can't prevent

18  friendships from, people from developing.  So I think that as

19  a cautionary measure, they might be or they should be told.

01:04   20  The other thing is --

21          THE COURT:  Well, before we go any further.  Every

22  night when they leave, they tell me they're ready to go and I

23  go stand in there to make sure it's time to go, I tell them

24  every night when they leave, once you leave this room, you

01:04   25  cannot discuss this case or do any reading or research.

1    MR. MANNO:  Okay.  The other thing that is not

2  covered by the instruction is that she felt that there was

3  pressure, time pressure to get this thing over with.  I know

4  Your Honor has already told them when they came back with that

01:05    5  question, that there is no time pressure.  There's no time

6  restraints on them.  I would ask that this be repeated and

7  reinforced along with instruction number 185.  And it has also

8  come to our attention that apparently two of the jurors, one

9  of the alternates and one of the jurors were seen having

01:05    10  dinner at the Bone Fish Grill.  I assume Your Honor is going

11  to question the alternate about that and make sure that

12  there's been no discussion with the alternate.

13    THE COURT:  I didn't know nothing about that.

14    MR. RILEY:  Let me put that on the record just we're

01:05    15  all on the same page.  About a month and a half ago my wife

16  and I went to the Bone Fish Grill I think on a Thursday night

17  or something, walked in the restaurant.  I saw sitting

18  together seven and alternate, the gentleman that's going to

19  take that seat as an alternate on the panel and they were

01:06    20  sitting having dinner with a young woman, looks like could

21  have been the daughter of one or either of them.  I simply

22  came around the corner and when you see somebody you think you

23  recognize that's kind of out of context with someone, you

24  know, wasn't even any sign of recognition or nodding or

01:06    25  conversation, but I did note that the two of them were

1    together and felt that that was perfectly appropriate, given

2    the fact that friendships develop.  And, so, that's what Mr.

3    Manno is talking about.

4         THE COURT:  All right.  I was going to ask him

01:06    5    anyway.

6         MR. MANNO:  Okay.

7         THE COURT:  About whether he talked to anybody about

8    the case or anything look that before we formally seat him.

9         Anybody else, anything else they want to put on the

01:06    10    record?  All right.

11         MR. GELB:  Judge, I have something.

12         THE COURT:  Mr. Gelb.

13         MR. GELB:  This goes back to some comment that I

14    think I made on Thursday of last week for the record with

01:06    15    regard to my concern that this jury may have felt pressure or

16    may have been coerced into reaching a verdict with the

17    knowledge that juror now 12, juror number 12's last day was

18    the end of Thursday.  I have a concern, given the

19    communications that we've seen and particularly the juror note

01:07    20    that was sent on Thursday.  In addition to the testimony that

21    we've just read, that was in camera with you today, that this

22    juror had -- this jury, rather, has been constrained in the

23    deliberations by virtue of the knowledge that number 12 juror

24    was going to leave the jury.

01:07    25         My motion, I am making a motion for a mistrial at this

1  time, and I cite United States versus Rosalels-Rodriguez which

2  is a Ninth Circuit case decided in 2002, in which the Ninth

3  Circuit said under very similar circumstances that it was

4  inappropriate for the court to, in that case, initiate a

5  communication with the jury that a certain juror's last day

6  was going to be on a certain day.  The Court found, although

7  it did not reverse, the Court did find that the error was

8  harmless.  However, the Court did find that there was both a

9  statutory violation as well as a constitutional violation and

10  said that that was inappropriate under the circumstances.

11      I think we have a similar situation here in which this

12  jury clearly knew that juror number 12 was going to leave the

13  jury and likely was going to be replaced by an alternate.  And

14  I believe that based upon the note that we've seen where the

15  jury specifically asked the court, are we under a time

16  constraint based upon the testimony that we've just read in

17  the transcript of juror number seven today, we have a

18  substantial problem in which --

19      THE COURT:  What's the problem?  I have a brand new

20  juror with no verdicts.  What's the prejudice at this point?

21  I'm going to tell the jury to start all over again.  We took

22  no verdicts at your insistence.  What is the problem?  And I

23  never initiate any discussions with any jurors about when

24  number 12 was leaving.  She told us during this selection

25  process.  She told you repeatedly and I repeated it to you

1  that she had these vacation plans and that the last week was

2  her last week.

3          MR. GELB:  I understand that.  I'm not suggesting

4  that Your Honor in some way caused this.  We all knew that the

01:09    5  juror had vacation plans.  The difficulty that I have, Judge,

6  is I don't know whether this jury is at this point in time

7  given the amount of deliberations that have occurred, the

8  number of days that the jury has deliberated, I don't know

9  whether they can follow the Court's instruction that they

01:10   10  start is number one.  And number two, I have a concern that a

11  new juror coming into the situation where the alternate has

12  not been privy to the deliberations that have occurred thus

13  far where that juror is essentially going to be relegated a

14  non-entity.  Notwithstanding --

01:10   15          THE COURT:  Well, why do you say that?

16          MR. GELB:  Because there are cases, Your Honor, in

17  which the courts have been concerned and I think this is the

18  thrust of the Rule.  The concern is that the new juror is

19  going to be subject to the will of those jurors who are

01:10   20  already deliberating.

21          THE COURT:  How is that any different than a single

22  juror, before we lost juror number 12?  Everybody s subject to

23  the will of the majority.  That's why I gave them charge

24  number whatever it is, 185.  Twice I gave it to them, at the

01:11   25  beginning and that's the last thing I told them before they

1    started deliberating.  But that's human dynamics.  I can't --

2    we can't prevent that and nor is it improper for the jurors to

3    feel that way.  There's nothing improper about one of the

4    existing jurors, one through eleven, saying to juror, the new

5    juror, you know, we've discussed this.  I want to hear what

6    you have to say and then having heard what number 12 says,

7    says, well, I didn't change my mind.  I'm still going to vote

8    that way.  There's nothing with that.  All this does, this

9    charge is to tell the jurors that they have to listen to this

10   new juror.  If this new juror has any input and they have to

11   take into account what the new juror has to say.  I am not

12   telling them, nor could I tell them you have to change your

13   minds.  Whatever it was before, you have to change your minds,

14   because they don't have to change their minds.

15          MR. GELB:  Correct.  I'm not arguing that they could.

16   I'm pointing out what the commentary to the Rule says, Your

17   Honor.  And I'm quoting from the Committee's comments and the

18   Committee's comments quote:  From Moore Federal Practice and

19   I'm quoting.  The inherent coercive effect upon an alternate

20   who joins a juror leaning heavily toward a guilty verdict may

21   result in the alternate reaching a premature guilty verdict.

22   From United States versus Lamb.  It is not desirable to allow

23   a juror who is unfamiliar with the jury -- with the prior

24   deliberation to suddenly join the group and participate in

25   goading without the benefit of the earlier group discussion.

1    That's a quote from <u>United States versus Lamb</u>.

2         THE COURT:  And that's why the Rule was adopted to

3    require me to charge them to start over again.

4         MR. GELB:  I understand.

01:12    5    THE COURT:  There's a reason the Rule exists.  We

6    don't declare a mistrial every time you lose a juror and then

7    substitute an alternate.  What you do is you tell the jury

8    start again which is we went over the charge I'm going to give

9    them.  You all approved it and that's what I'm going to give

01:13   10    them.

11         MR. GELB:  I understand, Your Honor.

12         THE COURT:  Your motion for a mistrial is denied.

13         MR. GELB:  Thank you.

14         THE COURT:  Anybody else.  I'm not going to charge

01:13   15    them anything else on 184 -- whatever, 185 it was.  I charged

16    that during the charge.  It was the last thing I told them

17    before they began deliberating.  Clearly number seven gets it

18    because she says she's not going to change her mind.  Mr.

19    Farrell.

01:13   20    MR. FARRELL:  I just wanted to join in Mr. Gelb's

21    motion and objection.

22         MR. GELB:  Just, may I ask the Court a question?

23         THE COURT:  Sure.

24         MR. GELB:  In light of your giving the charge 7.12

01:13   25    which I believe you mentioned was not a Third Circuit pattern

|    |    |
|----|----|
| **1** | charge? |
| **2** | THE COURT:  Ninth Circuit. |
| **3** | MR. GELB:  Ninth Circuit.  Thank you.  Would Your |
| **4** | Honor also indicate that, that -- I'm just asking is the jury |
| **5** | going to get a new verdict form. |
| **6** | THE COURT:  Yes, I have 12 of them right there. |
| **7** | MR. GELB:  I assume that's why it went up on ECF. |
| **8** | THE COURT:  Yes. |
| **9** | MR. GELB:  Very good.  And you will instruct them |
| **10** | that you're giving them -- |
| **11** | THE COURT:  I'm going to be giving them the jury -- |
| **12** | MR. GELB:  Will you be saying anything at all about |
| **13** | the old form that they have been using thus far? |
| **14** | THE COURT:  The only thing I'm going to tell them |
| **15** | about the old form is if they want to throw it away, not to |
| **16** | throw it in the regular trash.  To give it to Barbara and I or |
| **17** | so it can be destroyed so nobody gets to see it.  Which is |
| **18** | we've told them about their notes -- I mean we already told |
| **19** | them we're going to destroy their notes and everything else |
| **20** | which we are doing with the juror we just lost, number 12, |
| **21** | we're going to shred her notes and the papers that she gave, |
| **22** | that she left behind.  As to the transcripts of the phone |
| **23** | conversations, we may give them back to you or we may shred |
| **24** | them.  I haven't decided yet what we're going to with that, |
| **25** | the note books that you gave them. |

01:13 (line 5)
01:14 (line 10)
01:14 (line 15)
01:14 (line 20)
01:14 (line 25)

1      MR. GELB:  Thank you.

2      MR. FARRELL:  Your Honor, if I may.  I've had an

3  opportunity over the weekend to look at additional case law

4  and on behalf of my client, we would object to the

5  substitution of the alternate juror.

6      THE COURT:  Why?

7      MR. FARRELL:  Essentially based on the comments of

8  the specific rule that would give the Court the power to

9  proceed with eleven, and in light of the representations in

10  the notes on Thursday afternoon from the jury concerning

11  unanimity as to some counts.

12      THE COURT:  Not anymore.

13      MR. FARRELL:  I understand.

14      THE COURT:  There isn't any unanimity to anything

15  with them when you start again.  But you agree that the Rule

16  specifically permits substitution of an alternate during

17  deliberations.

18      MR. FARRELL:  Yes, Your Honor.

19      THE COURT:  All right.  Anything else?  Let's get the

20  jury out, please.

21          (Brief Pause)

22      MR. CATANZARO:  Your Honor, you're going to ask the

23  alternate if he had any conversations with anybody?

24      THE COURT:  Yes.

25          (Brief Pause)

1          THE DEPUTY COURT CLERK:  All rise.

2                    (Jury present)

3          THE COURT:  All right, have a seat, ladies and

4    gentlemen.  Before we begin there's a process I have to go

5    through to seat an alternate juror.  So, sir, if you'll please

6    stand up to for a moment?  Would you raise your right hand?

7    (**JUROR**, HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

8    (EXAMINATION OF THE JUROR BY THE COURT)

9          THE COURT:  All right, sir.  Have you spoken since

10   the beginning of this case with anyone about the facts of this

11   case?

12          A JUROR:  No, sir.

13          THE COURT:  Have you spoken since Thursday afternoon

14   about this case with anyone.

15          A JUROR:  No.

16          THE COURT:  Either directly or on Social Media such

17   as Twitter or Facebook in any way, shape or form have you made

18   any comments about this case.

19          A JUROR:  No.

20          THE COURT:  Has anyone attempted to speak to you at

21   any time about this case?

22          A JUROR:  No.

23          THE COURT:  Have you done any reading or research or

24   anything at all about anybody involved in this case or any of

25   the issues in this case?

1  A JUROR:  No.

2  THE COURT:  Have a seat, sir.  Thank you.  All right,

3  with that we're going to substitute the alternate as juror

4  number 12.

5  All right.  Now, ladies and gentlemen, in this case,

6  you must start your deliberations anew.  That means you should

7  disregard entirely any deliberations that took place before

8  the alternate was seated this morning and consider freshly the

9  evidence as if the previous deliberations had never occurred.

10  Although starting over may seem frustrating, please do not let

11  it discourage you.  It is important that each juror have a

12  full and fair opportunity to explore his or her views and

13  respond to the views of others so that you may come to a

14  unanimous verdict.  All the previous instructions given to

15  you, including the unanimity requirement for a verdict remain

16  in effect.  As you know, well, at least eleven of you knew as

17  of Thursday afternoon when you asked the question, I'm telling

18  you all again, there are no time constraints whatsoever as to

19  your deliberations.  You and you alone control your schedule

20  and the pace of your deliberations.  You and you alone will

21  decide when to begin and when to end for the day.  We've had a

22  discussion before about staying late if you want, starting

23  early if you want.  That's entirely up to you.  As you know,

24  the Court can offer no guidelines as to your deliberations,

25  any conduct of your deliberations, the pace of your

1    deliberations, other than to remind you that you must follow

2    the law that I gave you in the jury instructions, including

3    that which we just discussed this morning.  I'm also going to

4    provide to juror number one 12 clean verdict sheets that you

5    may want to use.  Bring them back with you.

6         Now, as with your notes.  You may remember I told you

7    during the charge that we will destroy your notes at the end

8    of the case.  So if you want to throw away any notes, if you

9    want to throw away any sheets that you marked up, don't throw

10   them in the regular trash.  Give them to Barbara or to me so

11   we can destroy them with the other court papers that we

12   destroy.

13        With that, I ask you to begin anew your deliberations

14   and we will await to hear from you.  Thank you very much.

15             THE DEPUTY COURT CLERK:  All rise.

16          (Jury leaves the courtroom)

17             THE COURT:  Anything else?  Now, I anticipate that

18   the Government is going to be raising this issue of partial

19   verdicts again this week.  So, we should be ready for that.

20   I'm not telling you anything they told me privately.  I'm just

21   anticipating that's going to happen.

22        All right, we'll see you all when we need you.  Thank

23   you.

24             MR. MANNO:  Judge, tomorrow is two o'clock?

25             THE COURT:  Yes.

1                    (Recess while the jury deliberated)

2            (The proceedings then adjourned for the day at 4:25

3    p.m)

EXHIBIT "F"

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____

UNITED STATES OF AMERICA

      -vs-                   CRIMINAL NUMBER:

NICODEMO SCARFO, ET AL,           11-740

      Defendants.
_____

Mitchell H. Cohen United States Courthouse
One John F. Gerry Plaza
Camden, New Jersey 08101
July 2, 2014

**B E F O R E:**      HONORABLE ROBERT B. KUGLER
                      UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S:**

PAUL J. FISHMAN, UNITED STATES ATTORNEY
BY: STEVEN J. D'AGUANNO
    HOWARD J. WIENER
    NORMAN GROSS
    ADAM SMALL
ASSISTANT UNITED STATES ATTORNEYS

MICHAEL E. RILEY, ESQUIRE
SARAH BREWER, ESQUIRE
JEREMY C. GELB, ESQUIRE
ATTORNEYS FOR NICODEMO SCARFO

TROY A. ARCHIE, ESQUIRE
MICHAEL FARRELL, ESQUIRE
ATTORNEYS FOR SALVATORE PELULLO

MICHAEL N. HUFF, ESQUIRE
ATTORNEY FOR WILLIAM MAXWELL

MARK W. CATANZARO, ESQUIRE
ATTORNEY FOR JOHN MAXWELL

Certified as true and correct as required by Title 28, U.S.C.,
Section 753
      /S/ Carl J. Nami

1    DRINKER BIDDLE & REATH LLP
     BY:  BARRY I. GROSS, ESQUIRE
2    ATTORNEYS FOR DAVID ADLER

3    HOWARD BRUCE KLEIN, ESQUIRE
     BY:  YUNE LO, ESQUIRE
4    ATTORNEYS FOR GARY MCCARTHY

5

     DONALD FRANCIS MANNO, ESQUIRE
6    PRO SE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (defendants present)

2           (Open court)

3      THE DEPUTY COURT CLERK:  All rise.

4      THE COURT:  Good afternoon, everybody.  Have a seat,

03:02    5 please.  Okay.  I want to tell you a few things that I've

6 heard from jurors.  I think you should hear about this.

7      The first is and I forgot to tell you this yesterday

8 but you remember Monday when I charged the jurors that they

9 had to start deliberations anew?  And I gave them new verdict

03:02   10 sheets?  And I told them do not, if you want to dispose of the

11 old verdict sheets, don't throw them in the regular trash.

12 Give them to Barbara or to me.  Monday night at 4:30 when they

13 were leaving, I was standing in the hallway just wishing them

14 a good night.  I told them again, you're not to discuss the

03:02   15 case or do any research and all that.  And one of the jurors

16 that was -- I don't remember the seat he's in, but he's a

17 male, a younger guy.  He handed me a stack of papers and I

18 didn't really know what they were because the top paper had

19 been turned over so you couldn't see what they were and I

03:03   20 finished saying good bye.  I turned over the top paper and it

21 was the first page of the verdict sheet and had writing on it.

22 And I fanned them out to confirm what I thought was going on

23 at that time and the second one also was the first page.  It's

24 the package with the first page of the verdict sheet, it had

03:03   25 writing on it.  It seems to me that they gave me the old

1   verdict sheets that they had used before.  I gave them to Miss

2   Arthur and we are going to destroy them.  And, so, I'm just

3   bringing that to your attention because it seems that they did

4   exactly what I asked them to do.

5         The second matter I want to tell you about occurred

6   this morning.  The male alternate juror, you know we have two

7   alternates left, the female and the male.  The male I think

8   started this as alternate number six, but because of what

9   happened, he's now down to alternate number two.  He asked to

10  see me.  Miss Arthur and I sat down with him back here and he

11  told me about an incident that occurred yesterday afternoon as

12  the jurors were being driven from the courthouse to the

13  location where they keep their cars.

14        Now I don't know how much you know about that process,

15  but it's a van.  He was sitting in the first row in the van

16  right behind the driver of the van.  The driver is a

17  Deputy U. S. Marshal.  And he said he heard a conversation

18  behind him involving three of the jurors.  He gave us the

19  first names of those jurors which means nothing to me because

20  I don't know anybody's name, but obviously we can find out who

21  they are.  The numbers, the deliberating jury panel.  He said

22  he heard them talking about he described what is the mortgage

23  application and he said they were talking about the Court's

24  instructions about the mortgage application.  And he, however,

25  he said he did not hear anybody's name mentioned.  Either a

1  defendant or an attorney or anybody else connected with the

2  case.  He said he turned around and told them that he thought

3  it was an inappropriate conversation to be happening in the

4  van and asked -- and told them to stop.  He said thereafter,

03:05    5  he said he heard some whispers but he couldn't make out what

6  anybody was saying.  Nobody was talking loud enough to make

7  out what anybody was saying.  So he had no idea what they

8  talked about on the rest of the trip.  I then interviewed the

9  Deputy Marshal who was the driver of the van.  She says that

03:06   10  she did not hear any conversation involving the jurors.  And

11  remember they're behind her.  But she did hear the alternate

12  juror turnaround and tell the jurors that the conversation he

13  believed to be inappropriate and they should stop talking, and

14  that's all she knows.  That's all she heard.  So that's where

03:06   15  I am with that.  I'm just bringing that to your attention in

16  making the record.  Anybody want to be heard?  Okay.  Anything

17  else from -- anybody have anything they want to say at this

18  point?

19          MR. FARRELL:  Court's indulgence just one moment?

03:07   20          THE COURT:  Sure.

21              (Brief pause)

22          MR. D'AGUANNO:  Judge, may I just be excused to talk

23  to Mr. Gross for a minute?

24          THE COURT:  Sure.

03:08   25              (Brief pause)

```
1    MR. FARRELL:  Your Honor, if I might.

2    THE COURT:  Yes.

3    MR. FARRELL:  I wanted to -- I think Your Honor's

4  suggestion about the destruction of the two pages as opposed

5  to filing under seal is appropriate.  There's no objection to

6  Your Honor doing that as you indicated.

7    The other topic, Judge, is just an inquiry.  The

8  dialogue that you had with the alternate juror, is that -- was

9  there stenography of that, or are you reporting it essentially

10 to us as it was placed on the record?

11   THE COURT:  I don't know what you mean as it was

12 placed on the record.  No, there was -- I didn't -- I did not

13 have a stenograph -- stenographer or a court reporter present

14 because I didn't know what he was going to say.

15   MR. FARRELL:  I understand, Judge.  It was just a

16 question.

17   THE COURT:  No, there's no transcript of it.  Mr.

18 Nami was not present.  It was just Miss Arthur and I.

19   MR. MANNO:  Judge, I have a request on that matter.

20   THE COURT:  Hang on.  Let Mr. Farrell finish.

21   MR. FARRELL:  Judge, the other, and I don't believe

22 that it would be helpful or convenient or appropriate for the

23 discussions to happen frankly right now.  But I believe

24 defense counsel wants to continue to discuss the issues that

25 have been presented.
```

03:10
03:10
03:10
03:11
03:11

1          THE COURT:  Sure.

2          MR. FARRELL:  I just wanted to simply indicate to the

3     Court that we may return for relief, but we haven't yet had an

4     opportunity to adequately discuss it.

03:11    5          THE COURT:  No, I understand that.  I'm just bringing

6     this to your attention.  I did it now because you know it's

7     midway through the day.

8          MR. MANNO:  Judge, I don't want to discuss it.

9          THE COURT:  You don't have to discuss it.

03:11   10          MR. MANNO:  I have a specific request of the Court at

11     this point.  My request is that this alternate be questioned

12     under oath on the record.  It appears as though, and I know

13     the Court has been very scrupulous in instructing the jury not

14     to discuss this case unless all 12 members are present.  It

03:12   15     appears as though there's been a clear violation of that, in

16     conjunction with the juror number seven who was concerned

17     about the clicks on the various transportation vehicles.  In

18     conjunction with the fact that several of the jurors have been

19     out having dinner together, I think it is imperative that on

03:12   20     the record a clear record be made of exactly what happened.

21          THE COURT:  I just did.

22          MR. MANNO:  Well, I think that the -- ought to be

23     made on the record under oath.

24          THE COURT:  I just made it on the record.

03:12   25          MR. MANNO:  Judge, I ask --

1    THE COURT:  I have no reason to believe he would say

2  anything different than what he told Miss Arthur and I.

3    MR. MANNO:  Judge, my request is that he be

4  specifically questioned under oath on the record.

03:12    5    THE COURT:  Well, I want to hear from the rest of

6  defense counsel before we do anything.

7    MR. BARRY GROSS:  I join Mr. Manno in the sense that

8  I think if the juror contacts the Court, something I raised, I

9  believe, last Thursday morning, that there should be a record

03:13    10  made or it should be done in a note, some type of record.  Not

11  we're -- I'm not saying anything was done wrong.  I just think

12  that in the future it's probably good to have a record of all

13  these things in case --

14    THE COURT:  I just made a record of these things.

03:13    15  What I am supposed to do?  The guy says he wants to talk to

16  me.  I have no idea what he wants to talk about.  He may want

17  to tell me that he can't come in tomorrow.  I don't know.

18    MR. BARRY GROSS:  I understand, but I guess it's my

19  position, our position on behalf of Mr. Adler that the safer

03:13    20  thing is to have Mr. Nami or another reporter there in case a

21  juror comes and says something completely off the wall.  And

22  you know that I think -- and look there has been odd comments.

23  I mean the comments from juror seven was this thing, you know,

24  where she was saying about clicks and people weren't talking

03:13    25  to her and she wasn't going to ever go camping with these

1  people.  She'll be voted off the island and since they've been

2  back there doing this for two weeks, I think it's important

3  that to have that record of exactly what they say.

4        THE COURT:  I just made a record of exactly what he

5  said, but I don't think -- and getting back to number seven.

6  I don't think there was anything unusual about what she said.

7  I think it's pretty standard in long complex cases with long

8  deliberations.  I've had this many times where jurors get on

9  each others' nerves.  I mean we're human.  We're all human.

10 We asked super human things of people, particularly this jury

11 the number of weeks they've been here.

12        MR. BARRY GROSS:  I agree with that.  All I'm saying

13 is I'm glad that was on the record so we all can see it

14 because it was a concern about her.  Or she, she -- not a

15 concern about her, but she articulated concerns which

16 obviously, you know, like thankfully she then said that she

17 could continue and come to a fair and impartial verdict.

18        THE COURT:  By the way, I haven't heard another word

19 from her or anyone else about that issue.  Which it's

20 certainly encouraging to me.  But anyway.

21        Well, do you want to reconvene in a couple hours so

22 everybody has a chance to mull this over and what they want to

23 do?  There's all kinds of case law in this Circuit and other

24 Circuits.  The Supreme Court.  United States versus Console

25 case.  It happened in that case.  There's case law directly on

1  point about jurors who discuss the case after they had been

2  told not to and at lunch time and things like that.  I think

3  what you're going to find out, there's a distinction between

4  intra juror communications and extra record communications.

5  And that distinction makes a difference as to how the Court

6  should react.  But, you know, do the research and why don't we

7  meet back at three o'clock.  Is that fine with everybody?

8  Okay?

9          MR. FARRELL:  Yes, Your Honor.

10         THE COURT:  All right.  Thank you.  See you then.

11         (The matter was then in recess)

12                 (Defendants present)

13                     (Open court)

14         THE DEPUTY COURT CLERK:  All rise.

15         THE COURT:  Okay.  Have a seat.  Thank you.  We've

16  traditionally started with the government in these things, so

17  I'll start I guess Mr. Norman Gross or Mr. D'Aguanno.

18  Anything you want to say about this information that was given

19  to me by the alternate juror this morning?

20         MR. NORMAN GROSS:  Thank you, Judge.  Judge just

21  preliminarily, in looking at the case law regarding

22  allegations of jury impropriety, as you pointed out the case

23  law distinguishes between two kinds of possible errors.  One

24  is extra jury communication, outside influence, and intra

25  juror misconduct.  And the cases all say that concerns about

03:15 (lines 5, 10)
04:10 (line 15)
06:05 (lines 20, 25)

1    outside influence are much more serious than concerns

2    improprieties that are going on within the jury.  So what we

3    have what here at worst is the second kind, intra juror

4    communications.  And typically what the court's talk about

06:06    5    with respect to intra juror communication, it's improper are

6    premature deliberations and that's not what we have here.  The

7    deliberations have already started.  So any communications are

8    not premature.  The potential problem here is that some of the

9    jurors may be talking about the case outside of the jury room

06:06    10    which they've repeatedly been instructed not to do.  The other

11    thing that the cases talk about is that you have a kind of two

12    competing concerns once the jury start deliberating.  You have

13    the need for the District Court to identify and if possible

14    rectify any improprieties by the jury in the deliberations but

06:06    15    also a strong concern that the court not intrude itself into

16    deliberations, and the critical importance that jury

17    deliberations be kept secret, not only by the parties but the

18    court as well.  And, so, there's a number of cases from the

19    Third Circuit that involve problems with jurors.  Two primary

06:07    20    cases are United States versus Resko, a Third Circuit decision

21    from 1993 and United States versus Bertoli, but both of those

22    cases involved conduct that occurred before deliberations took

23    place.  So there really is not that helpful.  And Resko Judge

24    Becker ordered a new trial because all of the jurors had said

06:07    25    in response to a questionnaire that there had been premature

1   deliberations and Mr. Farrell follow-up as to whether what had

2   happened in those premature deliberations.  There's a resent

3   unprecedential opinion from the Court of Appeals.

4        THE COURT:  Carey.

5        MR. NORMAN GROSS:  Yes.  So I assume that the court

6   is familiar can with that.  It's not binding of course.  I

7   note that it is an opinion from three current judges on the

8   Third Circuit, Judges Cirica, Sloviter and Hardman.  But in

9   that case, the Court did talk about, you know, these competing

10  concerns for leaving a deliberating jury alone and the need to

11  get to the bottom of any improprieties.  In that case the

12  panel of the Court said that District Court which has

13  expansive discretion in dealing with problems that arise

14  during deliberations did not abuse its discretion because it

15  did not follow up on concerns.  More serious concerns I would

16  argue than exist here because in Carey, you had allegations of

17  premature deliberations and extra party communications that

18  took place before the jury started deliberating, but because

19  the Judge decided not to interject himself into the

20  deliberating jury, no follow up investigation was done, and

21  the Court of Appeals said that wasn't an abuse of discretion.

22       So given that backdrop, Judge, it's the Government's

23  position that the court does not have to conduct an additional

24  inquiry beyond what you've already done and that is spoken to

25  the alternate juror whose made allegations about

1  communications outside of the jury room.  We would recommend

2  at the end of the day, if we haven't received a verdict, that

3  the Court again admonish the jury about the importance of

4  keeping discussions within the jury room and in case there's

06:09    5  any misunderstanding about what that entails, we'd ask you to

6  explain to them that when you say no discussions, that means

7  no discussions about anything.  They shouldn't talk about

8  anything having to do with the case except when they're in

9  that room deliberating.  So, that would be our request.

06:10   10        THE COURT:  I'll start with down here at the

11  beginning with Mr. Gelb.  Just go down the line.

12        MR. GELB:  I'm going to defer to Mr. Catanzaro.

13  We've talked among ourselves.  He can address this issue.  I

14  may have another issue to come back to if I may.

06:10   15        THE COURT:  All right.  Having to do with this juror?

16        MR. GELB:  Not with this juror, no.  No.

17        THE COURT:  Okay.  Mr. Catanzaro.

18        MR. CATANZARO:  Your Honor, it would be our -- it

19  would be my position on behalf of Mr. Maxwell, the court

06:10   20  conduct an inquiry with the three jurors that the alternate

21  identified.  And looking at and I understand United States

22  versus Resko dealt with conversations that occurred before the

23  jury began deliberating.  I'll deal with the issue of

24  inserting Your Honor into the jury deliberation.  But in Resko

06:11   25  the issue that the court spoke about and the concern the Court

1  had was that, and I agree completely with the Government.  I

2  know the Court's looked at the cases that says the Court's

3  afforded the great deference in how it deals with these

4  issues, but what the Court said was in that particular case

5  they gave the questionnaire, the jury acknowledged, the jurors

6  acknowledged they did something wrong and that it wouldn't

7  affect their deliberative process.  And the court said that

8  there's no way for us to evaluate the deference or evaluate

9  whether there was prejudice to this particular defendants

10  because we don't know anything.

11          THE COURT:  But we do here.

12          MR. CATANZARO:  But we know, Judge.

13          THE COURT:  You don't know exactly what the jurors

14  talked about.

15          MR. CATANZARO:  They talked about the case.

16          THE COURT:  Right.  We know exactly what they said

17  from the alternate jurors.  So we know what to say.

18          MR. CATANZARO:  We know what alternates were heard

19  but there's another part of Resko that the court, the inquiry

20  could be geared to and Resko points it out when it talks about

21  it says it will affect the issues and what the court notes is

22  that the Court talks about being a difficult case.  It says

23  similarly, there is, there is no way to know the extent of the

24  discussions because he didn't hear it in detail.  He said I

25  overheard some words and he said whether they had and the

1    court goes on to say, whether they had been occurring

2    throughout the trial or whether there were only a few brief

3    conversations.

4         THE COURT:  Well are you suggesting that I question

5    our deliberating jurors as to whether or not during the course

6    of the trial they discussed this case?

7         MR. CATANZARO:  Yes.

8         THE COURT:  That's absolutely insane.  Respectfully.

9         MR. CATANZARO:  Your Honor, we know that they're

10   discussing --

11        THE COURT:  We don't have any information whatsoever

12   that they spoke about this case before deliberations began.

13   And you're asking me to interfere in the deliberations to ask

14   them if they ever spoke about this case before deliberations

15   began.  There's no basis to ask them that question.  In every

16   one of these cases every one of these cases where the Court

17   suggests you should ask further questions, the Court knew

18   through a lot of different sources that the jurors had been

19   engaging in conversations before they were supposed to.  We

20   have no information whatsoever that they did that in this

21   case.

22        MR. CATANZARO:  But we know that they're not talking

23   -- we know that at least three of them have not followed the

24   Court's instructions because --

25        THE COURT:  Yesterday.

1  MR. CATANZARO:  Because Your Honor has told us that

2  every day you admonished them to not talk about this case at

3  all.  Absent -- so we know that they're not following the

4  Court's instructions.

5  THE COURT:  We know yesterday they didn't.  I agree

6  yesterday they did not follow the Court's instructions, but we

7  have no information whatsoever that any other day they

8  violated any directive of the Court.

9  MR. CATANZARO:  Unless somebody heard it, we wouldn't

10  know.  But we now know that they do.  We know at least three

11  do not follow the Court's instructions.

12  THE COURT:  They did not yesterday.

13  MR. CATANZARO:  And we would not know any other way

14  if the court didn't make further inquiry.  We'll never know.

15  THE COURT:  What authority do I have to ask jurors

16  about things that happened six months ago?  To interrupt the

17  deliberations of the jury now on day eleven, for eleven of

18  them to ask them if six months ago they talked about this

19  case.

20  MR. CATANZARO:  Well there's serious concern that the

21  jury is talking about the case at any time, absent after they

22  were sent out by Your Honor in that room with all 12 present,

23  and we know for a fact that at least three, that Your Honor

24  doesn't want to question all 12, we know that at least three

25  don't follow your orders at least they didn't at least on one

1   occasion.

2        THE COURT:  What's the prejudice?

3        MR. CATANZARO:  Resko talks about the questioning and

4   it says, whether they had similarly there's no to know the

5   extent of the discussions whether they had been occurring

6   throughout the trial or whether they were only a few brief

7   conversations.

8        THE COURT:  What's the prejudice?  Currently what is

9   the prejudice to the defendants?

10        MR. CATANZARO:  You know and that's what there Resko

11   talks about.  Because the Court didn't do the inquiry.  They

12   presumed prejudice because you can't establish it.  We don't

13   know, we can't establish prejudice.  And that's what Resko

14   says.  Resko specifically said, we grant trial Courts great

15   deference but if the Court doesn't make the inquiry, the

16   defendants have no way to establish prejudice.  And,

17   therefore, they reversed Resko's conviction.

18        THE COURT:  I made the inquiry.  I know what happened

19   yesterday afternoon.

20        MR. CATANZARO:  I know what alternate four, now

21   alternate two overheard.  I have no idea what the three people

22   that were talking about did or thought during deliberative

23   process among the three of them.

24        THE COURT:  You want me to ask them what their

25   thought process was during the deliberative process?

1      MR. CATANZARO:  What I'm saying to the court is I

2   know what alternate two heard.  I want to know whether the

3   jury had any other discussions besides when they discussed the

4   case in the van.  Whether they formed any opinions when they

06:15    5   had those discussions in the van.

6      THE COURT:  You want them if they had formed any

7   opinions?

8      MR. CATANZARO:  From the discussions in the van.

9      THE COURT:  A deliberating juror, you want me to

06:16   10   inquire as to their opinions and when they formed them.

11      MR. CATANZARO:  Judge, if my client's prejudice as a

12   result of them having discussions outside that room with 12

13   people in it, yes, I would like to know that.

14      THE COURT:  You don't think that's going to have an

06:16   15   effect on their deliberations if I ask them the thought

16   process of the deliberations, after I promised them in my

17   charge that no one will ever know how they arrived at their

18   verdict?

19      MR. CATANZARO:  And with all due respect they

06:16   20   promised Your Honor that they would follow your orders.

21      THE COURT:  Okay.

22      MR. CATANZARO:  And they didn't.

23      THE COURT:  They didn't, yet three of them didn't

24   yesterday.

06:16   25      MR. CATANZARO:  And that's, that's my position.  I

1    don't know.  I couldn't speak for everyone.

2         THE COURT:  Who else?  Mr. Farrell.

3         MR. FARRELL:  Judge, I join in that request.  And I

4    think we also have to evaluate Resko and the need for further

5    inquiry, in light of the remarks that we have as of record

6    from juror number seven and the potential that these three may

7    be the kind of click that's being described by seven who are

8    discussing the case outside the presence of the 12 which would

9    clearly be a violation and prejudicial, Judge.  And I think in

10   the light of that context of juror number 7's remarks, that

11   it's even more significant that Your Honor conduct some

12   inquiry.  And obviously as Mr. Gross appropriately said, Your

13   Honor has broad and extensive discretion, but when you see a

14   problem, you also have an obligation to explore it, frankly,

15   as I think Resko points out to determine the harm because it

16   would be impossible to show harm otherwise with in mind that

17   you don't, you know, you're obviously guided by not wanting to

18   intrude.  But I think that ultimately the question that would

19   be an introductory question is, did you speak about it

20   yesterday, the three of you in the van and have you, in fact,

21   had discussions like that, the three of you or less than the

22   12 on other occasions and how many.  When did they begin.  And

23   at that point, Judge, you -- maybe we want to back off and

24   think about it some more.

25        THE COURT:  Isn't the damage done at that point?

1    MR. FARRELL:  Well I don't think so.

2    THE COURT:  Of a deliberating jury to inquire into

3    the thought processes?

4    MR. FARRELL:  No, Judge.  I don't want to explore the

5    thought processes.  What we want to determine is if the

6    violation was limited to yesterday and the brief remarks that

7    we've heard from the alternate, then it may not warrant taking

8    any further -- making any further inquiry.  That's not asking

9    about their opinions.  It's only asking them about the

10   violation and if it's occurred before and how many times.

11   THE COURT:  Well, the alternate juror has no

12   information whatsoever that jurors discussed the facts of the

13   case with the deliberations before yesterday.

14   MR. FARRELL:  I understand that, Judge.  But

15   obviously it was an a happenstance, a coincidence that he

16   overheard the conversation in the first place, unless we infer

17   that the jurors intended for the alternate to hear the

18   conversation, which I don't think that's fair.  I don't think

19   it supports that inference.  So I think it's supports the

20   inference that it was accidental that the alternate heard it.

21   And without exploring whether this violation has occurred on

22   other occasions, we don't know the extent of the violation.

23   THE COURT:  Explain to me, you made a reference to

24   the statements that juror number seven made.  How does that

25   connect to this?

1      MR. FARRELL:  Well, Judge, and obviously this I think

2   my point is that those remarks prompt and I think strengthen

3   our request for further inquiry.

4           THE COURT:  How?

5           MR. FARRELL:  She mentioned that there were, that

6   jurors who were refusing to discuss the matter with her.  She

7   said that there were the development of clicks.  She said that

8   she was concerned about being voted off the island.  So that

9   those remarks, Judge, may, in fact, support an inference in

10  light of this conduct that there are three jurors who are in

11  fact conducting deliberations apart from the 12 confirming 7's

12  remark and confirming that that in fact those separate

13  discussions may be occurring in other places besides in the

14  deliberation room.  She was referring, frankly, to their

15  refusing to discussion it with her in the room.

16          THE COURT:  Right.

17          MR. FARRELL:  But now we may have some evidence that

18  they're discussing it outside the room.

19          THE COURT:  I don't think she was saying they refused

20  to discuss it with her in the room.  They refused to give her

21  the explanations she said she needed to change her mind.  They

22  were discussing it but she didn't it was a sufficient

23  explanation she was getting and she kept asking for more

24  explanations and she was met with, I have don't have the

25  transcript in front of me.  That's the way I feel.  That's the

1   way I think and that's it.

2       MR. FARRELL:  I don't disagree with Your Honor but

3   the use of the words click, the use of the word voting off the

4   island, these are concerns.  If in fact there's the

5   development of these clicks who are taking it upon themselves

6   to conduct deliberation as a jury of three apart from the 12.

7   And if it only happened yesterday, and it was only the

8   momentary interchange that occurred that was overheard by the

9   alternate, then I don't believe that any further inquiry would

10  be warranted.  But without knowing the extensiveness of the

11  violation, I believe that Resko compels Your Honor should take

12  a little closer look.

13      Judge, I don't want to change topics.  I do have

14  another topic, Judge.  I'm not sure I completely understood

15  and I don't want -- as to with the prior jury's verdict sheet.

16  Whether or not the new jury has had that verdict sheet during

17  any portion or their deliberations.

18      THE COURT:  Well, they didn't give it to me until

19  Monday night.  What they did with it during the day Monday I

20  have no idea.

21      MR. FARRELL:  I understand, Judge, and that also I

22  believe, although it's different, but that I believe actually

23  might even fall into and it's a hybrid, but, you know, the

24  distinction that cases make that Mr. Gross made between intra

25  and ex parte meaning inside and outside influences, you know,

1  I'm not sure that it's kind of a hybrid because we have the

2  outside influence of the prior jurors' verdict sheet with the

3  new jury.

4          THE COURT:  How is that an outside influence?

5          MR. FARRELL:  Well --

6          THE COURT:  Because you have the -- you only had

7  eleven jurors because juror number 12 who was dismissed, we

8  had her verdict sheet.  We took that on Thursday night when

9  she left.

10          MR. FARRELL:  I understand that, Judge.

11          THE COURT:  You only had the 11 who had been

12  deliberating and continue to deliberate.  So how does that

13  make extra record interference?

14          MR. FARRELL:  I concede it, Judge, that it's a hybrid

15  in the sense that actually those eleven are now essentially

16  part of a unit, a new unit and they had work product from

17  their part in a separate unit.  Now I indicated it's imprecise

18  to say you outside and inside because it's complicated but

19  Your Honor can, what you can tell us is that the eleven had

20  their verdict sheets when new deliberations began with the 12.

21          THE COURT:  No, I can't say that.  I can say they

22  were in the room.

23          MR. FARRELL:  Okay.

24          THE COURT:  I can't tell you that they looked at them

25  or what they did with them in the room.  I have no idea.

```
 1        MR. FARRELL:  Yes, your Honor.  And with respect to
 2  exhibits requested by the prior jury, did they remain in the
 3  room?  The testimony of Freeman and Phillips and Fleming.
 4        THE COURT:  Yes, they had them in the room and
 5  they're on the I-Pads.
 6        MR. FARRELL:  That's all I've been heard on the first
 7  issue, I didn't want to change gears.
 8        THE COURT:  Well let me address the latter part of
 9  your argument you have about the verdict sheets.  I really
10  haven't got the ability of seeing that there's -- how that
11  could have an improper influence on the jury, even if they
12  kept them at their seats.  It's no different than the notes
13  that they have and have kept have kept throughout the trial
14  and whatever notes they had during deliberations.  I don't
15  think it's improper even when you put a new juror in, you tell
16  them to begin anew.  For a juror to go back and say --
17  remember there's a hundred and 70 questions to be answered.
18  For a juror to go back in his or her own notes and say you
19  know what, I'm trying to remember why it is I thought that way
20  at that time.  Oh, here it is in my notes, and discuss that
21  with the new juror.  I don't think that's improper at all.
22        MR. FARRELL:  Well, Judge, frankly I think that would
23  be analogous to their note book.  But if, in fact, they were
24  recorded voting of the unit, the prior jury.
25        THE COURT:  I can't say that.
```

1    MR. FARRELL:  Well, that's -- you know, I'm just --

2    that's what I'm trying to pin down, Judge.  I don't think my

3    thinking is complete.  But I wanted to, just to see -- so all

4    we could say is, and we don't know what's in them.  Have they

5    already been destroyed?

6        THE COURT:  I don't know.

7    MR. FARRELL:  Okay.  But my concern is that those

8    verdict sheets may reflect deliberations of the unit that were

9    then present when a new unit began deliberations.

10       THE COURT:  I don't know how we would ever know

11   without asking the jurors that.  There are markings on the

12   verdict sheets that I saw, the two front pages.  I have no

13   idea if that represented the consensus or unanimity of the 12

14   then existing jurors.  I have no way of knowing that without

15   asking them or I guess -- I mean I don't -- I mean, I didn't

16   look at them all.  So I don't know if they're inconsistent

17   with each other.  I have no idea.

18       MR. FARRELL:  I understand, Your Honor.  May I just

19   only ask that we don't destroy them until counsel has an

20   opportunity to fully discuss that issue.

21       THE COURT:  Have we destroyed them?  The ones we got

22   Monday night?  They're gone.  Shredded.

23       MR. FARRELL:  Okay.

24       THE COURT:  Sorry.  Who else wants to be heard on

25   this information from the alternate juror this morning?  Mr.

**1** Manno.

**2**        MR. MANNO:  Thank you, Judge.  Judge, in addition to

**3** my earlier comment, I join in the comments and request with

**4** co-counsel.

**5**        THE COURT:  Let me make sure I understand what the

**6** request is.  The request apparently is that I interview the

**7** three jurors.

**8**        MR. MANNO:  Well, my first request was to interview

**9** the alternate.  I understand the second request now from Mr.

**10** Catanzaro is to, one, identify the three jurors which

**11** obviously we can do but have not done.  Your Honor can do, but

**12** we can't do, and then to have them interviewed.  So I join in

**13** that request.  And I have an additional request, Judge, and

**14** this additional request is borne out of, comes from United

**15** States versus Gypson.  It's a Supreme Court decision, 438 U.S.

**16** 422, 438, U. S. 422, 1978.  And it was distinguished but

**17** considered favorably by the Third Circuit in U.S. versus

**18** Aimone 175, Fed Second, 823 F at page 830.  And that's a 1983,

**19** Third Circuit case.  The gist of the Supreme Court case was

**20** and this is a quote.  "Any ex parte meeting or communication

**21** between the Judge and foreman of the deliberating jury is

**22** pregnant with the possibility for error".  And it goes on to,

**23** discusses that particular case which is certainly not our case

**24** here.  It's a much more extreme situation than our case here

**25** but as a cautionary matter, I request that any communication

1  with this sitting jury by the court, by anybody other than

2  taking a lunch order or taking their information as to when

3  they want to sit or not sit, but any other communication be

4  done with the court reporter present as it was done with juror

06:28   5  number seven.  And my request is is that it be done that way

6  with any of the other jurors that have requested discussion

7  with the Court or anyone else, that a court reporter be

8  present to take down a verbatim actual transcript of

9  everything that occurred.

06:29   10          THE COURT:  Well, let's remember, this was an

11  alternate juror who has not been participating in

12  deliberations.  Number seven was a deliberating juror, and

13  when she told me first, and I had no court reporter present,

14  that she wanted to talk about what was going on in the jury

06:29   15  room, I got the court reporter.  This alternate, this

16  alternate never said he wanted to talk about what was

17  happening in the jury deliberation room.  This was something

18  that happened outside the jury deliberation room.  I've had

19  numerous instances where jurors have asked to see me because

06:29   20  they wanted to talk about lunches.  I'm not going to put that

21  on the record, and I'm not going to ask that it be put on the

22  record.  Jurors have asked about, have gotten me out in the

23  hallway say can I talk to you, and they want to leave early

24  because of graduation.  I'm not going to put that on the

06:30   25  record.  I don't know what they're going to say when they ask

1  to see me.  But as soon as I think it's significantly and

2  important enough and has to do I think with a deliberating

3  jury, I put it on the record.  This conversation I had with

4  this alternate lasted all of about two minutes and it was very

5  brief and very limited.  I told you exactly everything he told

6  me, except one other thing he did ask me if he was doing the

7  right thing and I assured him he was doing the right thing by

8  telling me.  But that was the entirety of the conversation

9  with him.  And I told you everything there is and made a

10  record of it.

11      All right.  Anybody else want to be heard on this

12  application that I interview -- well, identify first and then

13  interview the three jurors who the alternate overheard

14  speaking about the mortgage application and the Court's

15  instructions about the mortgage application?

16          MR. HUFF:  Judge, I join in the arguments.

17          MR. GELB:  Judge, I do as well.  And as I indicated I

18  have just another concern that I wanted to place before the

19  court.  I don't know if you want me to do that now or wait.

20          THE COURT:  Sure.

21          MR. GELB:  My other concern is consistent with the

22  concerns that I've voiced previously and that is with regard

23  to the most recent three notes that we got from the jurors

24  which I think the Court has decided you are not going to

25  respond to at the moment and those are --

1          THE COURT:  The vacation notes?

2          MR. GELB:  Yes, vacation notes.  And I think I'm

3   correct that Your Honor decided that we're not going to

4   respond directly to those at this time.  Is that accurate?

5          THE COURT:  I don't know that we're going to respond

6   at all, but I haven't decided yet.

7          MR. GELB:  Okay.

8          THE COURT:  What we're going to do in terms of who

9   stays and who goes.

10          MR. GELB:  Right.  Judge, my only concern is, as I've

11   said before, I think that I'm concerned that if these jurors

12   have decided in their mind that jury number 12 was excused

13   because of her vacation plans and if they are assuming that

14   will serve as kind of precedent for them to be excused, I

15   again am concerned that this jury is under some sort of

16   pressure or coercion or whatever you want to call it to return

17   a verdict before these vacation plans go into effect.

18          THE COURT:  Why?  I mean they know the process is

19   that if we lose somebody, we substitute an alternate.  They

20   can do the math.

21          MR. GELB:  Well --

22          THE COURT:  So why would they feel under coercion

23   under a time pressure when they know no big deal that they

24   leave, that one of the jurors leaves because we're just going

25   to get a new juror.

1    MR. GELB:  Well, the first response I would give is

2  because it involves their participation and as I said this has

3  been a six month trial and this has been a very lengthy trial,

4  they may have an interest in participating as much as possible

5  in deliberations.  Number one.

6    THE COURT:  Apparently didn't motivate number 12

7  because she left before there were any verdicts.

8    MR. GELB:  Well, I understand.  That's fine.  But my

9  point is this.  That the jurors have seen the number 12

10  request has been honored, and they may be laboring under the

11  assumption that their requests are going to be honored.  And

12  my concern is that that may present some additional pressure

13  on the part of this jury to reach a verdict prematurely, and

14  that's my concern.  I don't, I'll be honest with you, Judge, I

15  don't know what the solution is quite frankly, and I don't,

16  and I don't know that we've even arrived at that, but this is

17  a, this is I think a part of a problem that has occurred over

18  time.  And I'm not -- I don't pretend to be a mind reader.  I

19  don't know exactly what the jurors are thinking but I think it

20  is a rational conclusion that these jurors are going to use

21  number 12's experiences as a precedent, if you will, and that

22  that is going to induce some additional pressure.

23    THE COURT:  Well, I frankly don't agree with that

24  supposition.  But you've made your point.  And, you know,

25  we'll just have to see what happens.  But did you want to

|     |     |
|-----|-----|
|     | 1   respond to this request that I interview the three jurors? |
|     | 2   MR. NORMAN GROSS:  Judge, if you're inclined to have |
|     | 3   an inquiry with the jurors.  You're not.  Okay.  I've got |
|     | 4   nothing else to say. |
| 06:34 | 5   THE COURT:  All right.  Well, the request before the |
|     | 6   court is to interrupt the deliberations on day eleven of the |
|     | 7   deliberations, at least day eleven of the eleven of the jurors |
|     | 8   to ask them whether or not they've committed any misconduct at |
|     | 9   any time in the past which would take us back actually to the |
| 06:35 | 10  date that they were selected in October or November of last |
|     | 11  year.  And defendants rely on the Resko case.  And I |
|     | 12  understand their frustrations but the problem is the |
|     | 13  defendants I think I have to concede that they can demonstrate |
|     | 14  absolutely no prejudice at this point to any of the |
| 06:35 | 15  defendants, and they're looking for evidence to buttress an |
|     | 16  argument for prejudice which I don't think is supported by any |
|     | 17  of the case law in this Circuit or any other Circuit.  When |
|     | 18  misconduct is alleged, there's three things the Court is |
|     | 19  supposed to do.  Ascertain whether the misconduct actually |
| 06:35 | 20  occurred.  It did.  I have to conclude based on the statement |
|     | 21  made by the alternate and the Deputy U. S. March who confirms |
|     | 22  part of the statement made by the alternate.  Second is |
|     | 23  determine whether it's prejudicial.  And thirdly is to specify |
|     | 24  the reasons I decide it was non-prejudicial.  I frankly can't |
| 06:36 | 25  find there's any prejudice whatsoever to the defendants in |

1    this case.  There is a distinction that's made in the case

2    law, though it's not quite that direct in Resko, but it is in

3    subsequent Third Circuit cases between extra legal and intra

4    jury communications.  There's a number of cases in which the

5    Courts have written about discussions among jurors, either

6    without all 12 jurors present or before deliberations were

7    supposed to begin.  In United States versus Quesada

8    Q-u-e-s-a-d-a Garcia, 231, Federal Appendix 601 which is a

9    Ninth Circuit 2007 case.  That had to do with extrinsic

10   evidence, but there was also evidence that some jurors had

11   discussed the case without all the jurors present.  The court

12   found that the defendant had failed to demonstrate any

13   prejudice.  Therefore, affirmed the convictions.

14        In Hill versus Virga, V-i-r-g-a, 2013 West Law, 321843,

15   Northern District California, 2013 case which was a habeas

16   case.  Some jurors had been discussing among themselves

17   without all jurors present the conduct of another juror.  The

18   court held that there was no requirement there for an

19   evidentiary hearing.  United States versus Lespier,

20   L-e-s-p-i-e-r, 2012 West Law, 1032698, Western District of

21   North Carolina, 2012 relying on Fourth and Ninth Circuit

22   precedent.  In that case, the jurors were returning during

23   deliberations from a luncheon break.  They were permitted to

24   go out to a restaurant for lunch and on the way back they were

25   overheard talking about the case and one juror was overheard

1   telling the other juror about the guilt of the defendant.  In

2   that case in the Fourth and Ninth Circuits relying on, at

3   least the Judge in that case was relying on the precedent

4   Fourth and Ninth Circuit because there was no outside improper

5   influence, either the Sixth Amendment or Rule 606B requires an

6   inquiry into jury deliberations.  And the Court wrote:  Even

7   where fewer than all members of the jury engage in a limited

8   deliberation concerning the possible penalties faced by the

9   defendant, it remains a matter of internal deliberations

10  absent a showing of outside influence.  Even assuming that

11  such conduct constitutes misconduct is not the sort of conduct

12  that this court can or should directly inquire into by

13  interrogating jurors, nor is it grounds for granting a new

14  trial.  There's no reasonable possibility that the defendant

15  was prejudiced as a result of the incident at issue.  In

16  Phillips versus Moore which is 2005 West Law, 2562972 which

17  was Judge Linares of this District in 2005.  This was a 2254

18  petition on a State conviction.  And that was during a recess

19  following the instructions to the jury before the jury had

20  actually begun deliberations, two jurors were overheard

21  talking about the case.  One said he's guilty and that's all I

22  know.  If he hadn't shot the victim, he wouldn't be on trial

23  now.  In that case Judge Linares found the petitioner could

24  not demonstrate any prejudice.  U.S. versus Tahi T-a-h-i, 29.

25  F3rd, 705, Second Circuit, 1994.  The handling of allegations

1   of juror misconduct is entrusted to the sound discretion of

2   the trial court.  The court has broad flexibility in such

3   matters especially where the alleged prejudice results from

4   statements made by the jurors themselves and not from media

5   publicity or other outside influence.  In many instances the

6   Court's reiteration of its customary instructions to the jury

7   is all that is necessary.  And in this Circuit, the United

8   States versus DeSalvo, F3rd, 1204 which is a 1994 case decided

9   after Resko.  An alternate juror reported that he had

10  overheard the jurors discussing the case and the guilt of the

11  defendants when they weren't supposed to.  And there was

12  also an allegation of external influence because of media

13  reports.  In that case the District Court did interview the

14  jurors but after trial.  In United States versus Console

15  October 13 F3rd 641, Third Circuit 1993.  Again decided after

16  Resko.  Juror number one told four other jurors she had

17  discussed the definition of RICO with her sister-in-law who

18  was an attorney and her sister had indicated the conviction

19  for two Predicate Acts must result in convictions for RICOS

20  because obviously was an extra record information about a

21  trial.  The Third Circuit then, this is post Resko wrote:

22  Not every exposure to extra record information about the case

23  will require a new trial.  Moreover, allegations of juror

24  exposure to prejudicial extra record information do not

25  automatically require the court to conduct an evidentiary

1    hearing.  The court, the Third Circuit did indicate in

2    allegations of extra record information is the preferred route

3    to do an individual voir dire, but it's not necessary.  <u>Resko</u>

4    I don't think controls this case because of the significant

5    differences in <u>Resko</u>.  In that case as I've already indicated,

6    every juror indicated that they had begun deliberations before

7    they were supposed to and they had begun talking about the

8    facts of the case before the closing statements or the

9    instructions.  In fact, I believe it was day seven of the nine

10   days.  In that case the trial Court had used a two

11   questionnaire of the 12 jurors as to whether or not they had

12   discussed the case, yes or no, and whether or not it affected

13   their decision, yes or no.  Unfortunately, the trial Judge

14   gave the jurors the questionnaire in the courtroom, all 12 of

15   them together alone.  The Third Circuit pointed out the

16   problems with that kind of procedure and made a point also

17   that there's no way to know about the jurors' discussions and

18   whether the discussions in fact resulted in prejudice to the

19   defendants.

20        Well, we don't have every juror here.  We have three.

21   We know exactly what the jurors were talking about.  I don't

22   really need to interrupt a deliberating jury to find out what

23   they're talking about.  And as <u>Resko</u> noted, when there are

24   premature deliberations among jurors with no allegations of

25   external influence on the jury, the proper process for jury

1  decision-making has been violated, but there is no reason to

2  doubt that the jury based its ultimate decision only on

3  evidence formally presented at trial.  And I think if you look

4  at United States versus Carey, which is non-precedential but

5  is 2009, the Court of Appeals Judges, the three Court of

6  Appeals Judges in that case pointed out the competing

7  interests that are implicated by a Judge's intrusion into jury

8  deliberations.  On the one hand, jury misconduct, including

9  premature discussion of the trial which we don't have here and

10  influences from extra jury sources may interfere with the

11  juror's ability to fairly consider all the evidence after its

12  been presented.  That's citing the Resko case.  On the other

13  hand, the secrecy of deliberations is critical to the success

14  of the jury system, citing United States versus Boone.  A

15  District Court should be more cautious in investigating juror

16  misconduct during deliberations and during trial.  They may,

17  of course, investigate if it finds substantial evidence of

18  juror misconduct during deliberations.  In that case it didn't

19  come to the attention of the court until deliberations had

20  begun.  That there had been intra jury communication during

21  the trial before deliberations about the case.  And that case

22  also involves some extra jury communications which is not

23  important here.

24        Three jurors are discussing the application, the

25  mortgage application and the Court's instruction about the

1    mortgage application.  Should they be doing that in the van?

2    No.  But I fail to see any prejudice to any defendant.  After

3    all, it's not a <u>Resko</u> situation.  We have all 12 jurors.  It

4    takes 12 jurors to convict.  It takes 12 jurors to acquit.  I

06:47    5    was very careful in explaining to the jurors during the jury

6    charge when I went through every question of the jury

7    questionnaire and in every question of the jury questionnaire

8    pointed out that all 12 had to agree on guilty or all 12 had

9    agree on not guilty.  All 12 on the Predicate Acts had to

06:47    10   agree on yes, all 12 had to agree on no or they had no

11   verdict.  So it is impossible for me to find any prejudice

12   whatsoever when three jurors are talking about a jury charge

13   and a mortgage application when it takes 12 jurors to convict

14   or acquit in this case.

06:47    15       Accordingly, I'm denying the request to conduct any

16   inquiry whatsoever of sitting jurors this late in the process

17   as to whether or not they might have committed misconduct on

18   other occasions.  Now, you want to make another application

19   now?

06:48    20       MR. NORMAN GROSS:  Are you referring to the request

21   for partial verdicts, Judge?

22       THE COURT:  Yes.

23       MR. NORMAN GROSS:  Judge, tomorrow before the jury is

24   excused, we will ask the court to give the instruction that

06:48    25   the jury has the right to return partial verdicts.  And we

1 think that it's important to do it tomorrow because I

2 understand that some of the jurors have vacations scheduled

3 starting next week and --

4      THE COURT:  One juror starts Tuesday, two others

5 start the end of the week.

6      MR. NORMAN GROSS:  So, Judge, if that's the case,

7 then let's hold off on giving that instruction until Monday

8 because perhaps we'll get a complete verdict on Monday.  But

9 certainly no later than Monday.  We'll ask for the Third

10 Circuit standard instruction on partial verdicts.  I think

11 particularly given the fact that eleven of these jurors said

12 that they had partial verdicts and the court didn't give them

13 any guidance on whether they could return partial verdicts or

14 not.  I think that it would be appropriate at this point,

15 given the length of the deliberation, the length of the trial,

16 the danger that we are going to run out of jurors who may in

17 fact -- when in fact we may have some verdicts on some Counts,

18 something to show for the last seven months of the work of the

19 court and all the parties.  Other than a mistrial on all

20 counts.

21      THE COURT:  Well, then I'll just wait to hear your

22 application.

23      MR. NORMAN GROSS:  Thank you.

24      THE COURT:  Anybody else have anything else they want

25 to say?  As you know, the jurors indicated last night that

)6:48
)6:48
)6:49
)6:49
)6:49

06:50

07:42

07:42

07:42

07:43

1 they were staying until six and that they know they can say

2 later.  I don't know when they're going to be done.  So we're

3 just going to have to hang in until we get through.  They're

4 working now.  All right, thank you, everybody.

5      (The matter was then adjourned while the jury

6 deliberated)

7                (Defendants present)

8                  (Open court)

9      THE COURT:  All right.  Has everyone had a chance to

10 read the latest note from the jurors.

11      MR. D'AGUANNO:  Yes, Your Honor.

12      MR. FARRELL:  Yes, Your Honor.

13      THE COURT:  We feel, it says:  We feel we are close

14 to a consensus but need to sleep on it.  We've done all we can

15 today and are ready to leave.  Signed Juror Number One.

16      Anybody have any comments?  Everybody have any requests

17 at this point?  Obviously they'd like to go home.  They want

18 to go home and keep my fingers crossed they don't do anything

19 stupid.  I will tell them again, not to discuss this case.

20 Not discuss this case before tomorrow morning at 9:30.  I

21 suggest all counsel be here at 9:30 tomorrow and the

22 defendants also here at 9:30 and just hang out in close

23 proximity to this courtroom.  Sounds like they're ready to

24 deliver a verdict.

25      All right.  Well, I don't know how many questions

1    they're going to answer.  It obviously depends on the count

2    one, racketeering conspiracy as to whether or not they can

3    answer all the Predicate Act questions.  If they do, as you

4    know, it's a hundred and 70.  So it's going to take a while to

5    deliver this verdict.  Maybe an hour or so.  Always been my

6    plan to immediately get into the forfeiture.  And we all know

7    tomorrow is July 3rd and then the Fourth is a holiday on

8    Friday.  So, I'd like your suggestions and, of course, need to

9    hear from the jurors.  As I said, you're all limited to ten

10   minutes on your presentations on the forfeiture, maximum.

11   That's nine presentations because the Government can have a

12   rebuttal.  So that's 90 minutes.  As you know, the charge is

13   five pages.  So it will be five minutes.  So we're talking

14   about 90 minutes of their time before they start deliberating

15   on the forfeiture.  But -- and we don't know yet which

16   forfeiture questions they're going to have to answer because

17   we don't know whose guilty of what, if anybody.  But that is

18   my plan is to launch right into that, give them that

19   preliminary charge as to what it's all about and then go from

20   there with counsel.  And at least tomorrow, assuming we get

21   the verdict early tomorrow in the morning, at least get

22   through that 90-minute process tomorrow.  That's what I'd like

23   to do.  At least that much.

24           MR. D'AGUANNO:  Your Honor, may I ask you a question

25   relating to that?  With respect to the portion of the

1  indictment related to the forfeiture, I assume a redacted

2  version of that will go back?

3          THE COURT:  If that's what you want to do.  I don't

4  know that we need to, but I mean it's not that complicated, to

5  be honest with you.

6          MR. D'AGUANNO:  I think it would help.

7          THE COURT:  The only thing that's complicated is the

8  darn statutes are a little different, and we have to operate

9  under all the statutes.

10         MR. D'AGUANNO:  I think in this instance it may

11 actually help if the indictment does not go back because we,

12 depending upon the verdict, we may have to redact.

13         THE COURT:  I'm sure.

14         MR. D'AGUANNO:  Certain things from that, and if the

15 interrogatories are specific enough and I think they are,

16 given the length, that they may be able to just use the

17 interrogatories as the guide.

18         THE COURT:  Sounds good to me.  Everybody agree we

19 will not send back that portion of the indictment that talks

20 about criminal forfeiture?

21         MR. FARRELL:  Yes, Your Honor.

22         THE COURT:  Okay.  Anything else you want to say

23 about the plans for tomorrow?

24     Okay.  See you all tomorrow morning at 9:30 then.

25 Thank you.

1           (The matter was then concluded for the day at 4:44

2    p.m.)